**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**<br>600 Pennsylvania Avenue, N.W.<br>Washington, DC 20580<br><br>                              Plaintiff,<br><br>              v.<br><br>**PEABODY ENERGY CORPORATION**<br>701 Market Street<br>St. Louis, MO 63101<br><br>              and<br><br>**ARCH COAL, INC.**<br>One CityPlace Drive, Suite 300<br>St. Louis, MO 63141<br><br>                              Defendants. | Civil Action No. ___cv____ |

**COMPLAINT FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION PURSUANT TO
SECTION 13(b) OF THE FEDERAL TRADE COMMISSION ACT**

The Defendants, the two largest coal-mining companies in the United States, propose forming a joint venture that would eliminate the substantial competition between them. Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), by its designated attorneys, petitions this Court to enter a temporary restraining order and grant a preliminary injunction enjoining Defendants Peabody Energy Corporation ("Peabody") and Arch Coal, Inc. ("Arch"), including their agents, divisions, parents, subsidiaries, affiliates, partnerships, or joint ventures, from consummating their proposed joint venture (the "Joint Venture"). Plaintiff seeks this provisional relief pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C.

1

§ 53(b). Absent such provisional relief, Peabody and Arch (collectively, "Defendants") would be free to consummate the Joint Venture after 10:59 p.m. CST on Sunday, March 1, 2020.

Plaintiff requires the aid of this Court to maintain the status quo and prevent harm to competition during the pendency of an administrative proceeding on the merits. The Commission has already initiated that administrative proceeding pursuant to Sections 7 and 11 of the Clayton Act, 15 U.S.C. §§ 18, 21, and Section 5 of the FTC Act, 15 U.S.C. § 45, by filing an administrative complaint on February 25, 2020. Pursuant to FTC regulations, the administrative hearing on the merits is scheduled to begin on August 11, 2020. That administrative hearing will determine the legality of the Joint Venture and will provide all parties a full opportunity to conduct discovery and present testimony and other evidence regarding the likely competitive effects of the Joint Venture.

## NATURE OF THE CASE

1. This is an action to temporarily restrain and preliminarily enjoin the consummation of an anticompetitive Joint Venture between Peabody and Arch. If consummated, the Joint Venture would combine the coal mining operations and the sales operations of Defendants' coal mines located in the Southern Powder River Basin ("SPRB"). Defendants are currently—by a wide margin—the two largest producers of SPRB coal. They compete with one another to supply SPRB coal, providing substantial benefits to purchasers in the form of lower prices and other benefits. The Joint Venture would eliminate that competition and those benefits.

2. The SPRB is a large coal-bearing geological formation located in northeastern Wyoming. Defendants extract the coal and sell it primarily to power plants, which burn the coal to generate electricity. SPRB coal is attractive to electric power producers because the SPRB's coal deposits are relatively close to the earth's surface and therefore relatively inexpensive to

extract, and SPRB coal's characteristics (in particular, its sulfur content) allow electric power plants to burn significant quantities of it without violating environmental regulations. Moreover, many power plants that burn SPRB coal can face substantial switching costs if they attempt to switch to other coals, which could include installation of additional pollution-control equipment.

3. In 2018, Defendants produced more than 60% of all SPRB coal mined. Defendants collectively control more than 60% of SPRB coal reserves. The Joint Venture would significantly increase concentration in an already concentrated market, well beyond the thresholds set forth in the 2010 U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ("Merger Guidelines"). Under the Merger Guidelines, a merger or other business combination, such as a joint venture, is presumptively unlawful when it would result in a post-transaction market-concentration level above 2,500 points, as measured by the Herfindahl-Hirschman Index ("HHI"), and an increase in market concentration of more than 200 points. The Joint Venture exceeds those thresholds and is thus presumptively unlawful.

4. The Joint Venture would substantially lessen competition for the production and sale of SPRB coal by eliminating current head-to-head competition between Peabody and Arch, replacing that competition with a single producer with a greater incentive and ability to reduce output or increase prices, which would likely result in significant harm to SPRB coal customers. Other SPRB coal producers are significantly smaller than Defendants and will not make up for this lost competition. The SPRB coal market contains few competitors; aside from Defendants, only three other producers of SPRB coal are realistic options for power plants that demand SPRB coal, and none is likely to increase output or otherwise compete more aggressively to sufficiently eliminate the harm from a post-Joint Venture price increase or output reduction.

5. Due to high entry barriers, new entry into SPRB coal production is unlikely to occur in a timely manner, or on a scale sufficient to counteract the anticompetitive effects of the Joint Venture. The significant barriers to entry for SPRB coal producers include the need for substantial capital investment and the likelihood that it would take several years to begin coal production due to regulatory requirements. Expansion or repositioning by current producers is also unlikely to be sufficient to offset the Joint Venture's anticompetitive effects. Among other reasons, a significant portion of Defendants' rivals' coal reserves are more costly to extract than the coal currently mined by Peabody and Arch.

6. Defendants cannot show cognizable, transaction-specific efficiencies that would offset the likely and substantial competitive harm resulting from the Joint Venture.

7. On February 25, 2020, the Commission found reason to believe that the Joint Venture would substantially lessen competition in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45. On the same day, the Commission commenced an administrative proceeding on the antitrust merits of the Joint Venture before an Administrative Law Judge, with the merits trial scheduled to begin on August 11, 2020. The ongoing administrative proceeding provides a forum for all parties to conduct discovery, followed by a merits trial with up to 210 hours of live testimony. *See* 16 C.F.R. § 3.41 (2014). The decision of the Administrative Law Judge is subject to appeal to the full Commission, which, in turn, is subject to judicial review by a United States Court of Appeals.

8. A temporary restraining order enjoining the Joint Venture is necessary to preserve the status quo and protect competition while the Court considers the Commission's application for a preliminary injunction. Unless temporarily restrained by this Court, Defendants would be free to consummate the Joint Venture after 10:59 p.m. CST on Sunday, March 1, 2020.

9. Preliminary injunctive relief is necessary to preserve the status quo and to protect competition during the Commission's ongoing administrative proceeding. Allowing Defendants to consummate the Joint Venture before the administrative proceeding has concluded is likely to cause immediate harm to consumers, and would undermine the Commission's ability to remedy the anticompetitive effects of the Joint Venture if it is found unlawful after a full trial on the merits and any subsequent appeals.

## JURISDICTION AND VENUE

10. This Court's jurisdiction arises under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and under 28 U.S.C. §§ 1331, 1337, and 1345. This is a civil action arising under the Acts of Congress protecting trade and commerce against restraints and monopolies, and is brought by an agency of the United States authorized by an Act of Congress to bring this action.

11. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides in pertinent part;

Whenever the Commission has reason to believe –

(1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and

(2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public – the Commission by any of its attorneys designated by it for such purpose may bring suit in a district of the United States to enjoin any such act or practice. Upon a proper showing that weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond . . .

12. Defendants are, and at all relevant times have been, engaged in activities in or affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.

13. Defendants Peabody and Arch both are headquartered in St. Louis, Missouri. In addition, personal jurisdiction exists where service is effected pursuant to a federal statute. Fed. R. Civ. P. 4(k)(1)(C). The FTC Act, 15 U.S.C. § 53(b), authorizes nationwide service of process. Defendants are therefore subject to personal jurisdiction in the Eastern District of Missouri. Venue is proper in the Eastern District of Missouri under 28 U.S.C. § 1391(b) and (c), as well as under 15 U.S.C. § 53(b).

## THE PARTIES AND THE PROPOSED JOINT VENTURE

14. Plaintiff, the Commission, is an administrative agency of the United States government, established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41 *et seq.*, with its principal offices at 600 Pennsylvania Avenue, N.W., Washington, D.C. 20580. The Commission is vested with authority and responsibility for enforcing, *inter alia*, Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.

15. Defendant Peabody Energy Corporation is headquartered in St. Louis, Missouri. Peabody is the largest coal producer in the United States and the largest producer in the SPRB by production and reserves. Peabody operates three mines in the SPRB: North Antelope Rochelle, Caballo, and Rawhide. The North Antelope Rochelle mine is the largest coal mine in the world, according to Peabody. In 2018, Peabody sold 119.2 million tons of coal extracted from its three SPRB mines. Worldwide, in 2018 Peabody sold 186.7 million tons of coal, and recognized revenues exceeding $5.5 billion.

16. Defendant Arch Coal, Inc., also headquartered in St. Louis, Missouri, is the second largest coal producer in the United States, and the second largest in the SPRB by production and reserves. Arch operates two mines in the SPRB: Black Thunder and Coal Creek.

In 2018, Arch sold 79 million tons of coal extracted from these two mines. In total, Arch sold 96 million tons of coal in 2018, and recognized revenues of approximately $2.5 billion.

17. Under the terms of the June 18, 2019 Joint Venture Agreement, each firm will contribute assets comprising their respective SPRB and Colorado coal mining operations. Specifically, Peabody will contribute four mines—three from the SPRB (North Antelope Rochelle, Caballo, and Rawhide) and one in Colorado (Twentymile)—and Arch will contribute three mines—two in the SPRB (Black Thunder and Coal Creek) and one in Colorado (West Elk). In exchange for their respective contributions, Peabody and Arch will receive 66.5% and 33.5% of the noncorporate interests of the Joint Venture, respectively.

## RELEVANT MARKETS

### A. Relevant Product Market

18. A relevant product market in which to assess the effects of the Joint Venture is the sale of SPRB coal.

19. SPRB coal is distinguishable from coal mined elsewhere in the United States (*e.g.*, the Illinois Basin, the Uinta Basin located in Utah and Colorado, and coal mined in the Appalachian region) by a number of key factors that are important to electric power producers, including, but not limited to:

- Low cost of production: SPRB coal is relatively close to the earth's surface, and thus is extracted from surface mines, which generally face lower costs than underground mines. SPRB coal beds are relatively thick, which also reduces the cost of extraction, compared to thinner beds. The difference in cost is reflected in the sales price of the coal. Measured in dollars per million British Thermal Units ($/mmBTU), SPRB coal is the lowest priced coal in the United States, measured at the mine mouth. For example, the United States Energy Information Administration ("EIA") releases weekly information regarding the spot price of different coals, broken down by coal region. According to the EIA, for the week ending January 10, 2020, on a $/mmBTU basis, the spot price of Appalachian coals was more than three times the price of Powder River Basin coal, and such price differences have been persistent over time.

7

- <u>Heat content</u>:  SPRB mines yield subbituminous coal with a heat content that typically ranges from 8400 to 8800 BTU per pound, while other varieties of coal have different heat contents (for example, lignite coal typically produces less than 8300 BTU per pound, while bituminous and anthracite coal produce substantially more heat per pound, at least 11,500 BTUs).  Electric power generators typically seek to purchase coal with an appropriate BTU specification in order to run their units cost-effectively.

- <u>Low sulfur content</u>:  The sulfur content of the coal burned in coal-fired power plants is important to power generators because local, state and federal regulations limit emissions of certain pollutants, including sulfur dioxide.  SPRB coal typically has relatively low sulfur content, and thus when burned produces less sulfur dioxide than higher-sulfur coals.

- <u>Low sodium content</u>:  SPRB coal is also relatively low in sodium compared to other coals mined in the United States.  Ash is another waste product of coal combustion, and a relatively low sodium content in ash is considered desirable by power producers.

20.     Coal mined in other basins does not meaningfully constrain the price of SPRB coal in the large portions of the United States where SPRB coal can be shipped economically. Power plant generation units that burn SPRB coal rarely switch to coal from a different basin. Not only is SPRB coal the lowest-cost coal produced in the United States, environmental restrictions may prevent SPRB-burning power plants from burning coal with higher proportions of certain pollutants (such as sulfur).  In some cases, plant owners may be entirely foreclosed from burning another type of coal because the plant only has regulatory approval to burn SPRB coal.  Moreover, many power plants that burn SPRB coal can face substantial switching costs if they attempt to switch to other coals, which could include installation of additional pollution-control equipment.

21.     Industry and public recognition confirms that SPRB coal differs from non-SPRB coals.  Public sources of information, including analysis of commodity prices, routinely differentiate between SPRB coal and other types of coal.  Likewise, market participants and

8

industry analysts regularly discuss supply and demand conditions for SPRB coal separately from supply and demand for other types of coal.

22. SPRB coal prices are typically determined through direct interactions between SPRB coal producers and customers, involving a request-for-proposal ("RFP") process in which customers solicit bids from multiple suppliers of SPRB coal. Customers typically issue an RFP specifying the quantity of coal that they desire to contract for and the time period in which the coal will be delivered (often one year or two years). Based on responses to the RFP, a customer will negotiate a supply contract with one or more suppliers. While customers can also purchase SPRB coal by placing a bid on the Over-The-Counter ("OTC") spot market, due to their reliance on regular supplies of large amounts of coal for their coal-fired power plants, most customers prefer to contract with suppliers for most of their SPRB coal purchases rather than rely exclusively or primarily on OTC purchases. SPRB coal customers value the security of supply provided by a contract, and OTC prices are typically higher than individually negotiated contract prices.

23. Due to the widespread use of RFPs, SPRB coal producers typically know the identity of customers seeking to purchase SPRB coal, and are able to customize their bids based on a customer's circumstances, including the location of the customer's power plants, which impact both the plants' regulatory requirements and the shipping costs the customer will incur. SPRB coal purchasers generally negotiate shipping costs directly with railroads, without the involvement of SPRB coal producers, and greater distances typically result in greater shipping costs. Shipping costs are significant compared to the free-on-board price of SPRB coal; in many cases, shipping costs account for 50% or more of a customer's delivered cost.

24.     Power generation units designed to burn SPRB coal cannot readily replace SPRB coal with natural gas, wind, sun, or nuclear fuels.  Owners of such units cannot practicably construct new facilities that use alternative fuels in response to small-but-significant increase in the price of SPRB coal, because it is expensive and time-consuming to construct new facilities powered by natural gas, renewables, or nuclear fuels.

25.     While the total demand for SPRB coal in the economy has been falling over time, industry regulators such as EIA, and SPRB coal producers (including Peabody and Arch), expect that SPRB coal plants will continue to purchase and burn many millions of tons of SPRB coal for many years to come.

26.     Some power plants that rely on SPRB coal are owned by utilities that can also supply electricity to end-customers by (i) generating it from power plants designed to use fuels other than SPRB coal, and/or (ii) purchasing power "wholesale" from other power generators.  If SPRB coal prices were to increase by a small-but-significant amount, such utilities are unlikely to reduce their purchases of SPRB coal by enough to render the price increase unprofitable, for several reasons.  Among other reasons:

- coal-fired power plants are expensive to construct (modern plants can cost more than one billion dollars), and once a power plant operator has made such a significant investment, it has strong incentives to operate its plant, even if the price of coal increases by a small-but-significant amount;

- electricity producers often rely on coal-fired power units to run continuously to reliably supply power despite variable conditions (such as weather, natural gas pipeline constraints, and electricity grid congestion) that can render alternative power sources unreliable or unavailable; and

- a small-but-significant increase in SPRB coal producers' prices would have only a minor impact on a power generator's cost of producing electricity, due to the high transportation costs of SPRB coal and other factors.

**B. Relevant Geographic Market**

27. A relevant geographic market in which to analyze the competitive effects of this transaction is the Southern Powder River Basin. The suppliers of SPRB coal are located within the Southern Powder River Basin, and this is the region in which purchasers of SPRB coal can seek alternative suppliers of SPRB coal.

28. Further, the United States is a relevant geographic market in which to analyze the competitive effects of this transaction. SPRB coal is not sold in any significant quantities outside the United States, and even if it were, due to high transportation costs, SPRB coal customers could not defeat a price increase by purchasing SPRB coal outside of the United States and re-importing it.

29. Alternatively, relevant geographic markets could be defined based on the locations at which SPRB coal is consumed. All or nearly all SPRB coal consumed in 2018 was burned at fewer than 150 power plants; the majority was consumed by power plants located in the central United States and upper Midwest, within the states of Arkansas, Illinois, Indiana, Iowa, Kansas, Louisiana, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Oklahoma, South Dakota, Texas, Wisconsin, and Wyoming. The Joint Venture would substantially lessen competition for the sale of SPRB coal within a relevant geographic market consisting of one or more of the locations at which SPRB coal is consumed.

## THE JOINT VENTURE IS PRESUMPTIVELY ILLEGAL

30. The Joint Venture would create a single entity with a dominant share of SPRB coal reserves, and a dominant share of sales to SPRB customers. Post-Joint Venture, the combined entity would control more than 60% of SPRB coal reserves and approximately 60% or more of SPRB coal production.

31. The minority of SPRB reserves and production not controlled by Peabody and Arch are split among five producers. Two producers are vertically integrated companies that utilize their SPRB production to supply their own captive power plants: the Dry Fork mine is operated by the Western Fuels Association, a cooperative organization of power plant owners, and the Wyodak mine is owned by the Black Hills Corporation, which operates an SPRB coal-fired power plant located at the mine mouth. These mines do not meaningfully compete to supply power plants other than the captive power plants the mines currently serve. The other three producers are Navajo Transitional Energy Company, LLC, Eagle Specialty Materials, LLC, and Peter Kiewit Sons' Inc. If the Joint Venture were consummated, none of these would approach the scale of the Joint Venture: in 2018, Arch and Peabody collectively produced approximately five times the SPRB coal production of the next largest producer, and collectively controlled more than five times the SPRB coal reserves of the next largest rival.

32. The Merger Guidelines and federal courts measure concentration using HHIs. The HHI for a relevant market is calculated by totaling the squares of the market shares of each producer that sells the relevant product within the relevant geographic market. The post-Joint Venture HHI and the change in HHI (post-Joint Venture compared to pre-Joint Venture) are used to determine whether a transaction raises significant competitive concerns. A transaction is presumed likely to create or enhance market power – and is presumptively illegal – when the post-transaction HHI exceeds 2,500 and the transaction increases the HHI by more than 200 points. Both of these conditions would be satisfied by the Joint Venture in any of the three geographic markets identified above: the Southern Powder River Basin, the United States, or a relevant geographic market consisting of one or more of the locations at which SPRB coal is consumed. In each of these relevant geographic markets, whether market shares are measured by

12

SPRB coal reserves or SPRB coal production, the Joint Venture would result in HHIs over 4,500 and produce an HHI increase of at least 2,000 – far exceeding the thresholds that create a presumption of illegality.  Therefore, the Joint Venture is presumptively unlawful.

### THE JOINT VENTURE WILL PRODUCE ANTICOMPETITIVE EFFECTS

33. The Joint Venture would eliminate current competition between Peabody and Arch that benefits SPRB coal customers.

34. As the two biggest SPRB coal competitors, with large deposits of high-quality coal that can be mined at relatively low costs, Defendants often bid directly against each other in response to RFPs and other competitive opportunities to supply SPRB coal, resulting in lower prices and other benefits for customers.  The Joint Venture would eliminate this competition immediately.

35. The Joint Venture would face few rivals with significant low-cost and high-quality reserves, and would have the increased incentive and ability to reduce its output and/or increase its prices compared to the prices and output that Peabody and Arch would provide to customers but-for the Joint Venture.

36. The other, much smaller SPRB coal producers will not make up for the competition lost as a result of the Joint Venture.  Among other reasons, a significant portion of the Defendants' competitors' coal reserves are more costly to extract than the coal currently mined by Peabody and Arch.  As a result, even if Defendants' rivals had an incentive to increase output or otherwise compete more aggressively in response to the Joint Venture's post-transaction conduct, they would not be able to do so on a scale sufficient to alleviate the anticompetitive effects on SPRB coal customers.  In addition, one or more of Defendants' rivals

may be dissuaded from acting on an incentive to increase output or compete more aggressively due to an anticipated reaction by the Joint Venture.

37. Moreover, Defendants' rivals may each find it individually rational to refrain from increasing output or otherwise competing more aggressively in response to a post-Joint Venture price increase or output reduction. By reducing the number of producers in the market and significantly increasing concentration, the transaction will increase rivals' ability to predict the overall response to a price increase or other competitive initiative, thereby affecting rivals' competitive incentives and potentially emboldening price increases. Each SPRB coal producer's ability to predict rivals' responses is heightened by significant transparency regarding output, pricing, and the competitive initiatives of rival firms. In addition to mine production, mine cost, and mine capacity information, SPRB coal producers have awareness of pricing. SPRB coal producers learn about competitors' pricing during the RFP process, and each producer can (and generally does) track the OTC spot market price of SPRB coal.[1]

38. Competition from fuels other than SPRB coal will also not replace the competition lost between Peabody and Arch. Suppliers of natural gas, uranium, and renewable energy do not bid against SPRB coal suppliers in RFPs or other competitive opportunities to supply SPRB coal-fired power generation units at all. SPRB producers face relatively inelastic demand for SPRB coal because, among other reasons, SPRB coal-fired power plants have high fixed costs, their generating units are unable to use alternative fuels, and many customers are utilities subject to retail rate regulation that are able to pass through their fuel costs to their end-customers (residential, commercial, and industrial consumers of electricity).

---

[1] While some SPRB mines yield coal with different heat rates, the price of SPRB coals of differing heat rates can be compared by calculating the price per-million-BTUs (rather than the price-per-ton).

## LACK OF COUNTERVAILING FACTORS

39. Defendants cannot demonstrate that new entry or expansion by existing firms would be timely, likely, or sufficient to offset the anticompetitive effects of the Joint Venture.

40. Expansion by the existing firms sufficient to defeat anticompetitive effects in the SPRB coal market is unlikely because, among other reasons, a significant portion of Defendants' rivals' coal reserves are more costly to extract than the coal currently mined by Peabody and Arch.

41. New entry into the SPRB coal market is unlikely due to substantial barriers to entry. Firms historically enter the SPRB coal market by leasing rights to extract SPRB coal from federally owned land. Obtaining these rights typically entails a lengthy regulatory process including environmental assessments, the submission of detailed plans, and other regulatory hurdles. Moreover, new SPRB coal producers must make significant up-front financial investments in equipment and infrastructure before they are able to mine coal cost-effectively, and must be able to fund significant reclamation liabilities once the lease expires. Thus, new entry is unlikely to occur in a timely fashion on a scale sufficient to prevent a price increase by current SPRB coal producers.

42. Defendants cannot demonstrate cognizable, transaction-specific efficiencies that would be sufficient to rebut the strong presumption and evidence of the Joint Venture's likely significant anticompetitive effects.

## LIKELIHOOD OF SUCCESS ON THE MERITS, BALANCE OF EQUITIES, AND NEED FOR RELIEF

43. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the Commission, whenever it has reason to believe that a proposed transaction is unlawful, to seek preliminary injunctive relief to prevent consummation of the transaction until the Commission has had an

opportunity to adjudicate the transaction's legality in an administrative proceeding. In deciding whether to grant relief, the Court must balance the likelihood of the Commission's ultimate success on the merits against the public equities. The principal public equity weighing in favor of issuance of preliminary injunctive relief is the public interest in effective enforcement of the antitrust laws. Private equities affecting only Defendants' interest cannot defeat a preliminary injunction.

44. Here, the Commission is likely to succeed in proving that the Joint Venture is likely to lead to anticompetitive effects in the relevant market for the sale of SPRB coal, as it may substantially lessen competition in the sale of SPRB coal in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, or Section 5 of the FTC Act, 15 U.S.C. § 45.

45. Preliminary relief is warranted and necessary. Should the Commission rule, after the full administrative proceeding, that the Joint Venture is unlawful, reestablishing the status quo of vigorous competition between Peabody and Arch would be difficult, if not impossible, if the Joint Venture has already occurred. Moreover, in the absence of relief from this Court, irreversible harm to competition would likely occur in the interim, even if suitable divestiture remedies were obtained later.

46. Accordingly, the equitable relief requested here is in the public interest. The Commission respectfully requests that the Court:

    1. Enter the temporary restraining order and preliminarily enjoin Defendants from taking any further steps to consummate the Joint Venture, or any other acquisition of stock, assets, or other interests of one another, either directly or indirectly;

2. Retain jurisdiction and maintain the status quo until the administrative proceeding that the Commission has initiated is concluded; and

3. Award such other and further relief as the Court may determine is appropriate, just, and proper.

Dated: February 26, 2020

Of counsel:

IAN R. CONNER
Director
Federal Trade Commission
Bureau of Competition

GAIL LEVINE
Deputy Director
Federal Trade Commission
Bureau of Competition

DOMINIC VOTE
Assistant Director
Federal Trade Commission
Bureau of Competition
Mergers II Division

PEGGY BAYER FEMENELLA
Deputy Assistant Director
Federal Trade Commission
Bureau of Competition
Mergers II Division

MICHAEL FRANCHAK
TAYLOR ALEXANDER
JEANINE BALBACH
ALICIA BURNS-WRIGHT
STEVEN A. DAHM
AMY E. DOBRZYNSKI 5902855 (MD)
E. ERIC ELMORE
JOSHUA GOODMAN
SEAN HUGHTO
JONATHAN LASKEN
STEPHEN SANTULLI
CECELIA WALDECK

Attorneys
Federal Trade Commission
Bureau of Competition
Mergers II Division

Respectfully Submitted,

*/s/ Daniel Matheson*

DANIEL MATHESON
502490 (DC)
Deputy Chief Trial Counsel
Federal Trade Commission
Bureau of Competition
400 Seventh Street, S.W.
Washington, DC 20024
Telephone: (202) 326-2075
Facsimile:  (202) 326-2286
Email: dmatheson@ftc.gov

*Attorney for Plaintiff Federal Trade Commission*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 26th day of February, 2020, I served the foregoing on the following counsel via electronic mail:

Ted Hassi
Debevoise & Plimpton LLP
801 Pennsylvania Avenue N.W.
Washington, D.C. 20004
Tel: (202) 383-8135
Email: thassi@debevoise.com

Gorav Jindal
Akin Gump Strauss Hauer & Feld LLP
20001 K St. NW
Washington, DC 20006
Tel: (202) 887-4234
Email: gjindal@akingump.com

*Counsel for Defendant Peabody Energy Corporation*

Stephen Weissman
Michael Perry
Baker Botts LLP
1299 Pennsylvania Ave. NW
Washington, DC 20004
Tel: (202) 639-1313
Email: stephen.weissman@bakerbotts.com
Email: michael.perry@bakerbotts.com

*Counsel for Defendant Arch Coal, Inc.*

_____
Daniel Matheson
Attorney for Plaintiff Federal Trade Commission

19