UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:20-cv-00317-SEP |
| | ) | |
| PEABODY ENERGY CORPORATION | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ARCH COAL, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendant Peabody Energy Corporation ("Peabody") and Arch Coal, Inc.'s ("Arch") (collectively, "Defendants") Unopposed Motion to Modify the Protective Order (Doc. [52]) ("Defendants' Motion"), the parties' Joint Request for a Teleconference, (Doc. [64]) ("Joint Request"), and multiple motions opposing Defendants' proposed modifications to the protective order submitted by Navajo Transitional Energy Company, LLC ("NTEC"); Ameren Corporation and Union Electric Company d/b/a Ameren Missouri ("Ameren Entities"); and Peter Kiewit Sons', Inc. ("Kiewet") (collectively, "Intervenors"). Docs. [62], [68], [73].[1]

---

[1] ALLETE, Inc., Evergy, Inc., Indiana Michigan Power Company, Public Service Company of Oklahoma, Southwestern Electric Power Company, and WEC Energy Group, Inc., also moved to intervene, *see* Doc. [82], and they participated in the telephonic hearing and supplemental briefing in support of Intervenors' motions opposing the modifications, *see* Docs. [88], [98].

I. **Background**

At the request of the parties, this Court entered a preliminary protective order in this case on March 4, 2020, with the understanding that Defendants would be seeking modifications to permit certain of their employees access to information designated as "confidential material" under that order. Doc. [47]. Defendants' Motion seeking a modification to that protective order was filed on March 12, 2020. Doc. [52]. Five days later, the parties filed the Joint Request indicating that Defendants would like further modifications to the protective order, but the FTC was opposed. Doc. [64]. Between March 13th and the 23rd, Intervenors all sought intervention for the purpose of opposing the proposed modifications to the protective order.[2] Docs. [62], [68], [73]. The Court held a telephonic hearing on March 24, 2020, on Defendants' Motion, the parties' Joint Request, and the Intervenors' objections thereto. In anticipation of that hearing, the Court invited Defendants to submit limited supplemental briefing. Docs. [89], [90]. At the hearing, the Court invited the FTC and Intervenors to respond to Defendants' supplemental briefing. Those responsive briefs were filed March 26, 2020. Docs. [97], [98]. This Memorandum and Order considers all of the above-described briefing and argument.

Defendants' Motion, which the FTC did not oppose at the time that it was filed,[3] seeks a modification of the protective order that would allow one member of each of Defendants' in-

---

[2] In addition to opposing Defendants' proposed modifications to the protective order, Intervenors' motions also seek additional relief, including their own proposed modifications of the protective order. *See, e.g.*, Doc. [62] ¶ 28; Doc. [68] ¶¶ 15-16; Doc. [73] at 1 (seeking "outside counsel only" designations). NTEC's also seeks apparent remedies for alleged non-compliance by the parties with existing provisions. *See, e.g.*, Doc. [62] ¶¶ 12-14, 26 (alleging that Defendants have not provided a copy of the protective order to every entity that has received a subpoena and requesting the Court therefore add a requirement to the protective order that NTEC itself be notified of all subpoenas). This Order addresses only the parties and Intervenors' proposed modifications to the protective order. Concerns about non-compliance with existing provisions of the protective order should be raised separately as they arise—first with the parties themselves, and then, if efforts to meet and confer fail, with the Court.
[3] Later, the FTC asked the Court to impose greater limitations on Ms. Li and Ms. Klein's access to confidential material than the FTC had agreed to in consenting to Defendants' Motion. Doc. [97] at 4-5.

house legal departments (specifically, Carol Li for Peabody and Rosemary Klein for Arch) to view documents deemed "confidential material" under the protective order. Defendants' Motion would otherwise leave the protective order unchanged.[4] Although the FTC did not oppose granting access to Ms. Li and Ms. Klein, the parties agreed—and notified the Court in Defendants' Motion—that the FTC would notify "third parties that produced Confidential Information" of the proposed modification and provide them six days to object thereto before asking that the Court enter the modified protective order. Doc. [52] at 2 n.1.

During that six-day period, not only did several third parties file such objections, but the parties themselves also submitted the Joint Request, outlining a disagreement between Defendants and the FTC over proposed further modifications of the protective order. Specifically, Defendants want to allow two additional employees from each Defendant (Scott Jarboe and Alice Tharenos for Peabody; Robert Jones and Kenneth Cochran for Arch) to view confidential material under the protective order, and the FTC objects to granting such access.

Intervenors, meanwhile—coal producers and purchasers and other energy providers, all of whom have been subpoenaed by one or more parties to this litigation—object to allowing *any* of the six employees of Defendants to view confidential material they have produced or will produce in the context of this litigation. They argue that, as non-parties to this litigation, they have legitimate privacy interests, and it is unfair for their competitors or suppliers to view their most sensitive information, some of which they have developed over years and is central to their competitive business strategies.

---

[4] Counsel for the FTC originally advised this Court that they had to seek approval from the administrative law judge who will preside over the anticipated Part 3 administrative hearing before it could consent to any modification to the protective order. The Court understands the FTC's lack of opposition to Defendants' Motion to signify that counsel obtained that approval for the modifications proposed therein.

After careful consideration of the parties' written and oral arguments, the Court will grant Defendants' Motion with two modifications, outlined below. The Court will deny Intervenors' motions insofar as they oppose *any* employee of Defendants having *any* kind of access to confidential material under the protective order, but it will grant Intervenors' motions as to the further modifications proposed by Defendants in the context of the Joint Request. None of the additional four employees proposed by Defendants in the Joint Request will have access to confidential material under the protective order. As described below, the Court will also grant NTEC's request for one additional safeguard against disclosure of confidential material.

**Legal Standard**

Federal Rule of Civil Procedure 26(c) allows for the issuance of a protective order upon a showing of good cause. *See Monsanto Co. v. Pioneer Hi-Bred Int'l, Inc.*, No. 4:12-cv-1090-CEJ, 2014 WL 1211111, *1 (E.D. Mo. Mar. 24, 2014). "Rule 26(c) is highly flexible, having been designed to accommodate all relevant interests as they arise. . . . [T]he 'good cause' standard in the Rule is a flexible one that requires an individualized balancing of the many interests that may be present in a particular case." *United States v. Microsoft Corp.*, 165 F.3d 952, 959–60 (D.C. Cir. 1999).

Here, the Court must balance Defendants' interest in "a fair opportunity to help prepare their defense to the FTC's challenge," Doc. [64] at 1, and the risk of serious competitive harm to third parties, including Intervenors, who have been compelled to produce sensitive information for inspection by Defendants, who are their competitors or suppliers. *See* Doc. [98] at 4-5; *see also F.T.C. v. Advocate Health Care Network*, 162 F.Supp.3d 666, 671-72 (N.D. Ill. 2016) ("[W]e are not talking about an exchange of documents between two sides in a lawsuit. We are

talking about a number of third parties, not targets of any FTC action, who had to give up exceedingly confidential information in response to a government subpoena.").

In such situations, courts often try to balance the relevant interests by requiring third parties to produce their sensitive information for use in the lawsuit but issuing a protective order to prevent that information from falling into the hands of "competitive decision-makers"[5] at rival corporations. *Intervet, Inc. v. Merial Ltd.*, 241 F.R.D. 55, 57 (D.D.C. 2007). In a seminal case, *U.S. Steel Corp. v. United States*, 730 F.2d 1465 (Fed. Cir. 1984), the United States Court of Appeals for the Federal Circuit noted that involvement in competitive decisionmaking "may well be" grounds for disqualifying certain in-house counsel from seeing confidential material submitted by third parties, but the court stressed that these cases are highly fact-dependent and not susceptible to brightline rules. 730 F.2d at 1468. Accordingly, the Federal Circuit rejected a categorical distinction between "in-house" and "retained" counsel and encouraged courts to focus instead on "[w]hether an unacceptable opportunity for inadvertent disclosure exists," as "determined . . . by the facts, on a counsel-by-counsel basis." *Id.*

Following *U.S. Steel*, courts have focused on involvement in competitive decisionmaking and, more fundamentally, on the risk of inadvertent disclosure: "The primary concern underlying the 'competitive decision-making' test is not that lawyers involved in such activities will intentionally misuse confidential information; rather, it is the risk that such information will be used or disclosed inadvertently because of the lawyer's role in the client's business decisions." *F.T.C. v. Sysco Corp.*, 83 F. Supp. 3d 1, 3-4 (D.D.C. 2015) (citing *Brown Bag*

---

[5] The Federal Circuit has defined "competitive decisionmaking" as "shorthand for a counsel's activities, association, and relationship with a client that are such as to involve counsel's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor." *U.S. Steel Corp. v. United States*, 730 F.2d 1465, 1468 n.3 (Fed. Cir. 1984).

*Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992), and *Carpenter Tech. Corp. v. Armco, Inc.*, 132 F.R.D. 24, 27 (E.D. Pa. 1990)). *See also Matsushita Elec. Indus. Co. v. United States*, 929 F.2d 1577, 1580 (Fed. Cir. 1991); *Advocate Health Care Network*, 162 F.Supp.3d at 667-668; *United States v. Aetna Inc.*, No. 1:16-CV-01494 (JDB), 2016 WL 8738420, at *5 (D.D.C. Sept. 5, 2016); *Saint Alphonsus Med. Ctr. v. St. Luke's Health Sys.*, No. 1:12-CV-00560-BLW-RE, 2013 WL 139324, at *4 (D. Idaho Jan. 10, 2013) ("the very nature of competitive information makes it difficult to compartmentalize.")).

Accordingly, this Court understands its task to be to assess—"by the facts, on a counsel-by-counsel basis" *U.S. Steel*, 730 F.2d at 1468—whether each of the individuals for whom Defendants seek access to confidential material presents *too great* a risk of inadvertent disclosure, keeping in mind that the risk of harm to third parties must be balanced against Defendants' very substantial interest in having access to discovery materials that may be used in the case against them. *See Brown Bag Software*, 960 F.2d at 1470.

**Analysis**

Defendants' six designees divide helpfully into three categories, which the Court will address in turn.

1. **Carol Li (Peabody) and Rosemary Klein (Arch)**

The Court finds that Ms. Li and Ms. Klein present minimal risk of inadvertent disclosure of confidential material, and that the risk is outweighed by the disadvantage to Defendants of inhibiting their in-house litigation counsel's involvement in their defense.

Defendants have persuaded the Court that Ms. Li and Ms. Klein are vital contributors to Defendants' litigation of this case. For Peabody, Ms. Li exercises operational oversight over this litigation and outside counsel. Doc. [90-1] ¶ 12. She is the employee who will provide outside

counsel with the day-to-day detailed guidance they will need to litigate this case, and if she cannot review draft and final briefs or expert reports containing confidential information, her involvement in Peabody's defense will be substantially impaired. *Id.* ¶ 13. For Arch, Ms. Klein set up and ran the "clean team" during the FTC's investigation of the joint venture. Doc. [89-1] ¶ 13. She coordinates directly with outside counsel on a day-to-day basis regarding legal strategy and is one of only a few individuals at Arch with comprehensive knowledge of the transaction. *Id.* ¶ 9. She intends to be an active member of the trial team, which will be substantially more difficult if she is categorically excluded from reviewing any confidential material. *Id.* ¶ 12.

On the other side of the balance, no one has contested Defendants' claims that neither Ms. Li nor Ms. Klein plays any role in competitive decisionmaking nor poses any appreciable risk of inadvertent disclosure. Doc. [90-1] ¶ 7; Doc. [89-1] ¶ 6. In fact, the FTC originally did not object to modifying the protective order to allow these two attorneys access to confidential material. *See* Doc. [52] at 2.

Intervenors' primary counterargument to Ms. Li and Ms. Klein is that their roles in the future may change such that the risk of inadvertent disclosure would be greater than it is now. Doc. [98] at 5. Of course, that is possible; the future is uncertain. But on the evidence before the Court, Ms. Li and Ms. Klein both appear to have exclusively legal experience and current portfolios. *See* Doc. [90-1] ¶ 4; Doc. [89-1] ¶ 5. There is no evidence that they have any qualifications that would suit them for competitive decisionmaking roles. Unlike the other attorneys Defendants seek access for, there is no suggestion that either Ms. Li or Ms. Klein regularly participates in strategy meetings outside her respective company's legal department.[6]

---

[6] Ms. Klein reports that she has "approximately five times" attended an Executive Leadership Team meeting to deliver a 10-15-minute presentation. Doc. [90-1] ¶¶ 8, 9. The Court does not regard that as

7

The Court cannot find that the entirely speculative possibility that Ms. Li or Ms. Klein might someday be in a position to disclose confidential material to competitive decisionmakers outweighs the cost to Defendants of denying their most integrally involved in-house litigators full access to the evidence adduced against them.

Li and Klein are the employees of Defendants who have the greatest operational, day-to-day involvement with this litigation. They are lawyers, not businesspeople, and neither is currently, or ever has been, involved in any competitive decisionmaking on behalf of their companies; nor have Intervenors or the FTC raised any grounds for realistic concern that they will be in the future. To deny Ms. Li and Ms. Klein access to confidential material while permitting it to outside counsel would be to apply the overly formalistic distinction between in-house and external counsel that the Federal Circuit forbade in *U.S. Steel*. 730 F.2d at 1468 (noting that in-house counsel are equally officers of the court and subject to the same codes of professional conduct as outside counsel).

Because the Court finds that permitting Ms. Li and Ms. Klein to view confidential material would not pose an undue risk of inadvertent disclosure, it will grant the proposed modification of the protective order to allow them access to confidential material.

**2. Alice Tharenos (Peabody) and Kenneth Cochran (Arch)**

By contrast, the Court finds that providing Ms. Tharenos and Mr. Cochran access to confidential material would present a substantial risk of inadvertent disclosure, outweighing any disadvantage to Defendants of denying them access to confidential materials.

---

comparable to, for example, Mr. Jarboe's attendance of "weekly Executive Leadership Team meetings, the periodic Board of Directors meetings, the monthly Business Performance Reviews, the monthly Marketing Matters meetings, and the weekly Global Development Steering Committee meetings." Doc. [90-2] ¶ 6.

The second pair of prospective designees are at the opposite end of the spectrum from the first. Unlike Ms. Li and Ms. Klein, Ms. Tharenos and Mr. Cochran *are* businesspeople and are *not* lawyers. Doc. [90-3] ¶¶ 4, 13; Doc. [89-3] ¶¶ 3, 4, 9. Asked directly by the Court, Defendants were unable to cite a single instance in which a court has granted non-lawyers the kind of access to competitor and customer data that they are asking this Court to grant to Ms. Tharenos and Mr. Cochran. Transcript of Tel. Conf. at 21:14-20 (Mar. 24, 2020) (Doc. [96]).

The nearest example Defendants could provide was *F.T.C. v. Sysco*, in which, counsel claimed, the court required that the FTC provide redacted affidavits for review by businesspeople. *Id.* at 21:21-22:10 (referring to *F.T.C. v. Sysco Corp.*, 83 F. Supp. 3d 1 (D.D.C. 2015)). This Court has been unable to find any order requiring the provision of affidavits stripped of confidential information to businesspeople in *Sysco*, but it did find an order requiring the FTC to provide the names of declarants to Sysco employees. Order, *FTC v. Sysco*, No. 1:15-cv-00256 (APM) (D.D.C. Mar. 18, 2015). Unfortunately, whether to provide Defendants' corporate employees with the names of declarants (or redacted affidavits, for that matter) is not the question before this Court. Instead, Defendants have asked this Court to grant Ms. Tharenos and Mr. Cochran access to *all* information designated as "confidential material" under the protective order. Doc. [64] at 1-2. *Sysco* provides no support for granting Mr. Cochran and Ms. Tharenos that level of access. In fact, the district court in *Sysco* denied such access to an attorney whose activities brought him merely "within the orbit" of competitive decisionmaking activities. *Sysco*, 83 F.Supp.3d at 4. *Sysco* certainly does not support granting full access to employees who actually *are* businesspeople.

The Court also does not find in the record any reason to conclude that the need for Ms. Tharenos and Mr. Cochran to view confidential material outweighs the risk of harm to third

9

parties of their competitively sensitive information being reviewed by businesspeople who work for Defendants. Both individuals claim that they will be better able to help with the litigation with such access. Doc. [90-3] ¶¶ 11-12; Doc. [89-3] ¶¶ 7-8. But like the attorney excluded in *Sysco*, Ms. Tharenos and Mr. Cochran are

> not in any way prevented from imparting [their] personal knowledge of the [coal] industry, [their employers'] business operations or the proposed merger to assist outside counsel. Though this restriction may somewhat diminish [their] ability to advise [their employers,] the court must strike a balance between [Defendants'] ability to prepare and present [their] defense and the interest of third parties in avoiding the inadvertent use or disclosure of their confidential information.

*Sysco*, 83 F.Supp.3d at 4. In this case, that balance weighs against granting access to businesspeople.

This is not to discount Ms. Tharenos and Mr. Cochran's promises not to disclose any confidential material, of course. *See* Doc. [89-3] ¶ 11; Doc. [90-3] ¶ 15. The probability of willful disclosure is not what this Court is bound to assess; rather, it's the risk of *inadvertent* disclosure. *See U.S. Steel*, 730 F.2d at 1468. That risk is plainly substantially higher for an employee whose experience and expertise are in "directing and overseeing [a coal] company's mining operations, procurement, safety initiatives, and development projects," Doc. [89-3] ¶ 3, even if his contact with competitive decision-makers is "on a social basis" *id.* ¶ 5, than it is for an in-house litigation attorney who has no business expertise or operational experience in the coal industry. And the risk of inadvertent disclosure is even higher for an employee whose *current* responsibilities include "integrational planning and transition services relating to acquisitions and joint ventures," Doc. [90-3] ¶ 3, and who attends "Business Performance Reviews," "Marketing Matters meetings," and "Global Development Steering Committee meetings," *id.* ¶ 6.

Peabody's counsel frankly acknowledged that it could not predict what role Ms. Tharenos would play at Peabody in the future. Doc. [96] at 45:14-15. Arch stressed that Mr. Cochran is "semi-retired," as if to suggest that he is unlikely to exercise any responsibility for competitive decisionmaking in the future, Doc. [96] at 21:6, but no one asserted definitively that he certainly would not, nor could they have. There is nothing about being "semi-retired" that would prevent Mr. Cochran from being involved in competitive decisionmaking in the future, any more than it has prevented him from "being a member of the 'clean team' that was responsible for evaluating the expected synergies from the proposed joint venture." Doc. [89-3] ¶ 4; *see Steuben Foods, Inc. v. GEA Process Eng'g, Inc.*, No. 12-CV-0904S(SR), 2013 WL 12238482, at *3 (W.D.N.Y. July 2, 2013) (finding good cause to preclude access to retired executive working as a consultant where he was involved in the activity underlying the dispute). As observed with respect to Ms. Li and Ms. Klein above, uncertainty about future career paths can be a reason to exclude even members of companies' legal teams from viewing confidential documents. *See, e.g.*, Order at 2, *United States v. Deere*, No. 16 C 08515 (N.D. Ill. Apr. 26, 2017). Although the Court did not find that a persuasive argument against Ms. Li and Ms. Klein on the facts presented, the Court does find it a compelling concern about Ms. Tharenos and Mr. Cochran.

For all of these reasons, the Court finds that the risk of inadvertent disclosure of third parties' sensitive information is too great to grant Defendants' request to include Ms. Tharenos and Mr. Cochran among those who may access confidential material under the proposed order.

### 3. Scott Jarboe (Peabody) and Robert Jones (Arch)

Although the third category of designees is a closer call, the Court finds that the risk of inadvertent disclosure by Mr. Jarboe and Mr. Jones is too great to allow them access to confidential materials under the protective order.

Mr. Jarboe is the Chief Legal Officer of Peabody and Mr. Jones, the General Counsel of Arch. Both provide comprehensive legal counsel to their respective employers and Boards of Directors and have ultimate supervisory authority over all litigation. Doc. [90-2] ¶¶ 3, 13; Doc. [89-2] ¶ 3. Crucially, though, they also both claim significant industry expertise and non-legal responsibility within their companies, and both acknowledge that they regularly participate in meetings of corporate leadership at which competitive decisions are at least discussed, if not "made." Mr. Jones, for example, has been with Arch for nearly 30 years, claims to be "knowledgeable about Arch's operations and the energy industry overall," and admits to "see[ing] various reports and attend[ing] Executive Meetings, including Board Meetings where the status of our sales commitments and production forecasts are discussed . . . ." Doc. [89-2] ¶¶ 4, 6. Similarly, Mr. Jarboe, who has been with Arch for more than 10 years, "stay[s] informed regarding the current status of generation sources, plant closures, and announcements from utilities about power plant closures, as well as supply and demand forecasts," and he attends "weekly Executive Leadership Team meetings, the periodic Board of Directors meetings, the monthly Business Performance Reviews, the monthly Marketing Matters meetings, and the weekly Global Development Steering Committee meetings." Doc. [90-2] ¶¶ 4, 6.

Notwithstanding the above, both Mr. Jarboe and Mr. Jones deny involvement in competitive decisionmaking on behalf of their employers. Doc. [90-2] ¶¶ 5, 7; Doc. [89-2] ¶ 5. The Court has no reason to doubt either their truthfulness or their commitment to using confidential material only in the defense of this litigation. Doc. [89-2] ¶ 15; Doc. [90-2] ¶ 20. Nevertheless, given their substantial roles in the strategic leadership of their respective companies, the Court concludes that granting them access to the competitively sensitive data of competitors and customers would create an unacceptably high risk of inadvertent disclosure. *See*

*Sysco*, 83 F.Supp.3d at 4 ("Mr. Libby's membership on the Executive Team brings him well within the orbit of Sysco's competitive decision-making activities.") (internal citation omitted); *see also PhishMe, Inc. v. Wombat Sec. Techs., Inc.*, No. CV 16-403-LPS-CJB, 2017 WL 4138961, at *9 (D. Del. Sept. 18, 2017) (denying access to General Counsel after weighing risk of inadvertent disclosure against harm to movant from restriction); *Cytosport, Inc. v. Vital Pharm., Inc.*, No. CIV S-08-2632 FCDGGH, 2010 WL 728454, at *3 (E.D. Cal. Mar. 2, 2010) ("If the CEO is not a lawyer, query who will advise him on such issues. Questions such as the extent that in-house counsel will be advising the employer on such legal issues as input on contract formation, marketing, and employment are important [in this inquiry].").

Undoubtedly, Mr. Jones and Mr. Jarboe will be considerable assets to Defendants' litigation teams, even without access to confidential materials. Like Ms. Tharenos and Mr. Cochran, Mr. Jones and Mr. Jarboe will not be sidelined by this decision. They will still be "able to assist outside counsel and advise [Defendants] on litigation strategy. [They] will have access to redacted final and draft pleadings, expert reports, affidavits, and deposition transcripts, and to discovery not designated as Confidential Material." *Sysco Corp.*, 83 F. Supp. 3d at 4. And like Tharenos and Cochran, they will still be free to impart their expertise—in their cases, both industry-related and legal—to outside counsel. *See id.* Also like their business-side colleagues, they may be marginally less effective in providing that advice due to their lack of access to confidential material. Still, the Court does not believe that the marginal advantage to Defendants of granting a second member of each in-house legal staff access to confidential material outweighs the very real risk to Intervenors from their competitively sensitive data being provided to members of Defendants' executive leadership. *Id.* (denying access to a second member of in-

13

house counsel with close connections to executive board where court had granted access to one in-house counsel already).

### 4. Additional safeguards for confidential information

The Court expects all parties to comply strictly with every term of the protective order and believes that they will. Still, in deference to Intervenors' legitimate concerns for the security of their confidential materials, the Court will make the following two modifications to the proposed modified protective order already submitted by the parties (Doc. [52-1]):

(1) As requested by NTEC in its motion to intervene (Doc. [62] ¶ 27), Ms. Li and Ms. Klein will be required to attest in writing that they will fully comply with the protective order. The requirement should be added to the protective order itself, and attestations completed by Ms. Li and Ms. Klein should be appended to the final protective order submitted by the parties pursuant to this Order.

(2) The final protective order will contain the following penalty provision, as an added incentive against misuse of confidential material:

> Any violation of this Order will be deemed a contempt and punished by a fine of $250,000. This fine will be paid individually by the person who violates this Order. Any violator may not seek to be reimbursed or indemnified for the payment the violator has made. If the violator is an attorney, the Court will deem the violation of this Order to warrant the violator being sanctioned by the appropriate professional disciplinary authority, and the Court will urge that authority to suspend or disbar the violator.

### 5. No "Outside Counsel Only" designation

Intervenors and, in its supplemental briefing, the FTC have requested that, if this Court grants any of Defendants' employees access to confidential material under the protective order, it further modify the protective order to permit third parties to designate especially sensitive materials as viewable by "Outside Counsel Only." Doc. [62] ¶ 28; Doc. [68] ¶¶ 15-16; Doc. [73]

at 1; Doc. [97] at 4-5. Defendants object that creating such a classification would essentially effect no change to the current, unmodified protective order, because third parties will simply shift to classifying all of their information as "Outside Counsel Only," leaving Defendants in precisely the same predicament they are in now. Doc. [96] at 30:7-15.

The Court cannot tell at this point if Defendants' prediction is cynical or sound, but it harbors its own significant concerns about the administrability of a two-tiered protective order, especially given the expedited timeline on which this case is proceeding. Those concerns, together with the Court's confidence in the ability of Ms. Li and Ms. Klein to avoid inadvertent disclosure of confidential material, persuade the Court to deny the requests for an "Outside Counsel Only" designation. *See generally United States v. Aetna Inc.*, No. 1:16-CV-01494 (JDB), 2016 WL 8738420, at *10 (D.D.C. Sept. 5, 2016) (rejecting two-tier protective order where it would have required re-designation of large swathes of confidential materials in a case litigated on a highly expedited schedule).

## Conclusion

For the reasons outlined above, Defendants' Motion (Doc. [52]) is **GRANTED**, and their proposed modified protective order (Doc. [52-1]) will be entered, subject to the modifications described above. Intervenors' motions (Docs. [62], [68], [73]) are **GRANTED** in part and **DENIED** in part as outlined above.


**IT IS HEREBY ORDERED THAT**, no later than 5 PM CT on the date following the entry of this Order, the parties should submit a final protective order incorporating the above modifications for immediate entry by this Court.

Dated this 1st day of April, 2020.

_____
SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE