# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| FEDERAL TRADE COMMISSION<br><br>Plaintiff,<br><br>v.<br><br>PEABODY ENERGY CORPORATION<br><br>and<br><br>ARCH COAL, INC.,<br><br>Defendants. | Case No. 4:20-cv-00317-SEP<br><br>REDACTED VERSION OF<br>DOCUMENT FILED UNDER SEAL |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF FEDERAL TRADE COMMISSION'S MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ........................................................................1

II.   STATEMENT OF FACTS ..............................................................................5

   A.   Electricity Generation and Distribution. ................................................5

   B.   The Commerical Realities Have Radically Changed In Recent Years. ...............7

   C.   Coal Production, Distribution, and Sale. ................................................10

   D.   The Joint Venture. ..........................................................................12

III.  THE FTC BEARS A HEAVY BURDEN OF SHOWING THAT THE JOINT
      VENTURE SHOULD BE ENJOINED. ...........................................................14

IV.   THE FTC CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS. ..................15

   A.   The FTC Fails to Establish an "SPRB Coal Only" Market. ...............................16

      1.   The *Brown Shoe* Factors Demonstrate that an "SPRB Coal Only" Relevant
           Product is Fatally Flawed. ........................................................18

      2.   The Hypothetical Monopolist Test Does Not Support the FTC's Overly Narrow
           Product Market Definition. .......................................................31

      3.   The FTC's Reliance on the 2004 *Arch Coal* Decision Is Misplaced and Does
           Not Reflect Today's Commercial Realities. .......................................38

   B.   THE FTC FAILS TO ESTABLISH LIKELY ANTICOMPETITIVE EFFECTS. ............39

      1.   Sophisticated, High-Volume Customers Promote Competition and Have
           Multiple Levers to Resist Anticompetitive Effects. ..............................40

      2.   The FTC's Competitive Effects Analysis Requires the Court to Assume the
           Joint Venture Would Pursue an Irrational Business Strategy. .....................44

      3.   The Joint Venture Will Enhance Competition by Substantially Lowering Costs
           and Providing Better Pricing and Services to Customers. ..........................45

V.    THE EQUITIES WEIGH IN FAVOR OF THE JOINT VENTURE. .............................50

VI.   CONCLUSION .......................................................................................50

# TABLE OF AUTHORITIES

## CASES

*Brown Shoe Co., Inc. v. United States*,
   370 U.S. 294 (1962) ..................................................................... 17, 18, 31

*FTC v. Arch Coal, Inc.*,
   329 F. Supp. 2d 109 (D.D.C. 2004) ...........................................*passim*

*FTC v. Butterworth Health Corp.*,
   946 F. Supp. 1285 (W.D. Mich. 1996) ...........................................41, 47

*FTC v. Cardinal Health, Inc.*,
   12 F. Supp. 2d 34 (D.D.C. 1998) ....................................................17

*FTC v. Exxon Corp.*,
   636 F. 2d 1336 (D.C. Cir. 1980) ....................................................14

*FTC v. Freeman Hosp.*,
   69 F.3d 260 (8th Cir. 1995) .....................................................16, 39

*FTC v. Great Lakes Chem. Corp.*,
   528 F. Supp. 84 (N.D. Ill. 1981) .................................................35, 42

*FTC v. H.J. Heinz Co.*,
   246 F.3d 708 (D.C. Cir. 2001) .......................................................50

*FTC v. Lab. Corp. of Am.*,
   2011 WL 3100372 (C.D. Cal. Mar. 11, 2011).......................................50

*FTC v. Nat'l Tea Co.*,
   603 F.2d 694 (8th Cir. 1979) ....................................................14, 50

*FTC v. Penn State Hershey Med. Ctr.*,
   838 F.3d 332 (3d Cir. 2016), ...................................................48, 49

*FTC v. RAG-Stiftung*,
   2020 WL 532980 (D.D.C. Feb. 3, 2020).....................................15, 34, 39, 42, 45

*FTC v. Sanford Health*,
   926 F.3d 959 (8th Cir. 2019) ................................................15, 16, 17

*FTC v. Staples, Inc.*,
   970 F. Supp. 1066 (D.D.C. 1997) ..............................................16, 46

*FTC v. Tenet Health Care Corp.*,
   186 F.3d 1045 (8th Cir. 1999) ...............................................*passim*

*H.J., Inc. v. IT&T Corp.*,
   867 F.2d 1531 (8th Cir. 1989) ................................................................ 16, 17, 25, 29

*Little Rock Cardiology Clinic PA v. Baptist Health*,
   591 F.3d 591 (8th Cir. 2009) ...............................................................................16

*Menasha Corp. v. News Am. Marketing In-Store, Inc.*,
   354 F.3d 661 (7th Cir. 2004) ...............................................................................30

*Mo. Portland Cement Co. v. Cargill, Inc.*,
   498 F.2d 851 (2d Cir. 1974) ................................................................................14

*New York v. Deutsche Telekom AG*
   2020 WL 635499 (S.D.N.Y. Feb. 10, 2020)..............................................*passim*

*New York v. Kraft Gen. Foods, Inc.*,
   926 F. Supp. 321 (S.D.NY. 1995)........................................................................36

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
   792 F.2d 210 (D.C. Cir. 1986) .............................................................................17

*Science Prods Co. v. Chevron Chemical Co.*,
   384 F. Supp. 793 (N.D. Ill. 1974) ........................................................................17

*Se. Missouri Hosp. v. C.R. Bard, Inc.*,
   642 F.3d 608 (8th Cir. 2011) ................................................................... 4, 17, 25

*State of Illinois ex rel Hartigan v. Panhandle E. Pipe Line Co.*,
   730 F. Supp. 826 (C.D. Ill. 1990)........................................................................35

*U.S. v. Archer-Daniels-Midland Co.*,
   781 F. Supp. 1400 (S.D. Iowa 1991)....................................................................41

*U.S. v. AT&T, Inc.*,
   310 F. Supp. 3d 161 (D.D.C. 2018) .....................................................................33

*U.S. v. AT&T, Inc.*,
   916 F.3d 1029 (D.C. Cir. 2019) ...........................................................................45

*U.S. v. Baker Hughes Inc.*,
   908 F.2d 981 (D.C. Cir. 1990) ................................................................ 15, 16, 39, 40

*U.S. v. Country Lake Foods, Inc.*,
   754 F. Supp. 669 (D. Minn. 1990) .......................................................................40

*U.S. v. Gen. Dynamics*,
   415 U.S. 486 (1974) ..........................................................................................4, 15

*U.S. v. Gen. Dynamics*,
341 F. Supp. 534 (N.D. Ill. 1972) ............................................................4, 15, 18, 28, 29, 40

*U.S. v. Long Island Jewish Med. Ctr.*,
983 F. Supp. 121 (E.D.N.Y. 1997)...................................................................................47

*U.S. v. Marine Bancorp., Inc.*,
418 U.S. 602 (1974) .........................................................................................................15

*U.S. v. Oracle*,
331 F. Supp. 2d 1098 (N.D. Cal. 2004).............................................................................33

*U.S. v. Sabre Corp.*,
2020 WL 1855433 (D. Del. Apr. 7, 2020)....................................................18, 28, 31, 36, 39

*U.S. v. SunGard Data Sys Inc.*,
172 F. Supp. 2d 172 (D.D.C. 2001) ............................................................................ 38, 39

## STATUTES

15 U.S.C. § 53(b) .....................................................................................................................14

## OTHER AUTHORITIES

Horizontal Merger Guidelines ........................................................................................*passim*

Defendants Peabody Energy Corporation ("Peabody") and Arch Resources, Inc. (f/ka Arch Coal, Inc.) ("Arch") respectfully submit this brief in opposition to the Motion for Preliminary Injunction (DE 137) filed by the Federal Trade Commission ("FTC").

## I.    **PRELIMINARY STATEMENT**

"[A]ntitrust theory and speculation cannot trump facts" and reality. *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 116 (D.D.C. 2004).  But, for the second time in 16 years, the FTC's challenge to a coal producer combination offends this common-sense principle by relying on an unduly narrow market and ignoring competitive realities that virtually everyone else recognizes.

Here are the facts: (1) the coal industry currently faces the possibility of what one customer termed a ██████████████████████[1] (2) due to economic, technological, and regulatory developments that have caused substitution toward natural gas and renewables, electricity generated by coal-fired units has dramatically declined; (3) recent trends driving interfuel substitution for electricity generation, including sustained low natural gas prices, subsidized renewable generation, and increasing societal pressure relating to carbon emissions, are expected to continue, if not strengthen in the future; (4) electricity generators are retiring their coal-fired units, reducing their coal purchase volumes, and foregoing or deferring contracted coal deliveries because they are utilizing other forms of generation instead; (5) these competitive realities have caused the demand for coal, including coal produced in the Southern Powder River Basin ("SPRB"), to plummet, driven coal prices down, shrunk coal producer margins, and driven many major coal producers into bankruptcy; and (6) the only way for coal producers to try to remain competitive with natural gas and renewables is to further reduce costs. That is precisely what the joint venture between Peabody and Arch (the "Joint Venture") is designed to do—combine adjoining and complementary mining assets, realize significant cost savings achievable only through the Joint Venture, use those efficiencies to provide better pricing and service, and compete more effectively against other fuels.

---

[1] ████████████████████████████████████████████████████

A broad range of customers and industry participants, including even the FTC's own witnesses, recognize the Joint Venture's procompetitive nature and the many powerful constraints that the Joint Venture will face.  For example, ███████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████[2]  Likewise, customer ██████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ██████████████████████[3]  Another utility customer, ████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ █████████████████████[,][4] ████ ████████████████████████████████████ ████ ████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████[5]

Against this undisputed factual backdrop, the FTC, over Commissioner Wilson's dissent, asks this Court to take the extraordinary step of blocking the Joint Venture—and thereby undermine the competitive future of Defendants, their shareholders, their employees, and ultimately their customers—based on little but outdated assumptions and antitrust theories that are inconsistent with commercial realities.  The FTC's case hinges on flawed expert analyses that do not account for the dynamic competition facing coal producers from other fuels, and the

---

[2] ███████████████████████████████████████████████████████████████████ The FTC included ██████ on its initial witness list.

[3] ███████████████████████████████████████████████████████████████████████████████.  The FTC included ██████ on its initial witness list.

[4] ███████████████████████████████████████████████████████████████████████

[5] ██████████████████████████████████ ███████████████████████████████████████████████████████████████████.

testimony of select, unrepresentative customers whose own public statements and deposition testimony belie the FTC's theory and any credible concerns about a potential reduction in competition.  As an executive from ████████ an FTC witness, conceded, there is ███████████ ████████████████████████████████████████████████████████████[6] Just as in in *Arch Coal*, the FTC's reliance on theory and speculation is wholly insufficient to meet the FTC's heavy burden to show that Joint Venture's ***probable***—not just possible—effect will be to substantially lessen competition in a relevant antitrust market. The Court should deny the FTC's request for preliminary injunctive relief for multiple reasons.

*First,* the FTC cannot meet its threshold burden to establish its alleged relevant antitrust market.  While the FTC alleges a narrow SPRB coal market, that assertion is both directly contradicted by the competitive realities and premised on the faulty notion that the competitive dynamics facing SPRB coal remain basically the same as they did sixteen years ago. Indeed, seemingly everyone ***but*** the FTC and its expert, including government agencies, coal customers (including many of the FTC's witnesses), coal producers, and industry analysts, recognizes the simple truth that coal, both today and increasingly in the future, is in fierce competition with natural gas, renewables, and other fuels. Notably, the U.S. Energy Information Administration ("EIA"), the FTC's sister agency and the "premier source for energy information,"[7] recently stressed that "[t]he increased availability of low-priced natural gas has been the biggest factor in decreasing coal-fired generation,"[8] and, just this month, highlighted the unrelenting competition coal faces from natural gas and renewables, noting that coal's 45% share of electricity generation in 2010 plummeted to 24% in 2019, with further declines projected in the future.[9]

The competitive constraints natural gas and renewables place on coal are borne out not only in the extensive testimony in this litigation, but also in the day-to-day conduct of market participants and empirical and event study analyses demonstrating substitution among fuels in

---

[6] ████████████████████████████████
[7] *See* EIA Mission Overview, available at https://www.eia.gov/about/mission_overview.php.
[8] DX8012 (EIA, "U.S. coal-fired electricity generation in 2019 falls to 42-year low," 5/11/20).
[9] DX8010 (EIA, "Short-Term Energy Outlook Supplement: Summer 2020," 6/20) at 4-5.

both the short and long term.  Rather than confront this indisputable fact, the FTC invites this Court to put blinders on, draw an artificial barrier around SPRB coal based on economic theories that cannot be squared with the competitive realities, and presume that increased concentration in that contrived market dooms the Joint Venture.  While achieving a presumption of illegality through such theoretical and legal gymnastics may be the only way that the FTC can try to prove its case, this Court cannot countenance such an approach consistent with the Supreme Court's command to judge "the probable anticompetitive effects of the merger" "functionally" and based on "a further examination of the particular market—its structure, history and probable future." *U.S. v. Gen. Dynamics*, 415 U.S. 486, 498 (1974), *aff'g, U.S. v. Gen. Dynamics*, 341 F. Supp. 534, 555-56 (N.D. Ill. 1972) (rejecting challenge to coal company merger and holding relevant market "must encompass interfuel competition" based on weaker facts than present here).

In its brief, the FTC emphasizes examples of Peabody and Arch competition and testimony from select customers that believe they benefit from that competition.  Peabody and Arch are undoubtedly competitors, as are all other producers of SPRB coal; but that does not prove that the relevant market is limited to SPRB coal. Rather, "[d]etermining the limits of a relevant product market requires identifying the choices available to customers," focusing on "how consumers will shift from one product to the other in response to changes in their relative costs." *Se. Missouri Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 613 (8th Cir. 2011) (citations and quotation marks omitted).  And the evidence shows that electricity generators *already* (even without a hypothetical post-closing price increase the FTC posits) shift from SPRB coal to other fuels in response to changes in those fuels' relative costs.

***Second***, the FTC cannot meet its burden to establish that the Joint Venture is likely to have anticompetitive effects.  Even if SPRB coal alone were a relevant antitrust market (it is not), the commercial realities—including sophisticated customers with many levers to ensure competitive pricing, fierce interfuel competition, other coal producers with excess capacity and every incentive and intention to continue to vigorously compete, ever-decreasing coal demand, and the threat posed by coal retirements—will constrain any purported effort by the Joint

Venture to increase prices. To find a likelihood of anticompetitive effects, this Court would have to conclude that Defendants will pursue a strategy contrary to their stated intentions, unsupported by any evidence, and entirely irrational—indeed, ***self-defeating***—given dynamic competition and intensifying substitution away from coal to other fuel sources.

Nothing supports the hypothesis that the Joint Venture will engage in anticompetitive price hikes; instead, the Joint Venture will enhance competition. ███████████████████ ████████████████████████████ ████████████████████████ ████████████████████████████████████████ ██████████████████████████ By contrast, the Joint Venture will unlock transformational efficiencies that will reduce coal's cost relative to other fuels, increase output, provide additional blending capacity and improved service, and ensure a stable coal supply.

In short, rather than confront the commercial realties of electricity generation and coal production, the FTC ignores them, instead focusing on incomplete economic models purporting to bolster their dated view of energy markets.  The FTC cannot meet its burden to show that the Joint Venture is likely to have anticompetitive effects in any relevant antitrust market or that the equities favor injunctive relief, and the FTC's Preliminary Injunction Motion should be denied.

## II.      <u>STATEMENT OF FACTS</u>

### A.      ELECTRICITY GENERATION AND DISTRIBUTION.

The electricity ultimately supplied to consumers is generated at power plants owned by investor- or publicly-owned utilities and cooperatives, independent power producers, or the government.[10] Each power plant has one or more electricity generating units ("EGUs"), which use any one of several types of generating technologies to transform the energy in fuels, such as uranium, coal, oil, natural gas, and sunshine, or the force of wind or tides of flowing water, into electricity.[11]   Electricity output is measured in megawatts, and each megawatt of electricity is

---

[10]   DX4001 (Expert Report of Dr. Elizabeth M. Bailey ("Bailey Report")) ¶ 10.  Dr. Bailey is a Lecturer in Finance at the Wharton School of Business and former Executive Director of the Energy Institute at the Haas School of Business.  All references to the "Bailey Report" are to DX4001.

[11]   *See id; see also* DX4005 (Expert Report of Julie M. Carey ("Carey Report")) ¶ 6.  Ms. Carey is a Managing Director at NERA Economic Consulting and adjunct professor at Georgetown University

interchangeable (indeed, identical) regardless of the fuel used to generate it.[12]

Approximately two thirds of all U.S.-generated electricity is managed through regional electricity markets known as Independent System Operators ("ISOs") or Regional Transmission Organizations ("RTOs").[13]   These organizations conduct daily auctions to match regional electricity demand from providers (*e.g.* utility companies) with electricity supply offers from generators to ensure reliable and cost-effective electricity service.[14] To ensure cost-efficiency, ISOs/RTOs employ "merit order dispatch" to select the lowest cost electricity available—regardless of how it was generated—to meet anticipated electricity demands. Once the ISO/RTO sets the dispatch price, EGUs offered to the ISO/RTO market at or below that price (regardless of fuel type used to generate the megawatt) are "called" to run and the generator sells that EGU's electricity to the ISO/RTO at the dispatch price.[15]  By contrast, EGUs offered to the ISO/RTO market above that price do not run.[16]  Merit-order dispatch by ISOs/RTOs thus forces all EGUs to compete to generate electricity regardless of fuel type.[17]  In geographic areas not covered by an ISO/RTO, vertically integrated electrical utilities, such as the Tennessee Valley Authority ("TVA") and Southern Company, generate, transmit, distribute, and sell electricity.[18]  They in effect function as mini-ISOs, employing similar methods to ensure system reliability and cost-effectiveness, including merit-order dispatch.[19]   Regulated utilities—which may pass certain costs onto rate-payers—are not immune to the effects of merit-order dispatch.[20]

Electricity supply and demand are reflected on an electricity dispatch curve, which plots

---

with over twenty five years experience analyzing the wholesale electricity sector and electricity generation fuels.  All references to the "Carey Report" are to DX4005.

[12] Bailey Report ¶ 10.

[13] Carey Report ¶ 12; Bailey Report ¶ 12, Ex. 4.

[14] Carey Report ¶¶ 13, 27-32; Bailey Report ¶ 13; ████████████████████

[15] Carey Report ¶¶ 13, 27-32; Bailey Report ¶ 13.

[16] Uneconomic dispatch due to congestion or self-commitment is limited. *See* Carey Report ¶¶ 41, 57

[17] Bailey Report ¶ 13; DX4003 (Expert Report of Mark A. Israel, Ph.D. ("Israel Report")) ¶¶ 37-38.  Dr. Israel is a Senior Managing Director at Compass Lexecon and specialist in industrial organization and applied econometrics.  All references to the "Israel Report" are to DX4003.

[18] Carey Report ¶ 14; Bailey Report ¶ 14; ████████████████████

[19] Carey Report ¶¶ 14-16; Bailey Report ¶ 14.

[20] DX4006 (Carey Rebuttal Report) ¶ 14.

EGUs offered from lowest to highest cost.[21]  Different EGU types occupy different areas of the curve based largely on their fuel costs.  Units that generate electricity at little or no variable cost, such as nuclear, wind, solar, and hydroelectric generation, are bid into the market at those low costs, appear at the curve's bottom left, and are first to run and dispatch if available and needed to fulfill anticipated energy demand.[22]  EGUs that generate electricity from fossil fuels have higher variable costs depending upon their operating and fuel costs (*e.g.,* the price of natural gas, coal, or oil), among other factors.[23]  Coal, natural gas, and oil EGUs typically bid at their variable costs, appear further up the dispatch curve, and if needed to meet anticipated electricity demand, will be called to run in least-cost order.[24]  Due to now abundant, low-cost natural gas, coal EGUs have been displaced on the dispatch curve.[25]  As dispatch curves reflect, an individual EGU's competitiveness will be driven by its relative costs, fuel cost being a primary driver.[26]

## B.    THE COMMERICAL REALITIES HAVE RADICALLY CHANGED IN RECENT YEARS.

The commercial realties have significantly changed in the past fifteen years.  Due to the development of hydraulic fracturing and other technological advancements that created the shale gas boom, natural gas production costs have been greatly reduced.[27]  ██████████████████████████████████████████████[28]  Since 2008, natural gas prices have fallen over 75%—from over $8/mmBTU to less than $2/mmBTU.[29]  New, highly efficient combustion cycle gas turbines have made natural gas EGUs much more efficient.[30]  This combination—cheap natural gas and more efficient natural gas EGUs—has made natural gas generation much more

---

[21] Carey Report ¶¶ 103-07; Bailey Report ¶¶ 13-14; *see also* ██████████████
[22] Carey Report ¶¶ 85, 108; Bailey Report ¶ 34.
[23] Carey Report ¶¶ 30, 108-12; Bailey Report ¶¶ 28, 33-34; ██████████████
[24] Carey Report ¶¶ 28, 30, 99, 102-07; Bailey Report ¶¶ 13, 34, 54; ██████████.
[25] Carey Report ¶¶ 108-112.
[26] Bailey Report ¶¶ 28, 33, 54, 64; Carey Report ¶ 30; ██████████.
[27] Bailey Report ¶ 17; Israel Report ¶¶ 49-50.
[28] ██████████.
[29] Bailey Report ¶ 17 & Ex. 7.
[30] Bailey Report ¶ 17.

cost-effective,[31] led many utilities to construct and rely heavily on natural gas EGUs, and resulted in natural gas EGUs frequently displacing coal EGUs in the dispatch order.[32]

At the same time, government bodies concerned about pollution and carbon emissions introduced subsidies and other policies to encourage investment in renewable generation,[33] and electricity generators directed capital investments accordingly.[34] Coal generation, on the other hand, was subjected to stringent environmental and regulatory policies that made coal-fired EGUs more difficult and costly to operate and maintain.[35] These developments transformed the relative operational costs of coal-fired generation compared with alternative fuel sources, causing electricity generators to dramatically shift away from coal-fired generation by investing in new renewable and natural gas EGUs and idling or permanently retiring their coal EGUs.[36] Between 2010 and the first quarter of 2019, U.S. power companies announced the retirement of more than 546 coal-fired EGUs totaling 102 gigawatts of generating capacity, with plans to retire more in the near future.[37] This trend of utilities retiring coal EGUs and replacing them with natural gas and renewable EGUs has continued into 2019 and today.[38]

These changing conditions have turned electricity generation and coal production on their heads.[39] In 2004, coal was widely considered "baseload" electricity generation, and was responsible for nearly 50% of all electricity generation in the United States.[40] By 2019, coal's

---

[31] Israel Report ¶ 49; *see also* ███████████████████

[32] Bailey Report ¶¶ 28-35; Carey Report ¶¶ 93-94; Israel Report ¶ 53.

[33] ██████████████.

[34] ██████████████████████

[35] ██████████████████

[36] Bailey Report ¶ 18.

[37] DX8009 (EIA, "More U.S. coal-fired power plants are decommissioning as retirements continue," 7/26/19).

[38] DX8008 (EIA, "Electricity Monthly Update" 1/27/20), at 2-3; DX8707 (S&P Global, "Low winter gas prices shaping up to be 'another nail in the coffin' for coal," 1/27/20).

[39] ████████████SSMPA wrote in its 2019 Annual Report, "[l]ow natural gas prices and an abundance of wind and solar energy have flipped the regional operating model. Until recent years, coal-fired plants ran at high levels, and renewables supplemented that baseload energy. Now low-cost natural gas and renewable generation provide much of the daily base, with coal generation filling in the gaps." DX2094 (SMMPA 2019 Annual Report), at 6.

[40] Bailey Report ¶ 18. Baseload refers to EGUs that run continuously throughout the year. *Id.* ¶ 31.

share of electricity generation had fallen to 24% (by Q1 2020, it fell to less than 18%), and coal is no longer considered baseload.[41] ███████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████[42] Natural gas generation and renewables have displaced coal as leading fuels, and together now account for a growing 55% of all U.S. electricity generation.[43] These shifts are not the result of increasing electricity demand, but instead reflect a structural shift away from coal to other fuels.[44]

Consistent with this shift from coal to natural gas and renewables, SPRB coal production has dramatically declined. Since reaching a peak of 452 million tons ("mmt") in 2008, aggregate SPRB coal production decreased by over 40% to 267 mmt in 2019,[45] with accelerating decline projected in 2020. Similar large-scale declines in coal production and purchasing are observed in firm-level data for Peabody, Arch, and their customers.[46] Over the same period, although the number of SPRB coal producers has remained the same, producers' SPRB coal profit margins have halved,[47] and SPRB coal prices have fallen due to competing fuels' low prices.[48]

---

[41] Bailey Report ¶¶ 18, 31; *see also* ██████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
[42] ████████████████████████████ ████████████████████████
[43] Carey Report ¶¶ 6-7.
[44] Bailey Report ¶ 18 & Ex. 9. In other words, the denominator (total electricity generation) has remained the same or gotten bigger while the numerator (coal-fired generation) has dropped.
[45] Bailey Report ¶ 21 & Ex. 11.
[46] Bailey Report ¶¶ 21-22, ██████████████████████████████████
████████████████████████████████████████████████████████
[47] ████████████████████████████ *See* Bailey Report ¶ 23 & Exs. 17, 19.
[48] Bailey Report ¶¶ 22-27; *see also* ███████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████.

These trends are not expected to abate in the future.  Since the FTC initiated its investigation of the Joint Venture in June 2019, natural gas prices have continued to fall[49] and are widely projected to remain low for years,[50] the share of electricity generated by natural gas and renewables has continued to rise, and coal's has continued to fall.[51] Coal EGU retirements have accelerated and exceeded expectations, and generators continue to invest further in renewable and natural gas generation.[52]  Industry analysts , forecast that "prices for natural gas, perhaps coal's biggest competitor in North American power generation [will] remain low through the early 2020s," observe that "[a]dditional shutdowns of coal-fired power plants and persistently low natural gas prices will undercut" future coal demand, and now project thermal coal demand will decrease by an additional 25% this year.[53] The challenges posed by interfuel competition have caused significant workforce reductions at all SPRB mines in recent months.[54]

## C.   COAL PRODUCTION, DISTRIBUTION, AND SALE.

A portion of U.S.-produced thermal coal is mined in the Powder River Basin ("PRB") of Wyoming and Montana. There are twelve mines in the SPRB and four mines in the PRB's northern part ("NPRB").[55] Within the U.S., significant thermal coal production also occurs in other locations, including the Illinois Basin ("ILB").

Arch and Peabody operate coal mines throughout the U.S. (and, for Peabody, Australia), including metallurgical[56] coal mines and thermal coal mines outside the SPRB.  In the SPRB,

---

49 ███████████████████████

50 ████████████████████████████████████████████████████████████
████████████████████████ Although the FTC's expert claims SPRB prices are projected to grow faster than natural gas, that conclusion is based on his misleading decision to compare future projections exclusively to the historically low natural gas prices prevalent in 2020. The sources he relies on confirm that natural gas prices are projected to remain low (well below $2.50/MMBtu, and lower than in 2019) for the foreseeable future.  DX4002 (Bailey Rebuttal Report) ("Bailey Rebuttal") ¶¶ 70-75.

51 Bailey Report ¶ 18.

52 DX8010 (EIA, "Short-Term Energy Outlook Supplement: Summer 2020," 6/20) at 5 ("[T]he sustained low prices of natural gas have led the industry to retire a significant amount of coal-fired generating capacity and to add more natural gas-fired generating capacity.").

53 DX8694 (Moody's, Coal – North America Report, 5/31/20).

54 DX8698 (Casper Star Tribune, "Powder River Basin coal mine furloughs nearly 100 workers," 5/11/20) (noting "mass layoffs throughout the [PRB] this year" due to "weak market conditions").

55 The NPRB mines include the Decker Mine, Spring Creek, Absaloka Mine, and the Rosebud Mine.

56 Metallurgical coal or "coking coal" is used to produce steel.

Arch operates the Black Thunder and Coal Creek mines and Peabody operates the North Antelope Rochelle Mine ("NARM"), Caballo, and Rawhide mines.[57] Five other companies produce coal in the SPRB from seven mines.  These include NTEC, which operates the Antelope and Cordero Rojo mines, Eagle Specialty Materials ("Eagle"), an affiliate of FM Coal, which operates the Eagle Butte and Belle Ayre mines, Peter Kiewit Sons, Inc. ("Kiewit"), which operates the Buckskin mine, Black Hills, which operates the Wyodak Mine, and WFA, which operates the Dry Fork mine.[58]  Due to low gas prices, declining coal demand and historically higher production, these SPRB coal producers all have substantial excess capacity.[59]   Indeed,

███████████████████████████████ ████████████████████████████████████████████

████████████[60]  The combination of low natural gas prices, coal displacement by natural gas and renewables, declining production, and low margins have strained SPRB coal producers, many of which have declared bankruptcy and undergone restructuring processes, including Peabody, Arch, Cloud Peak Energy, Inc. ("Cloud Peak"), Alpha Natural Resources ("ANR"), and Blackjewel LLC ("Blackjewel").[61]  This instability has at times led to supply disruptions and concern among customers about the long-term reliability of SPRB coal supply.[62]

Coal historically has been sold pursuant to long-term coal supply contracts.[63]   These contracts typically are at least one year in duration and are for an agreed quality, volume (or volume range), and price and are frequently the product of a sealed and highly confidential bidding process conducted by large, sophisticated customers through requests for proposal

---

[57]  Bailey Report ¶ 1.
[58]  Bailey Report ¶ 88.
[59]  Bailey Report ¶ 91; ████████████████████████████████████████████████
[60]  ███████████████████████
[61]  Peabody filed for bankruptcy protection in April 2016 and emerged in April 2017. Arch filed for bankruptcy protection in January 2016 and emerged in October 2016. Cloud Peak operated the Antelope and Cordero Rojo mines prior to filing for bankruptcy in May 2019. Those mines were subsequently acquired by NTEC. ANR operated the Belle Ayr and Eagle Butte mines  prior to filing for bankruptcy in August 2015. Those mines were subsequently acquired by Contura and then Blackjewel, which filed for bankruptcy in July 2019, and then by Eagle.
[62]  ████████████████████████████████
[63]  ████████████████████████████████

("RFPs").[64]   Suppliers do not know how many suppliers are bidding on a given RFP, and customers typically do not share suppliers' RFP responses with other bidders.[65] Increasingly, coal supply contracts have shorter durations and include flexible terms that provide customers optionality in the form of deferment rights, optional volumes, indexed pricing, requirements clauses or other similar terms to account for challenges posed by interfuel competition.[66]  As a traded commodity, SPRB coal may be purchased at times on the spot market without a long-term contract.[67]  In a challenging market environment driven by low cost natural gas and renewables, it is imperative that coal producers keep prices competitive with other fuels to ensure coal EGUs dispatch, minimize further coal EGU retirements, and preserve remaining coal demand.[68] Accordingly, having an efficient, low cost structure with flexibility is a key pillar for the future viability of any coal producer, and essential to trying to remain competitive with other fuels.[69]

## D.    THE JOINT VENTURE.

The Joint Venture will combine Arch and Peabody's Colorado and SPRB coal mining assets in a "highly synergistic joint venture aimed at strengthening coal's competitiveness against natural gas and renewables."[70] It will join Peabody's NARM mine with Arch's Black Thunder mine—contiguous SPRB mines that share an over seven-mile long property line—into a single, lower-cost mining complex.[71]



---

[64]

[65]
[66]

[67]
[68]

[69] Israel Report ¶ 10; DX3043
[70] DX8696 (Peabody Energy Corp. & Arch Coal, Inc., Press Release, 6/9/19).
[71] With respect to additional SPRB assets beyond the adjoining NARM/Black Thunder mines, Peabody will contribute its Caballo and Rawhide mines, and Arch will contribute its Coal Creek mine.  *Id.*

12

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████[72]

The Joint Venture will combine these complementary mining assets, and "significantly reduce costs well beyond what each company could achieve alone" by, among other things, better mine production optimization through joint mine planning, duplicative cost elimination, and more efficient procurement and warehousing.[73] ███████████████████████████

██████████████████████████████████████████████████████████████████████

███████████████[74] █████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

███████████████████████████████████████[75]  The Joint Venture thus will not only combine complementary assets of Peabody—which is typically considered the lowest-cost SPRB producer—with high-quality coal reserves held by Arch, ███████████████ █████████████████████████████████████████████████████.

The Joint Venture will result in greater flexibility to offer lower prices, more tailored coal blends, increased supply security, and other customer benefits that will make coal-fired generation more competitive with other fuels, hopefully forestall further coal EGU retirements, and help preserve coal demand.  As a start, Peabody and Arch committed in early February to reduce prices on pre-existing contracts for all coal deliveries through the end of 2022 by $0.15/ton, effective as soon as the Joint Venture closes—an offer that is "only the beginning" of

---

[72] ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

[73] DX8696 (Peabody Energy Corp. & Arch Coal, Inc., Press Release, 6/19/19).

[74] ████████████████████████████████

[75] ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

the benefits that the Joint Venture will be able to provide its customers.[76] But with every day this litigation continues, customers are losing the benefit of those price decreases.[77]

## III. THE FTC BEARS A HEAVY BURDEN OF SHOWING THAT THE JOINT VENTURE SHOULD BE ENJOINED.

When the FTC seeks to enjoin a joint venture, "[t]he issuance of a preliminary injunction prior to a full trial on the merits is an extraordinary and drastic remedy," because it "may prevent the transaction from ever being consummated." *FTC v. Exxon Corp.*, 636 F. 2d 1336, 1343 (D.C. Cir. 1980) (quotations omitted); *see also Mo. Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851, 870 (2d Cir. 1974) (an injunction likely "spell[s] the doom of an agreed merger"). Indeed, no unconsummated transaction has survived the issuance of a preliminary injunction and the FTC's lengthy administrative review process, and this case would be no exception. The FTC has acknowledged how important the preliminary injunction is, confirming to Congress in 2015 that, "in the last 20 years, the Commission has not proceeded administratively following a loss at the preliminary injunction stage."[78] This Court will decide the Joint Venture's fate, and given the enormous stakes, the FTC bears a heavy burden to prove it is entitled to the extraordinary relief sought. *Arch Coal, Inc.*, 329 F. Supp. 2d at 116; *see also* 2015 FTC Prepared Statement at 13 (acknowledging the FTC cannot obtain a preliminary injunction without a "convincing factual and legal basis for competitive concern to secure appropriate relief"). And in assessing the FTC's case, the Court cannot defer to the FTC, but instead must "exercise [its] independent judgment" based on the evidence before it. *FTC v. Nat'l Tea Co.*, 603 F.2d 694, 698 (8th Cir. 1979).

To issue an injunction, the Court must determine that such relief is "in the public interest" after "weighing the equities and considering the [FTC's] likelihood of ultimate success." 15

---

[76] ███████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████

[77] █████████████████████████████████████████████ ██████████████████████████████████████.

[78] FTC, "Prepared Statement: S. 2102 - Standard Merger and Acquisition Reviews Through Equal Rules Act of 2015" (10/7/15) ("2015 Prepared FTC Statement") at 14, available at https://www.ftc.gov/public-statements/2015/10/prepared-statement-federal-trade-commission-s-2102-standard-merger. Five years later, the same holds true.

U.S.C. § 53(b).  Likelihood of ultimate success is the touchstone: "absent a likelihood of success on the merits, equities alone will not justify an injunction."  *Arch Coal*, 329 F. Supp. 2d at 116.

## IV.   THE FTC CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS.

As recent failed government merger challenges emphasize, to show a "likelihood of success" on the merits of its Section 7 claim, the FTC must show that the Joint Venture's probable effect will be a "substantial impairment of competition" in a relevant antitrust market. *New York v. Deutsche Telekom AG*, 2020 WL 635499, at *12 (S.D.N.Y. Feb. 10, 2020); *see also FTC v. RAG-Stiftung*, 2020 WL 532980, at *4 (D.D.C. Feb. 3, 2020). The "mere possibility" that competition may be impaired is insufficient and cannot justify an injunction.  *Deutsche Telekom*, 2020 WL 635499, at *12; *see also U.S. v. Marine Bancorp., Inc.*, 418 U.S. 602, 618, 622⎯23 & n.22 (1974) (noting merger review "deals in probabilities, not in ephemeral possibilities" and that a "substantial lessening of competition" must be "sufficiently probable and imminent").  The Court must examine the likelihood of substantial impairment in the context of the "structure, history, and probable future" of the relevant market, *Gen. Dynamics*, 415 U.S. at 498 (quotation omitted), and ***not*** on "antitrust theory and speculation." *Arch Coal*, 329 F. Supp. 2d at 116–17.

In assessing a Section 7 claim, courts employ a burden-shifting approach.  To establish a prima facie case, the FTC must demonstrate that the Joint Venture will result in undue market concentration in a relevant antitrust market.  *FTC v. Sanford Health,* 926 F.3d 959, 962–63 (8th Cir. 2019).  Only if it satisfies this threshold burden is the FTC entitled to a presumption that the Joint Venture will substantially lessen competition.  *Id.*  Even if it can make this threshold showing, however, high market concentration evidence "does not negate the breadth of the analysis [and] . . . simply provides a convenient starting point for a broader inquiry into future competitiveness."  *U.S. v. Baker Hughes Inc.*, 908 F.2d 981, 986 (D.C. Cir. 1990).  Thus, Defendants may rebut a presumption based on undue market concentration, and the Court must undertake "a broad analysis of the market to determine any effects on competition."  *Arch Coal*, 329 F. Supp. 2d at 130.  Injunctive relief is improper where the FTC's market share analysis presents an "inaccurate account of [the Joint Venture's] probable effects on competition," *id.* at

116; where customers are sophisticated and can resist a price increase, *Baker Hughes*, 908 F.2d at 986; where particular characteristics of the market make price increases unlikely, *Arch Coal*, 329 F. Supp. 2d at 158; and where the merger will produce pro-competitive efficiencies; *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1054 (8th Cir. 1999).  The FTC bears the "ultimate burden of persuasion," *Sanford Health*, 926 F.3d at 963, and a "failure of proof in any respect will mean the transaction should not be enjoined," *Arch Coal*, 329 F. Supp. 2d at 116.

## A.     THE FTC FAILS TO ESTABLISH AN "SPRB COAL ONLY" MARKET.

A relevant antitrust market has two components—a product market and a geographic market—and "is a necessary predicate to the finding of an antitrust violation." *Tenet Health*, 186 F.3d at 1051.   Indeed, "[w]ithout a well-defined relevant market, a merger's effect on competition cannot be evaluated.  It is thus ***essential*** that the FTC identify a credible relevant market before a preliminary injunction may properly issue." *Id.* (emphasis added); *see also FTC v. Freeman  Hosp.*, 69 F.3d 260, 268 (8th Cir. 1995) (stating that, without a well-defined relevant market, "an examination of a transaction's competitive effects is without context or meaning.").

A properly-defined product market must include all functionally similar products to which customers could turn if the Joint Venture attempted to, post-closing, impose a price increase. *See, e.g., Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 596 (8th Cir. 2009) (noting focus is whether "consumers will shift from one product to the other in response to changes in their relative costs").  Put another way, the relevant question is reasonable interchangeability: "whether two products can be used for the same purpose, and if so, whether and to what extent purchasers are willing to substitute one for the other." *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1074 (D.D.C. 1997).  As the Eighth Circuit has stressed, "[t]he definition of relevant market depends upon economic restraints which prevent sellers from raising prices above competitive levels," *H.J., Inc. v. IT&T Corp.*, 867 F.2d 1531, 1537 (8th Cir. 1989), which include substitutes for the parties' products, *see id.*, and must take into account the "influence of downstream competition faced by customers" (here, electricity generating utilities) in their downstream markets.  *See* Horizontal Merger Guidelines ("HMG") § 4.1.3.

"The proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers." *Tenet Health*, 186 F.3d at 1052. And "[i]f competition cuts across product or industry lines, the product market **must be drawn broadly to include competition as it exists.**" *Science Prods Co. v. Chevron Chemical Co.*, 384 F. Supp. 793, 795 (N.D. Ill. 1974) (emphasis added). As the Supreme Court explained in *Brown Shoe Co., Inc. v. United States*, 370 U.S. 294 (1962), courts determine whether two products are "reasonably interchangeable" by considering certain "practical indicia," which include "industry or public recognition of the [relevant market] as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct consumers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.* at 325. As "practical indicia," these factors are not criteria to be rigidly applied. *See Se. Missouri Hosp.*, 642 F.3d at 614 (stressing that, while *Brown Shoe* indicia are instructive in defining the relevant market, "the presence of some, and absence of others, is not dispositive."). But industry and public recognition are particularly important "because we assume that economic actors usually have accurate perceptions of economic realities." *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 219 n.4 (D.C. Cir. 1986).

Courts may also consider economic analyses to assist in market definition, including estimates of cross-elasticity of demand (*i.e.*, the degree that buyers of one product switch to the other in response to price changes), *see Se. Missouri Hosp.*, 642 F.3d at 613; *H.J.*, 867 F.2d at 1538; the hypothetical monopolist test (*i.e.*, whether a hypothetical monopolist would impose a small but significant non-transitory increase in price ("SSNIP")), *see Sanford Health*, 926 at 963; HMG § 4.1; and other empirical evidence. However, at the end of the day, "the determination of the relevant market . . . is a matter of business reality – [] how the market is perceived by those who strive for profit in it." *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 46 (D.D.C. 1998).

The FTC alleges that the relevant product market is limited to "SPRB coal" and is, therefore, effectively insulated from competition from other fuels used to generate electricity. Compl. (DE 1) ¶ 18; FTC Br. (DE 154) at 1, 15. But this alleged "SPRB coal only" product

market ignores the commercial realities experienced by actual market participants, is belied by the *Brown Shoe* factors, and fails the hypothetical monopolist test.

### 1.   The *Brown Shoe* Factors Demonstrate that an "SPRB Coal Only" Relevant Product is Fatally Flawed.

Evaluating the *Brown Shoe* factors against the extensive record in this case conclusively shows that a relevant antitrust market limited to "SPRB coal only" is too narrow because it fails to encompass interfuel competition that exists today and will exist even more so in the future.

####  a.   *Industry or Public Recognition – Government Agencies, Market Participants, and Industry Analysts All Acknowledge Vigorous Competition Among Fuels.*

There is overwhelming evidence that government agencies, market participants, and industry analysts all believe coal directly competes with other fuels and that, therefore, SPRB coal is not a "separate economic entity" insulated from this competition.  In the face of this evidence, the FTC does not cite any serious industry recognition of an "SPRB coal only" market. This virtually one-sided showing weighs heavily against the FTC's alleged narrow product market definition.  *See U.S. v. Sabre Corp.*, 2020 WL 1855433, at *36-37 (D. Del. Apr. 7, 2020) (finding industry recognition of competition undercut government's product market); *Gen. Dynamics*, 341 F. Supp. at 545-55 (rejecting coal-only product market and citing recognition of interfuel competition by utilities, producers, federal agencies, and other industry participants).

**Government Agency that Studies Industry**.  The fact that coal, including SPRB coal, cannot be carved out and is not insulated from interfuel competition is widely recognized in reports by the EIA, a division of the U.S. Department of Energy.  EIA's mission is to "analyze[], and disseminate[] independent and impartial energy information to promote sound policymaking, efficient markets, and public understanding of energy" and regularly issues reports on the U.S. energy market.[79] In recent years, these reports repeatedly have referenced interfuel competition and shifts among fuels used to generate electricity. For example, this month EIA reported:

> The mix of energy sources used in the United States to produce electricity has been undergoing large shifts during the past decade.  One of the most evident trends is the

---

[79]  *See* EIA Mission and Overview, available at https://www.eia.gov/about/mission_overview.php.

steady decline in the amount of electricity generation from coal-fired power plants . . . while natural gas generally been rising . . . The relative costs of different fuel sources have had both short-term effects on the utilization (or dispatch) of existing capacity and longer term effects on investment and retirement decisions . . . Over the long run, the sustained low prices of natural gas have led the industry to retire a significant amount of coal-fired generating capacity and to add more natural gas-fired generating capacity.[80]

Similarly, in May 2020, EIA found that "the primary driver" for "less coal-fired generation" was "increased output from natural gas-fired plants and wind turbines."[81] In a December 2019 report, EIA noted that "sustained relatively low natural gas prices has allowed natural-gas fired generators to become more competitive with coal fired units, leading to a general decline in using coal-fired capacity," which in turn "leads to a decline in revenues at a plant . . . lower operating margins, less ability to cover costs, and in many cases, retiring that capacity."[82] In a June 2017 report tellingly entitled "Competition between coal and natural gas affects power markets," EIA reported that in 2016, "natural gas provided 34% of total electricity generation, surpassing coal to be the leading generation source."[83] In May 2020, EIA reported renewable generation surpassed coal as a generation source as well.[84]

**Customers**. Likewise, customer after customer testified that they recognize coal is in close competition with other fuels used to generate electricity.[85] Indeed, based on her review of

---

[80] DX8010 (EIA, "Short-Term Energy Outlook Supplement: Summer 2020," 6/20) at 4-5.
[81] DX8012 (EIA, "U.S. coal-fired electricity generation in 2019 falls to 42-year low," 5/11/20).
[82] DX8011 (EIA, "U.S. coal plant retirements linked to plants with higher operating costs," 12/3/19).
[83] DX8007 (EIA, "Competition between coal and natural gas affects power markets," 6/16/17).
[84] DX8013 (EIA, "U.S renewable energy consumption surpasses coal for the first time in over 130 years," 5/28/20).
[85] ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

the record, Defendants' expert Ms. Carey compiled **86 pages** of customer statements recognizing interfuel competition and switching from coal to other fuels to meet generating needs.[86]



Even the small number of customers that filed declarations in support of the FTC acknowledge interfuel competition.[91] In fact, as Dr. Bailey illustrated, **every single customer** that was issued a subpoena in this case provided evidence that SPRB coal competes with other fuel sources.[92]

In particular, customers repeatedly testified that interfuel competition is magnified and



[86] Carey Report Ex. 8.

[92] Bailey Rebuttal ¶ 36 & Ex. 7.



[REDACTED] [93] For example, [REDACTED]

[REDACTED] [94] And when asked whether ISOs [REDACTED]

[REDACTED] [95] A similar dynamic exists for vertically integrated utilities [REDACTED] that function as mini-ISOs. [96]

The reality of interfuel competition is further confirmed in customers' ordinary course documents. For example, NIPSCO's 2018 Integrated Resource Plan states:

> The market is currently undergoing change as coal capacity retires and the generation mix shifts toward renewables and natural gas. In recent years, low natural gas prices have resulted in efficient natural gas plants displacing coal-fired generation in the



dispatch stack.  This dynamic has altered energy prices and has negatively impacted the economics of coal plants.[97]

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████[98] ███████████

████████████████████████████████████████████████████████████████

███████████████████[99]  And,  notably,  the  Western  Coal  Traffic  League  ("WCTL")  routinely commissions  presentations  for  its  utility  membership  that  explicitly  recognize  interfuel competition, including that "[s]ustained low natural gas prices, increased renewables generation and low load growths have resulted in significant reductions in coal burn."[100]

**Coal Producers**. Peabody and Arch executives, as well as other SPRB coal producers, testified that coal is in direct competition with other fuels.  ███████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████[101]  Other  Peabody  and  Arch  executives similarly testified about the effect competition from low-priced natural gas and renewables has had on their respective businesses.[102] █████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[97] DX1012 (NIPSCO 2018 IRP) at 5.

[98] █████████████████████████████████████████████████████

[99] ██████████████████████████████████████████████████████████████

[100] DX1019 ("The Future of Coal vs. Gas Competition" presented to WCTL, 2/16/18); DX2130 ("Coal: Down But Not Out?" presented to WCTL, 02/20); DX2128 ("Trends and Outlook for PRB Rail Markets: Retirements, Renewables, and Economic Dispatch Issues" presented to WCTL, 11/2/17).

[101] ████████████████████████████████████████████████████████

[102] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████ [103] ████████████████████████████████

██████████████████████████████████ [104] Other coal producers

consistently echo this reality,[105] and it is reflected in Defendants' ordinary course documents.[106]

**Industry Analysts**. Analysts who study and follow the coal industry, and whom both producers and customers rely upon for information, also recognize interfuel competition and substitution of SPRB coal with other fuels. ████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████ [107] ████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

---

[103] ███████████████████████

[104] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

[105] Cloud Peak attested to the direct impact that natural gas and renewable electricity generation had on its business, noting the "abundance of low cost alternatives to coal for electricity generation." DX8691 (Hill Decl. 5/10/19) at ¶¶ 50-55; *see also* DX8591 (Cloud Peak Energy, Inc., Annual Report, 3/15/19) at iii, 32-33 (recognizing "competition with natural gas, wind, solar, and other non-coal energy resources" and explaining "[i]n addition to competing with other coal producers, we compete generally with producers of other fuels, such as natural gas."). ████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████.

[106] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

[107] ██████████████████████
████████████████████████████████████

██████," [108]   In a June 2020 presentation, Clarksons Platou Securities recognized that coal producers "no longer compet[e] just among themselves," and "have encountered much more competition from alternative sources [of energy]." [109]   The record is replete with other industry reports recognizing the strength of interfuel competition. [110]

Others that closely follow the coal industry also recognize the intense competition between coal, natural gas, and renewables, and coal's increasing struggle to successfully compete against those alternatives.  Below are just a few examples of recent articles in major media outlets recognizing interfuel competition:

- Wall Street Journal – In October 2019, the Wall Street Journal recognized that coal, "the one-time king of American energy[,] is fading as it faces competition from cheap natural gas and renewable energy sources while reckoning with the retirement of coal-fired power plants." [111]  In subsequent reporting, it found that "[a]s Americans consume less electricity during the coronavirus pandemic, many utilities are cutting back on coal power first." [112]

- New York Times – In December 2019, the New York Times reported that "cheap natural gas continues to take market share from coal," that "low natural gas prices have been a boon to users of the fuel, especially electricity utilities, which are increasingly replacing coal-fired plants with ones that use gas," and that "the cost of wind and solar energy has tumbled in recent years, making those renewable sources of energy more attractive to power producers." [113]  It later reported in May 2020 that "America's total coal consumption will fall by nearly one-quarter this year . . . dropping for the first time below both nuclear power and renewable power." [114]

---

[108] ██████████

[109] DX8002 (Clarksons Platou Securities, "Peabody Energy & Arch Coal," 6/19/20) at 1.

[110] See, e.g., DX8692 (IHS Markit, "US Coal Market Briefing" 2/20) at 6, 10, 11, 31 (noting "growth in gas-fired generation and renewables will take market share from coal"); DX8033 (Hellerworx, "The Future of Coal Versus Natural Gas Competition" (2017)) at 5, 9-10, 15 (noting "[e]xisting coal- and gas-fired power plants are continually competing against each other (both hourly and daily) in the markets for electric power"); DX1002 (S&P Global Platts, Coal Trader, 1/22/20) at 1 (noting "increased competition between coal and gas over less power generation growth").

[111] DX8699 (Wall St. Journal, "Coal Bankruptcies Pile Up as Utilities Embrace Gas, Renewables" 10/13/19); see also DX8030 (Wall St. Journal, "An Antitrust Attack on Coal," 3/8/20) (noting "extremely challenging business conditions" due to "ongoing secular decline in demand for [coal]").

[112] DX8031 (Wall St. Journal, "Coal Suffers as Coronavirus Saps Power Demand," 4/23/20).

[113] DX8695 (N.Y. Times, "Natural Gas Boom Fizzles as a U.S. Glut Sinks Profits," 12/12/19).

[114] DX8026 (N.Y. Times, "In a First, Renewable Energy Is Poised to Eclipse Coal in U.S." 5/13/20).

### b. Price Sensitivity - Customers Can and Do Substitute Other Fuels for Coal in Response to Changing Market Conditions.

As further proof of interchangeability, market evidence confirms that customers regularly formulate their decisions about how much, if any, SPRB coal to purchase and whether to switch from coal to other fuels based on changes in relative fuel prices, a factor that is "[c]ritical" to market definition. *H.J.,* 867 F.2d at 1538; *see Se. Missouri Hosp.*, 642 F.3d at 613 (noting evidence of substitution "in response to a slight decrease in price strongly indicates those products compete in the same product market."). Before customers initiate a coal RFP process, they prepare a burn forecast and determine how much coal to request in part based on the price of natural gas, and continue to reevaluate their anticipated coal needs throughout the process.[115]

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████[116]

In some cases, customers may decline to purchase from the RFP all together.[117] As DTC highlighted this year, there is a "tight relation between coal burn and natural gas prices."[118]

████████████████████████████████████████████████████████████

██████████████████████████████[119] And, as Dr. Bailey explains, the FTC's expert's own analysis demonstrates "demand for SPRB coal is just as responsive to changes in the price of natural gas as it is to changes in the price of SPRB coal."[120]

This price sensitivity between coal and other fuels is apparent at both the ISO/RTO level and in individual customers' short- and long-term fuel purchasing and resource planning. As

---



[115] ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
[116] ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
[117] Bailey Report ¶ 84 (collecting examples of customers declining to purchase).
[118] DX1001 (DTC Flash 2/24/20) at 2.
[119] ████████████████████████████
[120] Bailey Rebuttal ¶ 32.

relative fuel prices change, ISOs/RTOs force substitution among fuels to ensure least cost electricity generation.  For example, due to low natural gas prices, coal EGUs have had increased difficulty dispatching, and thus have not been chosen to "run" by the ISOs/RTOs, with natural gas, renewables, and nuclear EGUs running instead.[121]   ISOs/RTOs' generation mixes demonstrate that substitution among fuels is occurring, and that coal generation—and, correspondingly, the amount of SPRB coal procured by utilities—is being reduced as a result of ISOs/RTOs selecting lower-priced renewable and natural gas EGUs to dispatch instead of coal.[122] ███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███[123] A ████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████[124]

Individual electricity generators also substitute among fuels in response to relative price changes.[125] In the short term, if coal EGUs cannot regularly dispatch, these customers burn less coal, defer their coal deliveries, and procure less coal in RFPs.[126] █████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

█████████████████████████████████████████[127] In the longer term, customers shift their

---

[121] Bailey Report ¶¶ 28-35; ███████████████████
[122] Bailey Report ¶ 19; Carey Report ¶¶ 87-88, Ex. 9; Israel Report ¶ 47 & Table 1.
[123] ████████████████████████
[124] ██████████████████
[125] ████████████████
[126] *See* Bailey Report ¶¶ 28, 87; ████████████████████████████████████████
███████████████████████████████████████████████████████████████████
█████████████████████████████████████████
[127] ███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
██████████████████████████████

generation fleets in response to changing market conditions by retiring their coal EGUs in favor of investments in renewables and natural gas, a reality which Ms. Carey extensively documented for dozens of customers in her report.[128]  This fact is confirmed by analyses demonstrating that the share of electricity generated by coal has dramatically decreased in favor of natural gas and renewable generation. *Supra* Parts II.B, IV.A.1.a.

Market participants confirm that competition among fuels directly contributes to coal EGU retirements, and that coal EGU retirements in favor of alternative generation pose a major competitive threat to coal producers. It is also well-recognized by market participants that customers are sensitive to relative changes in fuel prices, and that low natural gas prices in particular drive customers to substitute natural gas for coal.[129] ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████[130]  Understandably, coal producers are particularly concerned with coal EGU retirements because a coal EGU retirement results in a permanent loss of coal demand that, given the lack of investment in new coal EGUs, will be lost forever and never recovered.[131]  Indeed, coal producers make substantial efforts to work with customers to limit, prevent or delay coal EGUs' retirements through various types of concessions, including pricing concessions, designed to provide customers additional flexibility,

---

[128] Carey Report Ex. 8.

[129] The WCTL for example, believes that low natural gas prices and cost effective renewable energy have displaced coal generation.  *See* DX2128, at WCTL-FTC^PEABODY-001828 ("Wind Displacement of PRB Coal"); *id.* at -1830 ("NG Displacement of PRB Coal"); *id.* at -1832 ("Low NG prices started to displace significant amounts of coal in early generation in early 2009 during the Great Recession."); DX2130, at WCTL-FTC^Peabody-001786 ("Increases in renewable energy productivity will allow for more cost effective production and further displacement of coal.").

[130] ████████████████████

[131] ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████

and improve the ability of their coal EGUs to dispatch against other fuels.[132]

The fact that ISOs/RTOs and individual electricity generators base their decisions about which EGUs to dispatch, how much, if any, SPRB coal to purchase and whether to switch between fuels in response to changing relative fuel prices and other market conditions further contradicts the FTC's "SPRB coal only" market definition.  *See Sabre*, 2020 WL 1855433, at *37 (evidence of customers switching between travel booking platforms and airline websites confirms reasonable interchangeability); *Gen. Dynamics*, 341 F. Supp. at 539-40, 545-47 (rejecting coal-only product market where record showed utilities increasingly substitute between coal and other fuels and marked decline in coal's share of energy market).

> ### c.  Distinct Characteristics & Uses - SPRB Coal Is Used for the Same Purpose as Other Fuels: Generation of Electricity.

There is nothing unique about electricity generated by SPRB coal.  As numerous market participants testified, a megawatt of electricity produced by burning coal is identical to one generated by any other fuel ███████████████████████[133]  Electricity producers' mission is to generate electricity sufficient to meet their customers' energy requirements at the lowest possible cost regardless of fuel type.  To fulfill that charge, they evaluate their generation portfolio and assess generation costs, including fuel costs that are analyzed on standard price per BTU or cost per kilowatt/hour basis across all fuels.[134]  While SPRB coal has certain qualities that may physically distinguish it from natural gas, other fuels, and other types of coal, electricity



[132] Israel Report ¶¶ 118-120 ████████████████████████████ *id.* ¶123 ████

[133] ████████████████████████████████████████████

[134] ████████████████████

generators can and do utilize other fuels, including natural gas, uranium, wind, solar, and hydro-power to meet their electricity generation needs.   And, coal supplied from other regions, including the NPRB and the ILB, serves to supplement the options for a number of utilities either as a substitute for SPRB coal or as part of a coal blend.[135]   In short, SPRB coal is one of many fuels that are used interchangeably for the very same purpose or end use, *i.e.,* to generate electricity, therefore further belying an "SPRB coal only" market.  *See  H.J.*, 867 F.2d at 1538 (finding equipment having different physical qualities in the same market because they perform "same basic function"); *Gen. Dynamics*, 341 F. Supp. at 545, 555 (recognizing coal, natural gas, and other fuels have the same use, to produce heat measured in terms of BTUs to produce electricity, and rejecting market limited to coal).

### d.      *Distinct Customers - SPRB Coal Customers Are Not "Distinct" and Purchase a Wide Variety of Fuels to Generate Electricity.*

There is no "distinct set" of customers that purchase SPRB coal to the exclusion of all other fuels.  Customers generate electricity from a combination of EGUs powered by diverse fuels and/or from purchasing other generators' power.[136]  Indeed, the FTC has not identified any customer that purchases *only* SPRB coal to the exclusion of other fuels. Although the FTC's witnesses include some customers that may utilize a greater share of coal-fired generation than others, each and every FTC customer witness has a portfolio of generating assets that is not limited to coal, much less SPRB coal, and some use coal only for a minority of their generation.[137]   And, all SPRB coal customers have been reducing their coal burn, and all currently plan to continue reducing coal generation in favor of other fuels in the future.  The complete lack of any "distinct" customers further dooms the FTC's alleged market definition.

---



### e. *Distinct Prices - SPRB Coal Prices are Closely Related to the Price of Other Fuels.*

Market participants also recognize that the price of SPRB coal is directly related to other fuel prices, and natural gas prices in particular, thereby making even more untenable a relevant market limited to "SPRB coal only." *See Menasha Corp. v. News Am. Marketing In-Store, Inc.*, 354 F.3d 661, 664 (7th Cir. 2004) (stressing that if the prices of shelf coupon dispensers change when the prices of other couponing systems change "then they are probably in the same market").  Arch and Peabody's ordinary course documents confirm the reality that natural gas price declines have decreased SPRB coal demand and, accordingly, SPRB coal prices.[138]  Similarly, █████ recognizes that low natural gas prices directly contribute to low prices for SPRB coal.[139]  Numerous customers also agreed that coal prices are interrelated with prices charged for other fuels.[140] ██████████ ████████████████████████████████

████████████████████████████████████████████████████[141] ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████[142]

The fact that coal prices are closely related to natural gas prices is further reflected in market participants' commercial practices.  For example, coal producers consider natural gas prices when determining what price to bid in response to an RFP, and take care to ensure that the price they offer will be competitive with natural gas and other fuels.[143]  In addition, both

---



[138] *See, e.g.,* DX8697 (Peabody 2019 Annual Report) at 25 ("Declines in the price of  natural gas, or continued low natural gas prices, could cause demand for coal to decrease and adversely affect the price of coal."); DX8590 (Arch 2019 Annual Report) at 34 ("[N]atural gas pricing has declined significantly in recent years.  The decline in the price of natural gas has caused demand for coal to decrease and adversely affected the price of our coal.").

[139] ████████████████████████████████████████████████████████████

[140] ████████████████████████████████████████████████████████████

[141] ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

[142] ██████████████████████████████████████████████

[143] Bailey Report ¶ 27; ██████████████████████████████████████████
████

Peabody and Arch regularly offer SPRB coal pricing that is indexed to natural gas or energy prices in further recognition of the interrelationship between SPRB and natural gas.[144] Customers and suppliers alike also evaluate coal costs by analyzing coal prices on a dollar per million BTU basis and similar measures that can be used to directly compare them to natural gas prices and inform fuel purchasing decisions and resource planning.[145]

> ### f.    Specialized Vendors – Arch, Peabody and other SPRB Coal Producers Are Not Specialized Vendors.

Arch and Peabody are not specialized vendors that only produce SPRB coal.  To the contrary, most of Arch and Peabody's revenues derive from operating other kinds of mines, both metallurgical and thermal coal, in other regions throughout the country and (for Peabody) the world.  Other SPRB coal producers have similarly non-specialized businesses.  NTEC, for example, operates other non-SPRB mines as well as renewable energy supply businesses,[146] Kiewet has assets dedicated to production of gas, oil, and chemicals, and Black Hills operates a large electrical and natural gas utility business and generates power for sale to other utilities.[147]

### 2.    <u>The Hypothetical Monopolist Test Does Not Support the FTC's Overly Narrow Product Market Definition.</u>

While the above *Brown Shoe* factor analysis is by itself sufficient to conclude that the FTC has not met its burden to prove a relevant antitrust market, *see Sabre*, 2020 WL 1855433, at *37, an assessment of cross-price elasticity of demand, the hypothetical monopolist test, and other empirical analyses confirm that the FTC's alleged "SPRB coal only" product market is too narrow.  The record shows that customers, which already are decreasing their SPRB coal purchases seemingly every day, would resist a SSNIP by switching to other fuels to an even greater degree.  Moreover, given dynamic competition and the ever-present risk of coal EGU retirements and subsequent permanent loss of demand, it would be irrational for a hypothetical monopolist to increase SPRB coal prices and thereby accelerate declining demand.  Finally, real-

---

[144] ████████████████████████████████████████████ *see also* Bailey Report ¶ 85.

[145] ████████████████████████████████████████.

[146] ███████████████████████████.

[147] *See* Kiewit, Our Markets, available at https://www.kiewit.com/markets/; █████████████████

world natural experiments confirm that a hypothetical monopolist would not be able to profitably increase SPRB coal prices given the competitive constraint posed by natural gas and other fuels.

> **a.      Customers Would Resist a Small But Significant Non-Transitory Price Increase By Switching to Other Fuels.**

A hypothetical monopolist would not impose a price increase because ISOs/RTOs and customers would resist it by switching electricity generation to other fuels.  As described above in Parts II.A and IV.A.1.b, ISOs/RTOs apply merit order dispatch and decide which EGUs run and which do not.  Any increase in SPRB coal prices relative to other fuel prices will result in coal EGUs dispatching even less than they do.  Customers, wanting their EGUs to dispatch and thus get paid, in turn would switch from coal to other fuels in response to any increase in SPRB coal's relative cost, both in the short term by reducing coal burn, reducing coal purchases, taking advantage of optionality to defer coal purchases, or purchasing power, and in the long run by shifting their electricity generation resources away from coal EGUs to EGUs powered by other fuels.  There is no reason to believe that customers would simply throw their hands up and accept a price increase when they already shift away from coal generation in response to changes in the relative costs of fuel.



[150] which is fanciful.[151]

The FTC relies on select SPRB coal customers who opine that they (or their members) would not be able to resist a SSNIP by switching to other forms of generation.  This testimony,

---



[148]
[149]
[150]
[151]

however, is not supported by any serious analysis,[152] is self-interested,[153] and is directly belied by the fact that they (or their members) are shifting their electricity generation away from coal and will continue to do so.[154]  *See, e.g., Tenet Health,* 186 F.3d at 1054 (questioning district court's reliance on suspect testimony from select customers that "they would unhesitatingly accept a price increase" and reversing injunction); *U.S. v. Oracle*, 331 F. Supp. 2d 1098, 1131-32 (N.D. Cal. 2004) (rejecting customer testimony regarding that was "largely, their preferences" and  "not backed up by serious analysis that they had themselves performed or evidence they presented"); *U.S. v. AT&T, Inc.*, 310 F. Supp. 3d 161, 211–15 (D.D.C. 2018) (finding customer and competitor concerns unreliable and driven by self interest). The FTC's customer witnesses also are not representative. Unlike the small and unrepresentative set of customers the FTC relies upon, most customers who procure some amount of SPRB coal rely far less on coal generation and have not registered concerns about their ability to switch among fuels in the short run.  *Supra* Part IV.A.1.d.  Moreover, many customers (including some of the FTC's witnesses) recognize that the Joint Venture will likely benefit competition in numerous ways, including by reducing costs through efficiencies, providing better service and security of supply, and reducing prices.[155]

---



[154] In 2010, Evergy's generation mix was 52% coal and 1% renewables.  Evergy estimates that in 2020, it will be 40% coal and 27% renewables. DX2013 (Evergy, "Our Energy Mix"). In 2005, Xcel Energy's generation mix was 56% coal, 23% natural gas, and 3% renewables.  DX8700 (Xcel, "We're Building the Future RBC Conference") at 33.  In 2019, Xcel Energy's generation mix was 26% coal, 33% natural gas, and 24% renewables.  *Id.*  Minnesota Power "reli[es] on a mix of wind, water, coal and biomass to generate power for our customers.  Minnesota Power continues to seek out more sources of renewable energy and has moved from an energy supply that was about 5 percent renewable in 2005 to one that is about 30 percent renewable in 2019.  We expect to be 50 percent renewable by 2021." DX8693 (Minnesota Power, "Generation – Mix of Fuels").

In any event, when determining whether customers would be able to resist a SSNIP, the Court "must consider the degree to which buyers treat the [fuels] as interchangeable, but need not find that *all* buyers will substitute one [fuel] for another." *Arch Coal*, 329 F. Supp. 2d at 122; *see also RAG-Stiftung*, 2020 WL 532980, at\* 27 (select customer statements "not enough to outweigh the overall trends . . . reflected in the record").

> ### b.   A Hypothetical Monopolist Would Not Impose a Price Increase Given Dynamic Competition and Retirement Risks.

Given dynamic competition among fuels, a hypothetical monopolist would ***not*** impose a price increase.  Coal generation in the United States has been, and will continue to be, on the decline as more and more coal EGUs retire.[156]  As a result, the universe of EGUs is not static—it changes day-by-day and year-by-year, and not in favor of coal.[157] The higher coal prices are relative to other fuels, the more coal EGUs struggle to dispatch, the more likely it is that coal EGUs will be idled or retired.  And with each retirement, more coal demand is lost ***forever.***[158]

As Dr. Israel demonstrates, declining coal demand and the risk of further and accelerated coal EGU retirements introduces a dynamic element to competition that impacts how a rational, profit-maximizing coal producer will operate.[159]   In this dynamic market, a hypothetical monopolist must account for the risk that attempting to raise prices would induce customers to accelerate retirement of their coal EGUs, a result that would be economic suicide.[160]  In the short run, an increase in the price of SPRB coal causes these EGUs to be dispatched less frequently,

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████

---

[156] Israel Report ¶¶ 10, 13, 24, 46.
[157] *See* Israel Report ¶¶ 21, 90-94.
[158] Israel Report ¶¶ 81, 86-88.
[159] Israel Report ¶¶ 84-130.
[160] Israel Report ¶¶ 81, 86-88; DX4004 (Israel Rebuttal Report) ("Israel Rebuttal") ¶¶ 39-40, 76-79.

with electricity generation shifting to natural gas and other forms of generation.[161]  Over the longer term, as coal capacity utilization falls and the relative operational costs of coal-fired EGUs increase, electricity generators will accelerate the retirement of their coal-fired EGUs.[162] As a result, a hypothetical SRPB coal monopolist considering a price increase must account not just for short-term potential lost sales volume to other fuels, but also for the coal demand that will be permanently lost when coal-fired EGUs—dispatched less due to increased coal costs— are retired.[163] This retirement risk is not theoretical or conjectural; it is borne out in ordinary course documents and well-recognized by market participants as a driving force in coal's continuing competitive struggle against other fuels.[164] As a result, a hypothetical monopolist would ***not*** have any incentive to attempt a price increase due to the combined blow of short-term loss of sales to other fuels, and longer term permanent loss of coal demand due to additional retirements.[165]  *See, e.g., State of Illinois ex rel Hartigan v. Panhandle E. Pipe Line Co.*, 730 F. Supp. 826, 845 (C.D. Ill. 1990) (gas producer did not want customers "to switch to an alternate fuel" because "the loss might be permanent"); *FTC v. Great Lakes Chem. Corp.*, 528 F. Supp. 84, 94 (N.D. Ill. 1981) (producers have "strong incentives to keep the price of [intermediate products] low" to preserve future demand for finished products).

While the FTC's expert, Dr. Nicholas Hill, claims to account for the retirement risk by presenting a "declined demand" scenario, his analysis does no such thing.  Dr. Hill does ***not*** employ a dynamic model; he simply shifts the demand down at a fixed rate per year.[166]  That is, Dr. Hill assumes that the retirement of coal EGUs is *entirely unrelated to their relative operational costs*, despite extensive evidence to the contrary.[167]  Simply presenting a mathematical model that suggests a hypothetical monopolist might be incentivized to increase

---

[161] Israel Report ¶¶ 86-89, 113-14.
[162] Israel Report ¶¶ 96-103, 108-11, 115-16.
[163] Israel Report ¶¶ 112-16; Israel Rebuttal ¶¶ 39-41, 76-78.
[164] Israel Report ¶¶ 96-100, 102-11.
[165] Israel Report ¶¶ 86-89, 96-103, 108-16; Israel Rebuttal ¶¶ 39-41, 76-78.
[166] Israel Rebuttal ¶¶ 52-54.
[167] Bailey Rebuttal ¶¶ 33-39.

prices at a variety of static future demand levels fails to account for the key dynamic risk that retirements pose—that a price increase may itself *cause* or *accelerate* coal EGU retirements.[168] In the real word, coal EGUs that may continue to dispatch sporadically in the short term are frequently retired or converted to seasonal operations if customers cannot cover their fixed costs over the longer run.[169] Dr. Hill's elasticity analyses are also flawed because they are entirely out of step with the reality of low producer margins, which would not exist if, as Dr. Hill finds, SPRB coal were a relevant market.[170] As Dr. Israel demonstrates, modifying Dr. Hill's models to incorporate the dynamic risk of retirements and lower profit margins *reverses* his conclusions.[171] Dr. Hill's failure to adequately account for dynamic competition and low margins renders his analysis inconsistent with the realities of competition and of no use in market definition. *See New York v. Kraft Gen. Foods, Inc.*, 926 F. Supp. 321 (S.D.N.Y. 1995) (rejecting government's product market and agreeing with independent, court-appointed economist that "any market definition . . . that ignores the dynamic aspects of changing demands . . . would produce misleading results"); *Sabre*, 2020 WL 1855433, at *24 (finding an expert's SSNIP test unpersuasive where he relied on inaccurate assumption that "ignore[d]" commercial realities).

### c.     *Natural Experiments Confirm That SPRB Coal is Competitively Constrained By Other Fuels.*

The Merger Guidelines recognize that natural experiments provide useful, direct evidence of competitive effects that may also "inform market definition."  HMG § 4. Dr. Bailey conducted several event studies, each providing real-world empirical confirmation that coal is constrained by other fuels, and that any antitrust market must account for interfuel competition.

Event studies confirm that decreases in natural gas prices cause decreases in coals prices and margins.  With respect to coal margins, Dr. Bailey compared Arch and Peabody's profit margins for SPRB coal contracts signed in a relatively high natural gas price time period to those signed in a relatively low natural gas price time period.  Her analysis demonstrates that Arch and

---

[168] Israel Report ¶¶ 21-23, 45, 86-88; Israel Rebuttal ¶¶ 8, 39, 52-54; Bailey Rebuttal ¶¶ 48-50.
[169] Bailey Rebuttal ¶¶ 52-56, 62.
[170] Israel Rebuttal ¶¶ 14-17; *see also id.* ¶¶ 11-13, 17-45.
[171] Israel Rebuttal ¶¶ 32-37, 76-78.

Peabody's margins declined significantly, and she concludes that the "decline in natural gas prices cause[d] the decline in SPRB profit margins" as a direct result of merit order dispatch and the competition it forces among fuels.[172]   Dr. Bailey conducted a similar analysis of Arch and Peabody's contractual prices, and similarly shows that "the price for SPRB coal declined as a result of the competitive constraint imposed by the sharp decline in natural gas prices."[173]

Dr. Bailey also assessed the competitive impact of past supply disruptions on SPRB coal prices and utilization, finding that temporary SPRB coal output restrictions did not result in price increases, and did result in customers shifting electricity generation to other fuels. For example, in May-June 2018, heavy rains disrupted operations at certain SPRB mines, but not Arch's. ██████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████[174] █████████████████████

████████████████████████████████████████████████████████████

This finding demonstrates the "strong durable price constraint from natural gas and other fuel sources on SPRB coal prices."[175] Similarly, in July 2019, Blackjewel's bankruptcy resulted in the abrupt shuttering of the Belle Ayre and Eagle Butte mines. ██████████████████████

█████████[176]   In addition, Dr. Bailey reviewed plant utilization data, and her findings "confirm that, consistent with the ability to substitute between fuels, customers that typically purchase SPRB coal from the legacy Blackjewel mines reduced utilization at their coal-fired generating plants and increased utilization at their natural gas-fired generating plants."[177]

---

[172] Bailey Report ¶¶ 47-55.
[173] Bailey Report ¶¶ 57-64.
[174] Bailey Report ¶¶ 69-75.
[175] Bailey Report ¶ 75.
[176] Bailey Report ¶ 68; █████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████

[177] Bailey Report ¶¶ 65-68; Exs. 47-50 (demonstrating that particular utilities shifted from coal to natural gas generation during Blackjewel supply disruption).

**3.     The FTC's Reliance on the 2004 *Arch Coal* Decision Is Misplaced and Does Not Reflect Today's Commercial Realities.**

The FTC's product market analysis is based largely on the *FTC v. Arch Coal, Inc.* decision from 2004, in which the Court assessed Arch's acquisition of Triton's North Rochelle mine.  *See* FTC Br. at 15-24 (citing *Arch Coal* repeatedly).  But the FTC's heavy reliance on that case to prop up its "SPRB coal only" market definition is misplaced.  There, in the face of the FTC's contention that the relevant product market was narrower than SPRB coal, the parties *agreed* that SPRB coal was "a relevant product market within which to examine the competitive effects" of the acquisition, and the court nonetheless determined that acquisition would not substantially lessen competition. *Id.* at 121; *see U.S. v. SunGard Data Sys Inc.*, 172 F. Supp. 2d 172, 187 (D.D.C. 2001) (finding prior case "inapposite" where "parties stipulated to relevant product market"). The parties did not argue, and the court did not assess, whether, and to what extent, SPRB coal competed with, and whether the relevant product market properly encompassed other fuels.  And that made sense given the commercial realities sixteen years ago, when natural gas prices were consistently above $7.00 per mmBTU, renewable electricity generation was not even in its infancy, and ISOs/RTOs were not directly forcing competition across fuels as they do today.

The FTC and its experts give short shrift to today's *vastly different* commercial realities.  Indeed, the role of ISOs/RTOs in forcing interfuel competition, sustained low natural gas prices, renewable generation growth, shifting generation mixes, coal retirements, and dynamic competition among all fuels are hardly touched upon in the FTC's submissions. In *SunGard*, the Court rejected the government's product market in a similar context.  There, the government sought to define the market as limited to one segment of disaster recovery ("DR") services based largely on the fact that customers issued RFPs to external DR service providers, but the evidence showed the industry was rapidly evolving, customers increasingly switched to or were considering quick-ship or internal DR solutions as a substitute, and the merging parties justifiably viewed these substitutes as their "main competitive threat." 172 F. Supp. 2d at 187-93.

The court rejected the government's "overly narrow and static definition of the product market," finding it could not meet its burden to prove the relevant market excluded quick-ship or internal DR solutions.  *Id.*  Here, as in *Sungard,* the FTC's failure to meaningfully address interfuel competition—the "main competitive threat" to Defendants—is fatal to its product market definition, and ultimately to its case.  *See Tenet Health*, 186 F.3d  at 1055 (reversing injunction because lower court "did not properly evaluate evolving market forces in the rapidly-changing healthcare market" and relied instead on "outdated assumption[s]"); *Freeman Hosp.*, 69 F.3d at 269 (rejecting FTC's alleged definition of relevant market because it "gives a static, rather than a dynamic, picture" of competition); *Sabre*, 2020 WL 1855433, at *36-37 (rejecting government product market that excluded key constraints and was "at odds with the commercial realities").

**B.     THE FTC FAILS TO ESTABLISH LIKELY ANTICOMPETITIVE EFFECTS.**

The FTC cannot establish a presumption of illegality because it has failed to meet its burden of establishing a relevant market. There is not a "single case in which a court has enjoined a merger . . . where the government failed to show [a prima facie case]." *RAG-Stiftung*, 2020 WL 532980, at *19.  Regardless, even if the FTC could establish an "SPRB coal only" market, and with it market shares that give rise to a presumption of anticompetitive effects, that threshold showing "does not negate the breadth of this analysis" and the court still must conduct a "broader inquiry into future competitiveness." *Baker Hughes*, 908 F.2d at 984.

Here, the record demonstrates that the Joint Venture will continue to face sophisticated customers with multiple levers to constrain the Joint Venture and maintain competitive pricing, including day-to-day interfuel competition, dynamic competition created by the threat of coal retirements, and other coal producers with ample excess capacity. These constraints coincide with substantial efficiencies generated by the Joint Venture that will allow it to be more competitive and better able to effectively serve customers in a rapidly evolving and dynamic energy market. ██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████   These are ingredients of a transaction that will

make the market more competitive, not less, regardless of how the market is defined.

### 1.   <u>Sophisticated, High-Volume Customers Promote Competition and Have Multiple Levers to Resist Anticompetitive Effects.</u>

Electricity generators' sophistication, bargaining power, and competitive levers ensure that the Joint Venture will not have any anticompetitive effects. Coal purchasers are typically large, sophisticated, utility customers. They carefully assess the price and availability of all fuels when determining how to generate or buy electricity using the resources available to them or in the market, then engage in confidential RFPs when procuring coal, and carefully negotiate supply contracts. Throughout the process, customer "purchasing decisions with respect to coal [are] based primarily upon a comparison of competitive forms of energy." *General Dynamics*, 341 F. Supp. at 555. As result, these "sophisticated, knowledgeable purchasers wield[] great economic power and hav[e] formidable bargaining strength," *id.* at 559, will turn to other fuel options—coal or non-coal—if the Joint Venture attempts increase prices, and will ensure the Joint Venture's realized cost efficiencies translate to lower prices notwithstanding any relative SPRB coal production concentration. *See, e.g,* *Baker Hughes*, 908 F. 2d at 986, 992 (affirming denial of injunction and noting customer sophistication will "promote competition even in a highly concentrated market"); *U.S. v. Country Lake Foods, Inc.*, 754 F. Supp. 669, 679 (D. Minn. 1990) (finding "power of buyers" will blunt any anticompetitive effects).

### a.   *Competition From Other Fuels Will Constrain the Joint Venture.*

As explained in Parts IV.A.1-2 above, there is overwhelming evidence that SPRB coal competes intensely with other fuels. Indeed, the FTC and its expert do not dispute interfuel competition exists, and that shifts in generation occur as a result. FTC Br. at 17 (acknowledging "broader 'all energy' market may satisfy analytical tests that identify a market"); PX8001 at ¶ 100 (acknowledging natural gas is substitute for coal). In fact, the FTC seemingly concedes that interfuel competition driven by ISOs/RTOs constrains SPRB coal suppliers just not, according to the FTC, "as closely as direct competition among SPRB coal suppliers." FTC Br. at 39.

Even if, as the FTC counter-factually alleges, other fuels were not sufficiently close substitutes to SPRB coal to be in the same product market, they clearly operate as a competitive constraint on SPRB coal producers that will preclude any anticompetitive effects as a result of the Joint Venture. *See, e.g., Deutsche Telekom,* 2020 WL 635499, at *15 (denying injunction where evidence of competition from related market participants was not sufficient to include them in market, but did "bear on the overarching competitive analysis")*; FTC v. Butterworth Health Corp.*, 946 F. Supp. 1285, 1302 (W.D. Mich. 1996) (finding despite market power in relevant market, FTC failed to show likelihood of anticompetitive effects). Sophisticated customers have and will continue to substitute other fuels for coal due to relative changes in price and thereby constrain the Joint Venture in both the short term, by reducing coal burn, deferring deliveries and purchasing less coal, and the long term, by retiring their coal EGUs.

### b.    Competition From Other Coal Producers in the PRB and Elsewhere Will Constrain the Joint Venture.

Likewise, contrary to the FTC's suggestion, these sophisticated customers will be as able to use RFPs and other procurement methods to keep SPRB coal prices competitive. Just because Arch and Peabody compete against one another and other SPRB suppliers in certain RFPs does not mean that RFPs issued after the Joint Venture will yield higher prices. To the contrary, customers will benefit from a combination of a lower-cost supplier and remaining SPRB coal suppliers with substantial excess capacity. ████████████████████████

████████████████████████████████████████████[178]

Although the Joint Venture will be the largest SPRB coal producer, it will continue to compete hard, not only against other fuels, but also against other producers in the SPRB region and beyond, including in sealed bidding processes for large, infrequent coal contract awards. *See, e.g., Arch Coal*, 329 F. Supp. 2d at 132–33 (recognizing competitiveness of SPRB RFPs); *U.S. v. Archer-Daniels-Midland Co.*, 781 F. Supp. 1400, 1422 (S.D. Iowa 1991) (denying injunction and recognizing sealed RFPs as constraint on anticompetitive pricing). Three other SPRB suppliers—

---

[178] ██████████████████

NTEC, Eagle, and Kiewit—collectively operate five of the largest mines in the U.S, frequently win business from Defendants, and will continue to compete. In addition, Black Hills and WFA, although smaller producers, both supply numerous power generators with SPRB coal (including EGUs operated by customers opposed to the Joint Venture) in addition to filling their own coal needs, and they too could provide further SPRB coal supply to the market, especially in the event of a price increase.[179]   The fact that SPRB coal competitors have significant, low-cost excess capacity that may be used to increase output and take market share from the Joint Venture in the event of a price increase makes any supposed price increase even less likely.[180]   *RAG-Stiftung,* 2020 WL 532980 at *25 (noting smaller competitor that "has won business . . . in the past" and has "excess capacity" will be well-positioned to disrupt any price increase); *Great Lakes*, 528 F. Supp. at 93-95 (finding a 5 to 4 merger would not substantially lessen competition due to excess capacity).   And this excess capacity will only grow as demand continues to decline due to additional coal EGU retirements and the continued shift to natural gas and renewable EGUs.[181]

Arch and Peabody's SPRB coal competitors compete in RFPs today and frequently win business against both Peabody and Arch, and there is no reason to believe they would not continue to do so in the future simply because there is one fewer producer.[182]   *See RAG-Stiftung,* 2020 WL 532980 at *27 (noting producers participating in RFPs "compete just as aggressively to win contracts no matter how many bidders are involved"). The "pencil sharpening" that the FTC makes much of—which is not a feature of most RFPs,[183] much less all coal sales processes[184]—

---

[179] Bailey Report ¶¶ 88-90, Ex. 58-59; ████████████████████████████████████
████████████.

[180] In total, these producers are estimated have 48, 62.1, 61.9, and 62.9 mmt of excess capacity for the years 2020 through 2023, respectively, which approximates the entire production of Black Thunder in 2019. Bailey Report ¶ 91, Ex. 60. ████████████████████████████████████████

[181] ████████████████████████████████ DX8022 (Moody's, Coal–North America Report 7/10/19) (projecting coal plant retirements may "reduce coal to as little as 11% of total US power generation by 2030," with "greatest impact on demand for coal" in "the [PRB]").

[182] Bailey Report ¶ 92.

[183] It is not present in even all RFPs by customers opposed to the Joint Venture. ████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

depends on one additional bidder's availability, and does not require both Arch and Peabody to be effective given competition from other coal producers. ███████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████[185] For example, █████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████[186] Likewise, ███████████████████████████████████████████████████████████████████ ███████████████████████████[187] Other coal producers will be particularly incentivized to keep SPRB coal prices competitive given the dynamic of coal EGU retirements and declining coal demand.  They too understand that each and every remaining coal EGU is at risk for future retirement, the result of which will be a permanent loss in coal demand.[188]

      Coal produced outside the SPRB, including in the NPRB, ILB, Appalachia, Colorado, Texas, and even foreign countries, is additive to this enduring coal supplier competition against the Joint Venture.  Although electricity generators may have a preference for SPRB coal, they previously have, can, and do purchase coal from other areas.[189]  Indeed, ████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████

---

████████████████████████████████████████████████████████████████████

[184] In many cases coal is purchased without a formal RFP process.  Bailey Report ¶¶ 77-78.  Even where an RFP process has been conducted, requesting parties often accept the most attractive offer of supply without further discussion with bidders.  ███████████████████████████

[185] Bailey Report ¶ 92, Ex. 61-63.
[186] ████████████████████████████████████████
[187] ██████████████████████████
[188] ███████████████████████████████████████████████████
[189] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████

████████████████████████████████████████████████████ [190] ███

██████████████████████████████████████████████████████████████

███████████████████████████████████ [191]   Many generators are also able to burn a

variety of coal blends that incorporate coal from non-SPRB regions, providing them further coal

alternatives to turn to in the event of a price increase.[192]   In short, sophisticated customers have

many coal-based options at their disposal to resist any price increases.

### 2.   The FTC's Competitive Effects Analysis Requires the Court to Assume the Joint Venture Would Pursue an Irrational Business Strategy.

It would be irrational for the Joint Venture to try to impose a price increase or restrict

output.  As explained above, coal producers have no incentive to raise prices and further erode

future coal demand due to dynamic interfuel completion and the risk of further coal EGU

retirements. *See infra* Part IV.A.2.  The only rational business strategy for coal producers is to

lower their costs, be price competitive with other fuels, and affirmatively work with their

customers to improve the ability of their coal EGUs to dispatch, improve their coal EGU

utilization, delay retirements and preserve coal demand.[193]   That is precisely what Peabody and

Arch already do in their day-to-day business, and the Joint Venture's rationale is to achieve

significant efficiencies that will better enable the parties to execute that strategy.[194]

Predictions of anticompetitive effects must be closely scrutinized in dynamic and

evolving marketplaces like the energy market. A "basic flaw in the antitrust theory and economic

analyses" advanced by the FTC and Dr. Hill is their failure to account for the fact that

anticompetitive effects "do not just happen" as a result of increased market share, but instead are



[190] ███████████████████████

[191] ████████████████████

[192] ████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████

[193] ██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████

[194] Israel Report ¶¶ 117-22; Israel Rebuttal ¶ 105; ███████████████████████████

the result of "purposeful business choices made by the corporation's management calculated, affirmatively or by effect, to achieve those ends." *Deutsche Telekom*, 2020 WL 635499 at *49. Here, given the dynamic interfuel competition facing coal producers, the Joint Venture will not result in "whatever anticompetitive course traditional antitrust economic theory and analysis would foretell may come to pass in a simple, static market." *Id.* Indeed, the anticompetitive strategy foreseen by the FTC and Dr. Hill not only finds *zero* support in the 6 million pages of documents produced by Defendants in the course of the FTC's investigation (and is instead contradicted throughout), *RAG-Stiftung,* 2020 WL 532980, at *27⬜28 (denying injunction where "record contains *no* evidence that [Defendant] intends to raise prices post-merger"),  but "would be counter-productive, even self-defeating" as the Joint Venture's failure to "ultimately … lower prices, as market dynamism would demand and more reliably predict . . . would effectively imperil its own future."[195]  *Deutsche Telekom,* 2020 WL 635499 at *49-50.  Not surprisingly, as Dr. Israel demonstrates, Dr. Hill's hypothesized competitive harm based on theoretical models falls entirely by the wayside once dynamic elements of competition are accounted for.[196]

Given the realities of dynamic interfuel competition, the Joint Venture will not have any anticompetitive effects.  *See id.; U.S. v. AT&T, Inc.*, 916 F.3d 1029, 1039 (D.C. Cir. 2019) (finding industry had become "remarkably dynamic" and holding district court properly rejected as inaccurate projected price increases forecasted by government's traditional and outdated economic theory); *Tenet Health*, 186 F.3d at 1055 (reversing injunction and holding district court "did not properly evaluate evolving market forces in the rapidly-changing healthcare market" and had instead relied on "outdated assumption[s]").

### 3. The Joint Venture Will Enhance Competition by Substantially Lowering Costs and Providing Better Pricing and Services to Customers.

The "primary benefit" of combinations like the Joint Venture is "their potential to generate significant efficiencies and thus enhance the merged firm's ability and incentive to

---

[195] ████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
████████████████████████.

[196] Israel Rebuttal ¶¶ 61-75.

compete, which may result in lower prices, improved quality, enhanced service, or new products." HMG § 10.  Accordingly, the Court is required to consider "evidence of enhanced efficiency in the context of the competitive effects of the merger . . . [as] the merged entity may well enhance competition." *Tenet Health*, 186 F.3d at 1054□55.  Any claimed efficiencies must be "verifiable and merger-specific." *Id.*; *see also* HMG § 10 (same).  But because efficiency projections are by their nature predictive—the Joint Venture has not yet been consummated and the relevant mines are not yet jointly operating—evidence of efficiencies need not be definitive; it need only show that the FTC's purported evidence "gives an inaccurate prediction of the proposed [Joint Venture's] probable effect" on competition.  *Staples*, 970 F. Supp. at 1089.

### a.  The Joint Venture Will Generate Significant Efficiencies that Far Outweigh Any Theoretical Harm to Competition.

Dr. Israel estimates that, in *variable* cost savings alone, the Joint Venture will achieve $370.2 to $508 million in cost reductions through the end of the mines' lives, and $174.3 to $294.8 million in variable cost savings in its first five years.[197]  These efficiencies will be achieved by optimizing production across mines that are currently operated separately, including through more efficient usage of equipment, employees, capital, and resources,[198] as well as savings from purchasing due to increased volumes and improved inventory management.[199]  Importantly, these cost savings do not result from a reduction in output as the FTC alleges; but rather from the simple fact that jointly optimizing contiguous mines reduces operating costs in the short term.[200]  These significant variable cost reductions encourage further coal production and are most likely to be pro-competitive.  *See, e.g., Deutsche Telekom*, 2020 WL 635499, at *21 (denying injunction where "incentive to use excess capacity given lower marginal costs, as well

---

[197] The upper bound figures represent Dr. Israel's determination of efficiencies based upon Defendants' 2019 production projections.  *See* Israel Report ¶¶ 138-40.  The lower bound figures are based upon Defendants' 2020 production projections, which assume the current low demand, due in part to the COVID-19 crisis, will persist. *Id.* at ¶¶ 212-15.

[198] *See id.* ¶¶ 141-88.

[199] *See id.* ¶¶ 189-211.

[200] *See* Israel Report ¶ 135 (stating "mathematical and operational fact that jointly optimizing production choices of contiguous mines with complementary reserves, infrastructure, and equipment, allows for lower production costs . . . thus reducing the cost of operations and *increasing* the output of coal").

as the reduction of required capital and operational expenditures" will enhance competition).

Indeed, as Dr. Israel explains, variable cost savings are precisely the type of efficiencies that are most likely to be passed on to customers, and to place downward pressure on coal prices.[201]  This is particularly true given intense competition from other fuel sources and the importance of preserving coal demand by slowing or preventing further coal retirements.[202]  For that reason, the Joint Venture's rationale is to achieve these cost savings and enhance Defendants' ability to compete with low cost natural gas and renewables by offering better, more competitive pricing to customers.[203]  And Defendants put their money where their mouth is by offering all their SPRB customers a $0.15/ton base price reduction on already-committed tons through 2022. This immediate discount—and expected future price reductions—will result in enhanced competition and significant customer savings,[204] as many recognized when assessing the Joint Venture's benefits.[205] *See, e.g. Butterworth Health*, 946 F. Supp. at 1301 (denying injunction where merger "would result in significant efficiencies, in the form of capital expenditure avoidance and operating efficiencies" that would accrue to consumers in light of commitments made by defendants); *U.S. v. Long Island Jewish Med. Ctr.*, 983 F. Supp. 121, 148-49 (E.D.N.Y. 1997) (denying injunction where merger would "result in significant efficiencies in the form of annual operating savings" that would benefit consumers).

The Joint Venture will also be able to provide more and better services, including the ability to develop more tailored and efficient coal blends to fit customers' coal EGUs' needs based on their particular specifications and economics.[206]  In addition, the Joint Venture will be better positioned to ensure that its mines continue to operate, guaranteeing a stable and reliable

---

[201] *Id.* ¶ 134 (noting efficiencies "will lower coal prices (compared to prices in the absence of the JV)").
[202] *Id.* ¶ 130.
[203] *Id.* ¶ 134.
[204] *Id.* ¶ 100 & n.165.
[205] ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████
[206] Israel Report ¶ 137 n. 246.

supply of coal, which is a significant concern for many customers.[207] ███████████

█████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████[208]

These important non-price synergies provide further evidence that the Joint Venture will enhance, rather than impair, competition.  *See, e.g., Tenet Health*, 186 F.3d at 1054–55 (noting evidence that "larger and more efficient" merged entity would provide better services than either entity "could separately" and concluding "merged entity may well enhance competition").

Finally, a quantitative analysis of the Joint Venture's benefits demonstrates that the generated efficiencies far outweigh any theoretical harm to competition. Indeed, Dr. Israel's analysis shows that the efficiencies generated by the Joint Venture far exceed any theoretical harm to competition predicted by Dr. Hill's models,[209] which provides quantitative evidence that Joint Venture will enhance rather than hinder competition and ultimately benefit customers.

### b.      The Efficiencies are Verifiable.

Efficiencies are verifiable if shown in "real' terms," *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 332, 348 (3d Cir. 2016), and if they result from "shifting production facilities formerly owned separately, which enables the merging firms to reduce the incremental cost of production," and are "substantiated by analogous past experience." HMG § 10.

Here, the Joint Venture's concrete efficiencies satisfy both criteria and should be credited.  Each variable cost saving generated by the Joint Venture was documented years before the Joint Venture was first contemplated, is independently substantiated by Dr. Israel and results from combining formerly separate production operations to reduce incremental production

---

[207] ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████

[208] ██████████████████████████

[209] Israel Rebuttal ¶¶ 61-75.

costs.[210] *Deutsche Telekom*, 2020 WL 635499, at *26 (efficiencies sufficiently verifiable where merger would combine facilities, reduce marginal costs, and increase capacity). Numerous market participants testified that they too believe that the Joint Venture should be able to achieve significant efficiencies.[211] Moreover, Defendants have a history of not only achieving efficiencies promised in similar transactions, but exceeding them. Arch's previous acquisition and combination of Triton's North Rochelle Mine with Black Thunder in 2004 and Rio Tinto's Jacobs Ranch mine in 2009 resulted in significant efficiencies that involve many of the same or substantially similar categories of efficiencies that Peabody and Arch will achieve by through the Joint Venture.[212] The fact that Defendants historically have not only achieved, but exceeded, planned efficiencies in connection with combinations similar to the Joint Venture demonstrates the Joint Venture's transformational efficiencies are not speculative, pie-in-the-sky projections as the FTC suggests, but instead verifiable and achievable based on past experience. *See, e.g. Deutsche Telekom*, 2020 WL 635499, at *23–26 (denying injunction and finding efficiencies verifiable where defendant "already overdelivered on its projected efficiencies in an analogous past merger" and proposed combination "would be very similar").

### c.   The Efficiencies Are Specific to the Joint Venture.

Efficiencies are merger-specific if they "cannot be achieved by either company alone." *Penn State*, 838 F.3d at 348; *see also* HMG § 10 (agencies credit "only those efficiencies likely to be accomplished with the proposed merger and unlikely to be accomplished in [its] absence"). Both Peabody and Arch have filed for bankruptcy in the past five years and undergone

---

[210] Israel Report ¶¶ 136, 149-88, 192-211.

[211] ██████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████

[212] *See* Israel Report ¶¶ 234-39. In the case of North Rochelle, Arch achieved estimated savings of $115 million for the five years following acquisition—a significant increase above the pre-acquisition projected $75-100 million. *Id.* ¶ 237. Arch similarly surpassed expected efficiencies in the case of Jacobs Ranch, estimating pre-merger savings of $276 million, but later updating its post-acquisition estimate of total cost savings to $399 million. *Id.* ¶ 238; *see also* Israel Rebuttal ¶¶ 84-89.

significant restructurings designed to reduce their independent cost structures as much as possible. There is only so much Defendants can do on their own, and the Joint Venture's efficiencies "result directly from combining Peabody's and Arch's SPRB operations under a joint mine plan" and joint optimization of their respective equipment, people, inventory and resources, "cannot be achieved in the absence of the [Joint Venture]" and are thus "specific to the JV."[213] *See, e.g. Deutsche Telekom,* 2020 WL 635499, at *23 (finding merger-specificity where neither party "as a standalone can achieve the level of efficiencies promised").

## V.   THE EQUITIES WEIGH IN FAVOR OF THE JOINT VENTURE.

"Absent a likelihood of success on the merits . . . equities alone will not justify an injunction." *Arch Coal*, 329 F. Supp. 2d at 159. Here, the equities support denying injunctive relief.  *See Nat'l Tea Co.*, 603 F.2d at 697 (affirming denial of injunction where balance of equities weighed against enjoining proposed merger).  As explained above, the Joint Venture will generate substantial efficiencies that will improve competition and benefit consumers. Denying injunctive relief will ensure that these synergies are realized quickly and benefit customers.  *See FTC v. H.J. Heinz Co.*, 246 F.3d 708, 726 (D.C. Cir. 2001) ("[P]ublic equities include 'beneficial economic effects and procompetitive advantages for consumers.'").

By contrast, granting an injunction would doom the Joint Venture, ensure that its benefits are never realized, and impede Defendants' ability to compete in an increasingly challenging market environment. The Joint Venture simply cannot weather the "glacial pace of an FTC administrative proceeding." *FTC v. Lab. Corp. of Am.*, 2011 WL 3100372, at *22 (C.D. Cal. Mar. 11, 2011).  No proposed transaction has ever been completed after the issuance of a preliminary injunction. *Id.*  Accordingly, especially with the FTC's unlikelihood of success on the merits, the equities strongly support denying the FTC's request for injunctive relief.

## VI.   CONCLUSION

For all the foregoing reasons, the Motion for Preliminary Injunction should be denied.

---

[213] *Id.*¶ 135.

Dated: June 25, 2020

Respectfully submitted,

/s/ Edward D. Hassi

**DEBEVOISE & PLIMPTON LLP**

Edward D. Hassi, #1026776 (DC)
(thassi@debevoise.com)
Leah S. Martin, #1029757 (DC)
(lmartin@debevoise.com)
801 Pennsylvania Avenue, N.W.
Washington, DC 20004
Tel.: (202) 383-8000

Michael Schaper, #4033486 (NY)
(mschaper@debevoise.com)
J. Robert Abraham, #4935110 (NY)
(jrabraham@debevoise.com)
Tristan M. Ellis, #5405444 (NY)
(tmellis@debevoise.com)
919 Third Avenue
New York, NY 10022
Tel.: (212) 909-6000

**HUSCH BLACKWELL LLP**

Catherine L. Hanaway #41208 (MO)
(catherine.hanaway@huschblackwell.com)
Michael C. Martinich-Sauter # 66065 (MO)
(Michael.martinich-
sauter@huschblackwell.com)
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
Tel.: (314) 480-1500

**AKIN GUMP STRAUSS HAUER
& FELD LLP**

Goray Jindal, #471059 (DC)
(gjindal@akingump.com)
Corey W. Roush, #466337 (DC)
(croush@akingump.com)
J. Matthew Schmitten, #742690 (GA)
(mschmitten@akingump.com)
2001 K Street, N.W.
Washington, DC 20006
Tel.: (202) 887-4000

Cristina Thrasher, #5109954 (NY)
(cthrasher@akingump.com)
One Bryant Park
Bank of America Tower
New York, NY 10036
Tel.: (212) 872-1000

*Counsel to Defendant Peabody Energy Corporation*

**BAKER BOTTS LLP**

Stephen Weissman #451063 (DC)
(stephen.weissman@bakerbotts.com)
Michael Perry #1047965 (DC)
(michael.perry@bakerbotts.com)
William Lavery #503292 (DC)
(william.lavery@bakerbotts.com)
Matthew Adler #1022438 (DC)
(matthew.adler@bakerbotts.com)

Andrew George #988552 (DC)
(andrew.george@bakerbotts.com)
Elisa Beneze #1048179 (DC)
(elisa.beneze@bakerbotts.com)
Jarad Daniels #1044253 (DC)
(jarad.daniels@bakerbotts.com)
Steven Pet #1617458 (DC)
(steven.pet@bakerbotts.com)
700 K St NW
Washington, DC 20001
Tel: (202) 639-7700

*Counsel to Defendant Arch Resources, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 25th day of June, 2020, I served the foregoing on the following counsel via electronic mail:

Daniel Matheson
Federal Trade Commission
400 Seventh Street SW
Washington, DC 20024
Telephone: (202) 326-2075
Email: dmatheson@ftc.gov

*Attorney for Plaintiff Federal Trade Commission*

/s/ Edward D. Hassi

Edward D. Hassi

*Counsel to Defendant Peabody Energy Corporation*