UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 4:20-cv-00317-SEP |
| PEABODY ENERGY CORPORATION | ) ) ) |
| and | ) ) |
| ARCH COAL, INC., | ) ) |
| Defendants. | ) ) |

**STATE OF WYOMING'S *AMICUS CURIAE* BRIEF IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION .................................................................................................................... 1

BACKGROUND ...................................................................................................................... 2

DISCUSSION ........................................................................................................................... 5

       I.      The analytical framework applicable to horizontal mergers .................................. 5

      II.     The relevant product market ................................................................................. 9

      III.    The transaction's probable effect on competition ................................................. 9

      IV.    Equity favors denial of the preliminary injunction .............................................. 13

CONCLUSION ....................................................................................................................... 14

## TABLE OF AUTHORITIES

**Cases**

*Brown Shoe Co. v. United States*,
 370 U.S. 294 (1962) ............................................................................................. 5, 7

*FTC v. Arch Coal, Inc.*,
 329 F. Supp. 2d 109 (D.D.C. 2004) ..................................................................... 7, 10

*FTC v. Cardinal Health, Inc.*,
 12 F. Supp. 2d 34 (D.D.C. 1998) ............................................................................. 8

*FTC v. Food Town Stores, Inc.*,
 539 F.2d 1339 (4th Cir. 1976) ................................................................................ 13

*FTC v. Pharmtech Research, Inc.*,
 576 F. Supp. 294 (D.D.C. 1983) ............................................................................. 14

*FTC v. Staples, Inc.*,
 970 F. Supp. 1066 (D.D.C. 1997) ....................................................................... 6, 13

*FTC v. Univ. Health, Inc.*,
 938 F.2d 1206 (11th Cir. 1991) .............................................................................. 13

*FTC v. Warner Commc'ns Inc.*,
 742 F.2d 1156 (9th Cir. 1984) ................................................................................ 14

*FTC v. Weyerhaeuser Co.*,
 665 F.2d 1072 (D.C. Cir. 1981) .............................................................................. 13

*United States v. Archer-Daniels-Midland Co.*,
 781 F. Supp. 1400 (S.D. Iowa 1991) ........................................................................ 8

*United States v. Baker Hughes Inc.*,
 908 F.2d 981 (D.C. Cir. 1990) ........................................................................ 6, 7, 8

*United States v. Citizens & S. Nat'l Bank*,
 422 U.S. 86 (1975) ................................................................................................... 6

*United States v. Gen. Dynamics Corp.*,
 415 U.S. 486 (1974) ............................................................................................. 1, 7

*United States v. Philadelphia Nat'l Bank*,
 374 U.S. 321 (1963) ............................................................................................. 5, 6

**Statutes**

15 U.S.C. § 18 ............................................................................................................ 5, 6

15 U.S.C. § 53(b) ..................................................................................................... 5, 13

**Other Authorities**

Benjamin Storrow, E&E News, *Coal spiral deepens with 13 plant closures announced in 2020* (May 27, 2020) ................................................................................................................ 2

Benjamin Storrow, E&E News, *Meet America's 10 largest emitters* (May 11, 2020) ................... 3

H.R. Rep. No. 93-624 (1973), ................................................................................................... 13

Joint Statement in the Matter of The Boeing Company/McDonnell Douglas Corporation ......... 10

Lawrence A. Sullivan & Warren S. Grimes, *The Law of Antitrust* § 9.1 (2000) ............................ 5

National Association of Regulatory Utility Commissioners, *Recent Changes to U.S. Coal Plant Operations and Current Compensation Practices* (January 2020) .................................. 3

Robert Godby and Roger Coupal, University of Wyoming, Center for Energy and Economics and Public Policy, WIA Spring Meeting, *Potential Impacts to Wyoming of the Coal Transition* (March 28, 2019) ....................................................................................... 3

Seth Feaster and Karl Cates, Institute for Energy Economics and Financial Analysis, *Powder River Basin Coal Industry is in Long-Term Decline, Fast-Changing Markets Indicate Deeper Downturns to Come in Montana and Wyoming* (March 2019) ................ 2, 3, 4

Thomas A. Piraino, Jr., *A New Approach to the Antitrust Analysis of Mergers*, 83 B.U. L. Rev. 785 (2003) ...................................................................................... 8, 10, 12

United States Department of Justice and Federal Trade Commission, *Horizontal Merger Guidelines* (2010) ........................................................................................................ 8

United States Energy Information Administration, Today in Energy, *Sixteen mines in the Powder River Basin produce 43% of U.S. coal* (Aug. 26, 2019) ........................................... 3, 4

The State of Wyoming, through its undersigned counsel, hereby offers the following *amicus curiae* brief in opposition to the Federal Trade Commission's (FTC) Motion for Preliminary Injunction. (Docket 137).

## INTRODUCTION

Demand for Wyoming coal is declining, and that decline will only continue as investment in renewable electricity increases while domestic coal-fired plants near the end of their established depreciable lives and are not replaced with new coal-fired facilities. As a result of reduced demand, Wyoming mines have significant excess capacity and coal producers have struggled in recent years to stay economically viable. In fact, five Powder River Basin (PRB) coal producers have declared bankruptcy since 2015, including both Defendants in this action. The reduction in Wyoming coal production and resulting industry weakness have had significant consequences for the State, its counties, local governments and citizens, many of whom have lost good jobs with the coal companies. While there will be coal production in Wyoming for the foreseeable future, it will be on a significantly reduced scale. The industry must contract and consolidate to survive. That can be managed in a thoughtful way that minimizes harm or it can happen haphazardly through bankruptcies and sudden mine closures.

The FTC's conventional approach to the proposed joint venture ignores how the power generation market functions in the real world. This is evident in the FTC's constricted definition of the relevant product market. As far back as 1974, the Supreme Court had no trouble with the notion that "coal faced strong and direct competition from other sources of energy such as oil, natural gas, nuclear energy, and geothermal power which created a cross-elasticity of demand among those various fuels." *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 491 (1974). More importantly, the FTC's conventional approach breaks down and produces a

1

counterproductive result when applied to the unique circumstances of this case. Wyoming writes separately to ask the Court to conclude that, even assuming the FTC identified the relevant product market, which it has not, an undue percentage share of the coal production market simply does not translate into actual anti-competitive capability in an excess capacity market with a diminishing number of powerful buyers who have a wide range of available, competitively priced alternatives.

## BACKGROUND

Wyoming believes that the relevant facts are simple, beyond reasonable dispute, and that the parties will introduce evidence at the hearing confirming the facts set forth herein.

As the FTC correctly notes, the vast majority of PRB coal is sold to domestic power companies for electricity generation. (Docket. 160-1 at 4). But the last coal-fired power plant in the continental United States was commissioned in 2011 and no new coal-fired power plants are planned. Existing coal plants are retiring at an accelerating rate. A decade ago, slightly more than 200 plants bought PRB coal, but by 2018 that number was down to approximately 132. *See* Seth Feaster and Karl Cates, Institute for Energy Economics and Financial Analysis, *Powder River Basin Coal Industry is in Long-Term Decline, Fast-Changing Markets Indicate Deeper Downturns to Come in Montana and Wyoming* 14 (March 2019).[1] Just this year, "[p]ower companies have announced plans to close 13 coal plants [], according to an E&E News review of federal data and companies' closure plans. Two others will be converted to natural gas." Benjamin Storrow, E&E News, *Coal spiral deepens with 13 plant closures announced in 2020* (May 27, 2020).[2]

---

[1] https://ieefa.org/wp-content/uploads/2019/03/Powder-River-Basin-Coal-Industry-Is-in-Long-Term-Decline_March-2019.pdf

[2] https://www.eenews.net/climatewire/stories/1063243187/

At the same time coal plant utilization rates are dropping. "Collectively, coal plants are running less than ever before. Their usage rate nationwide fell below 50% for the first time in 2019, according to the Department of Energy." Benjamin Storrow, E&E News, *Meet America's 10 largest emitters* (May 11, 2020).[3] "As new natural gas combined cycle plants have become increasingly more efficient and cheaper to operate than older existing coal-fired power plants, coal units continue to lose baseload generation share and more frequently operate as load-following, or cycling, resources." National Association of Regulatory Utility Commissioners, *Recent Changes to U.S. Coal Plant Operations and Current Compensation Practices* 1 (January 2020).[4] This trend is the result of multiple aggregating factors including, cost competitiveness of natural gas and renewables, stricter environmental regulations, and consumer preference for cleaner, cheaper fuels. *See, e.g.*, Robert Godby and Roger Coupal, University of Wyoming, Center for Energy and Economics and Public Policy, WIA Spring Meeting, *Potential Impacts to Wyoming of the Coal Transition* 3 (March 28, 2019).[5]

As a result of having fewer buyers and those buyers using less coal, there is significant overcapacity in the PRB, while prices remain flat or are declining. For example, "In 2008, the PRB produced 496 million tons of coal. By 2018, that number had fallen to 324 million." Feaster and Cates, at 14. As production continues to decline even more since 2018, prices have also fallen. *See, e.g.*, United States Energy Information Administration, Today in Energy, *Sixteen mines in the Powder River Basin produce 43% of U.S. coal* (Aug. 26, 2019) ("In 2008, the average annual selling price for PRB coal with a heating value of 8,800 British thermal units per pound was $13.31

---

[3] https://www.eenews.net/stories/1063101975

[4] https://pubs.naruc.org/pub/7B762FE1-A71B-E947-04FB-D2154DE77D45

[5] http://www.wyia.org/wp-content/uploads/2019/04/Godby_WIA-Spring-Meeting-3-28-2019.pdf

3

per short ton, compared with $12.31 per short ton in 2018.").[6] In essence, there are multiple mines chasing too few customers who are demanding less and less coal. This situation is unsustainable and increases the risk of sudden unplanned mine closures absent contraction and consolidation of the coal production industry.

This situation is made even more untenable because the remaining customers have outsized power over the mines. "The majority of sales from at least 11 PRB mines are now concentrated at just a few power plants, leaving them highly vulnerable to individual power plant closures or changes in supply contracts." Feaster and Cates, at 18. Moreover, "Major advances in grid management [] have allowed the seamless integration of thousands of utility-scale wind and solar plants; enabled a far higher share of renewables than was forecast even a few years ago and facilitated greater flexibility in fuel switching by utilities." *Id.* at 7.

> Because coal is an increasingly shrinking part of their generation portfolio, utility companies are less reliant on the coal industry than they have been and are largely free to make decisions irrespective of the impact on coal producers. This phenomenon can be seen in how utilities are changing their coal-purchasing behavior by opting, for instance, for short-term supply contracts and more spot purchases, a trend that compounds uncertainty for coal producers.

*Id.* at 6.

Thus, the basic facts that Wyoming contends dictate the outcome of these proceedings are few. The market for PRB coal has significant excess capacity and a diminishing number of powerful buyers who have a wide range of available, competitively priced alternatives. Those buyers can choose other sources of electricity both in the short-term by buying or producing energy from alternative sources and in the long-term by retiring ever more idle coal plants. In these unique circumstances, even if the proposed joint venture resulted in an undue percentage share in the

---

[6] https://www.eia.gov/todayinenergy/detail.php?id=41053

relevant market, which it does not, that market share does not accurately reflect the merger's probable effects on competition.

## DISCUSSION

### I. The analytical framework applicable to horizontal mergers

The legal framework used to evaluate mergers alleged to be anti-competitive by the FTC is well established. Section 7 of the Clayton Act prohibits acquisitions, including mergers, "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18; *see United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 355 (1963) ("The statutory test is whether the effect of the merger 'may be substantially to lessen competition' 'in any line of commerce in any section of the country.'"). "Congress used the words '*may be* substantially to lessen competition' (emphasis supplied), to indicate that its concern was with probabilities, not certainties." *Brown Shoe Co. v. United States,* 370 U.S. 294, 323 (1962) (emphasis original). "Merger enforcement, like other areas of antitrust, is directed at market power. It shares with the law of monopolization a degree of schizophrenia: an aversion to potent power that heightens risk of abuse; and tolerance of that degree of power required to attain economic benefits." Lawrence A. Sullivan & Warren S. Grimes, *The Law of Antitrust* § 9.1, at 511 (2000).

Section 13(b) of the Act provides that "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, ... a preliminary injunction may be granted." 15 U.S.C. § 53(b). Section 13(b) provides a mechanism whereby the FTC may seek preliminary injunctive relief preventing the merging parties from consummating the merger until the Commission has had an opportunity to investigate and, if necessary, adjudicate the matter. Thus, "Whenever the

5

Commission has reason to believe that a corporation is violating, or is about to violate, Section 7 of the Clayton Act, the FTC may seek a preliminary injunction to prevent a merger pending the Commission's administrative adjudication of the merger's legality." *FTC v. Staples, Inc.,* 970 F. Supp. 1066, 1070 (D.D.C. 1997).

To determine the FTC's likelihood of success on the merits, courts measure the probability that, after an administrative hearing on the merits, the FTC will succeed in proving that the effect of the proposed merger "may be substantially to lessen competition, or to tend to create a monopoly" in violation of section 7 of the Clayton Act. *Id.* at 1072; 15 U.S.C. § 18. The standard for likelihood of success on the merits is met if the FTC "has raised questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals." *See, e.g., Staples,* 970 F. Supp. at 1071.

The analytical approach by which the government establishes a section 7 violation is well established. *See, e.g., United States v. Baker Hughes Inc.*, 908 F.2d 981, 982-83 (D.C. Cir. 1990). First the FTC must show that the merger would produce "a firm controlling an undue percentage share of the relevant market, and [would] result[ ] in a significant increase in the concentration of firms in that market." *Philadelphia Nat'l Bank,* 374 U.S. at 363. Such a showing establishes a "presumption" that the merger will substantially lessen competition. *Baker Hughes,* 908 F.2d at 982. To rebut the presumption, the defendants must produce evidence that "show[s] that the market-share statistics [give] an inaccurate account of the [merger's] probable effects on competition" in the relevant market. *United States v. Citizens & S. Nat'l Bank,* 422 U.S. 86, 120 (1975). "If the defendant successfully rebuts the presumption [of illegality], the burden of producing additional evidence of anticompetitive effect shifts to the government, and merges with

6

the ultimate burden of persuasion, which remains with the [FTC] at all times." *Baker Hughes Inc.,* 908 F.2d at 983.

"'[O]nly ... examination of the particular market—its structure, history, and probable future—can provide the appropriate setting for judging the probable anticompetitive effect[s] of the merger.'" *Gen. Dynamics*, 415 U.S. at 498 (quoting *Brown Shoe,* 370 U.S. at 322 n.38). "Analysis of the likely competitive effects of a merger requires determinations of (1) the relevant product market in which to assess the transaction, (2) the geographic market in which to assess the transaction, and (3) the transaction's probable effect on competition in the relevant product and geographic markets." *See FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 117 (D.D.C. 2004).

Among other defenses, defendants may demonstrate unique economic circumstances that undermine the predictive value of the government's statistics. *See, e.g., Gen. Dynamics*, 415 U.S. at 506-10 (finding that fundamental changes in structure of coal market made market concentration statistics inaccurate predictors of anticompetitive effect). The Supreme Court has cautioned that statistics reflecting market share and concentration, while of great significance, are not conclusive indicators of anti-competitive effects. *See id.* at 498("Statistics reflecting the shares of the market controlled by the industry leaders and the parties to the merger are, of course, the primary index of market power; but only a further examination of the particular market—its structure, history and probable future—can provide the appropriate setting for judging the probable anticompetitive effect of the merger."); *see also Brown Shoe,* 370 U.S. at 322 n.38. For example, in *General Dynamics* the Supreme Court held that the market share statistics the government used to seek divestiture of the merged firm were insufficient because, in failing to take into account the acquired firm's long-term contractual commitments (coal contracts), the statistics overestimated the acquired firm's ability to compete in the relevant market in the future. *Id.* at 500–04.

In addition, "powerful buyers may constrain the ability of the merging parties to raise prices." United States Department of Justice and Federal Trade Commission, *Horizontal Merger Guidelines* § 8 (2010).[7] "Large customers may be able to exercise their bargaining power to prevent the merged entity from raising prices. In certain markets, such customers may prevent firms with market shares in excess of fifty percent from engaging in unilateral anti-competitive conduct." Thomas A. Piraino, Jr., *A New Approach to the Antitrust Analysis of Mergers*, 83 B.U. L. Rev. 785, 804 (2003). Several courts have found that buyers had sufficient leverage to counteract the anti-competitive effects of proposed mergers. *See FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 60 (D.D.C. 1998) (finding that customers of drug wholesalers "possess a significant amount of leverage in contract negotiations"); *United States v. Archer-Daniels-Midland Co.*, 781 F. Supp. 1400, 1416 (S.D. Iowa 1991) (finding that "the existence of large, powerful buyers... mitigates against the ability of sellers to raise prices"); *Baker Hughes*, 908 F.2d at 986-87 (finding that the "sophistication" of the defendant's customers "was likely to promote competition even in a highly concentrated market").

Anti-competitive effects of a merger can be either coordinated or unilateral. Coordinated effects typically occur when the merged entity does not have enough market power to raise prices, reduce output, or engage in other anti-competitive conduct on its own, but the reduced number of firms in the market creates the opportunity for them to exercise oligopoly power collectively. *See, e.g.*, Piraino, 83 B.U. L. Rev. at 820. Unilateral effects typically occur when the relative market share of the merged entity exceeds fifty percent and the merged entity may be empowered to raise prices, reduce output, or engage in other anti-competitive conduct on its own. *Id.* at 821. Here the FTC asserts that the proposed joint venture will permit unilateral anti-competitive effects.

---

[7] https://www.justice.gov/atr/horizontal-merger-guidelines-08192010

## II.     The relevant product market

In Wyoming's view the FTC's definition of the relevant product market is shockingly antiquated and no longer reflects the realities of electricity generation in the United States. It seems to Wyoming that the FTC barely acknowledges, among other things, even the existence of the power grid, the ease with which electric utilities can choose one form of generation over another in nearly real time based on cost and other factors, the cost competitiveness of natural gas and renewables, the significant number of coal plant retirements, the reduced utilization of the remaining coal plants and their conversion from baseload generation to load-following, and the growing preference for spot purchases over long-term contracts. Nevertheless, Wyoming expects that the parties will thoroughly explore these and other matters related to the definition of the relevant market during the hearing. Accordingly, Wyoming will not belabor its vexation with the FTC's view here.

## III.    The transaction's probable effect on competition

Even assuming that the FTC has properly defined the relevant product market, the Court should conclude that the presumption of illegality is rebutted by the unique economic circumstances present here and by the presence of powerful buyers. These two factors alone make the probability of anti-competitive action by the merged entity highly unlikely.

It is true that the merged entity will control a majority of coal production capacity in the southern PRB. But the mere aggregation of market share above fifty percent of the relevant market does not make a proposed merger necessarily anti-competitive. For example, in 1997 the FTC approved the merger of Boeing and McDonnell Douglas creating a company with more than fifty

9

percent market share and only one competitor. *See Joint Statement in the Matter of The Boeing Company/McDonnell Douglas Corporation*.[8] At that time, the FTC acknowledged:

> On its face, the proposed merger appears to raise serious antitrust concerns. The transaction involves the acquisition by Boeing, a company that accounts for roughly 60% of the sales of large commercial aircraft, of a non-failing direct competitor in a market in which there is only one other significant rival, Airbus Industrie, and extremely high barriers to entry. The merger would also combine two firms in the U.S. defense industry that develop fighter aircraft and other defense products.

*Id.* In reaching its decision, the FTC explained that McDonnell Douglas was not a failing firm, as that term is commonly understood and explained in the Horizontal Merger Guidelines, but that "(1) McDonnell Douglas, looking to the future, no longer constitutes a meaningful competitive force in the commercial aircraft market and (2) there is no economically plausible strategy that McDonnell Douglas could follow, either as a stand-alone concern or as part of another concern, that would change that grim prospect." *Id.*

Thus, as the Court did in *General Dynamics*, the FTC was convinced "that certain market factors made the exercise of unilateral market power unlikely." Piraino, 83 B.U. L. Rev. at 821. And the FTC's conclusion proved to be correct.

> Despite this oligopoly, airlines have had sufficient bargaining power to win significant price concessions from the two companies. The Boeing-McDonnell Douglas merger has actually been advantageous to consumers. Airlines have benefited from their suppliers' economies of scale, which allow them to invest in improved airplane models, such as the new fuel efficient aircraft under development at Boeing and the new wide-body plane that Airbus is designing.

*Id.* (footnotes omitted). This pragmatic analysis of the "transaction's probable effect on competition" is exactly what is needed in this case. *Arch Coal*, 329 F. Supp. 2d at 117.

---

[8]https://www.ftc.gov/public-statements/1997/07/statement-chairman-robert-pitofsky-commissioners-janet-d-steiger-roscoe-b

This Court should consider the proposition that the proposed joint venture will provide an overall benefit to the public precisely because the merger will permit the companies to reduce production in order to redress chronic excess capacity. Traditionally, courts view reductions in output as harmful to consumers because they can lead to higher prices. In some cases, however, including this one, consumers and the public will benefit from the stability and predictability resulting from the elimination of excess capacity.

As explained by one distinguished antitrust commentator:

> With too much product chasing too few consumers, many companies have found it impossible to make a profit. American consumers have become unwilling to purchase certain products or services at a price that will generate a reasonable return for producers.
>
> \* \* \* \* \*
>
> In the short-run, low prices benefit consumers, but they may have adverse consequences. As one commentator recently remarked, "One person's purchase price is another person's revenue. Gas at ninety cents a gallon seems great if you own a Lincoln Navigator but not if you own an oil well." Although falling prices may provide a short-term boon to consumers in excess capacity industries, the long-term economic trends in such markets are usually adverse to consumers. Excess capacity markets are characterized by disinvestment, employment losses, bankruptcies, and a general decline in the quality of products and services. If prices sink too low, producers will not earn sufficient profits to fund capital investments in machinery, computers, and other tools of production. Industries that lack the profits necessary to sustain their productivity will fall behind in the global economic race. Indeed, robust capital investment is critical to maintaining gains in productivity, which is "'the single most important factor affecting our economic well-being.'"
>
> Companies that operate in markets suffering from over-capacity face a cruel dilemma. It is costly to bring capacity in line with demand. The need to accrue environmental remediation, employee termination, and other closure costs often deters companies from reducing the scope of their operations. Only companies with strong balance sheets can afford to incur such costs, and in excess capacity industries, few companies have such financial wherewithal. Instead of addressing their capacity problem, they stumble along, growing progressively weaker until they are forced to liquidate or reorganize in a bankruptcy proceeding.

> A merger may give firms the financial strength necessary to close or modernize outdated facilities in excess capacity industries. The economic and social costs of mergers are usually less than those of liquidations. A merger offers at least the prospect that a firm can enhance the productivity of its assets and provide continued employment and benefits to its workers, while in a liquidation, workers stand to lose not only their jobs, but also their health care and pension benefits. LTV Steel, for example, entered into Chapter 7 bankruptcy in late 2001 and later liquidated its assets, leaving 70,000 employees and retirees without health care and pension benefits. If LTV had merged with a financially viable company such as US Steel, it might have gained the financial wherewithal necessary to continue to provide such benefits while modernizing its plants.

Piraino, 83 B.U. L. Rev. at 826-29 (footnotes omitted).

Moreover, notwithstanding FTC's academic hypothetical monopolist exercise, the Court should focus on whether in reality it is probable that the merged entity will raise prices in this declining market. The answer to that question is clearly "No." The merged entity can, and probably will reduce production. But it must do so in order to match its production with reduced demand. That kind of reduction does not lead inevitably to a price increase. In the short term, a price increase would lead electric utilities to choose other available methods of generation within their portfolios, to buy cheaper power from the grid, and to elicit spot purchases from other mines. In the long term, they would invest in other methods of generation and speed coal plant retirements. There is little to be gained for the merged entity by alienating the few customers it has remaining.

That leads to the second critical reality in this case. The coal producers are dependent on the electric utilities, not the other way around. If there ever was a time when the electric utilities were dominated by the coal producers, and *General Dynamics* suggests there was not, that time has long passed. In a market with fewer and fewer buyers, those buyers have ever increasing power to dictate price. That fact is evident from the electric utilities' demonstrated ability to constrain coal prices during the last decade. If the coal companies, already in a market with few producers controlling significant market shares, could raise the price, they surely would have. But they cannot

12

raise prices. They cannot afford to give the electric utilities any reason to accelerate additional retirements, because they are acutely sensitive to those retirements. The coal producers simply have nowhere else to go. By contrast, the powerful buyers, have an ever increasing range of options, and they know it.

In Wyoming's view, the obvious practical outcome of the proposed joint venture is reduced production to align with demand and reduced price to appease powerful buyers. This outcome preserves, rather than prevents, competition in the market and should be permitted by the Court.

## IV. Equity favors denial of the preliminary injunction

Even if the FTC could show a likelihood of success, the Court must still weigh the equities in order to decide whether enjoining the merger would be in the public interest. 15 U.S.C. § 53(b); *see, e.g., FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1080-83 (D.C. Cir. 1981). The District of Columbia Circuit has held that in cases such as the one now before the Court, a judge is obligated "to exercise independent judgment on the propriety of issuance of a temporary restraining order or preliminary injunction." *Weyerhaeuser,* 665 F.2d at 1082 (quoting H.R. Rep. No. 93-624, at 31 (1973)). "Independent judgment is not exercised when a court responds automatically to the agency's threshold showings. To exercise such judgment, the court must take genuine amount of 'the equities.'" *Id.*

There are two types of equities which the Court must consider in all Section 13(b) cases, private equities and public equities. *Staples*, 970 F. Supp. at 1091. The principal public equity weighing in favor of issuance of preliminary injunctive relief is the public interest in effective enforcement of the antitrust laws. *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1225 (11th Cir. 1991). Congress specifically had this public equity consideration in mind when it enacted section 13(b). *See FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1342 (4th Cir. 1976) (noting that

13

Congress enacted section 13(b) to preserve status quo until the FTC can perform its function). Hence, if the merger were ultimately found to violate the Clayton Act, it would be impossible to recreate pre-merger competition. *See FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1165 (9th Cir. 1984) ("A denial of a preliminary injunction would preclude effective relief if the Commission ultimately prevails and divestiture is ordered."). But public equities may also include "beneficial economic effects and pro-competitive advantages for consumers." *FTC v. Pharmtech Research, Inc.,* 576 F. Supp. 294, 299 (D.D.C. 1983).

Here, Wyoming suggests that both the public and private equities weigh against a preliminary injunction. The principle public equity expressed above is well known, but not exclusive. The citizens of Wyoming are members of the public too and, their interest in a stable healthy coal industry merit consideration by the Court. The thoughtful planned consolidation of coal mines in Wyoming, despite the resulting production decline, provides a substantial benefit to Wyoming communities and their citizens. Unforeseen abrupt mine closures and bankruptcies result in immediate layoffs that ripple through the whole Wyoming economy, increasing demands for social services, depriving state and local budgets of both future tax revenues and tax revenues lost in bankruptcy proceedings, and ultimately, long-term population loss. Forcing the coal industry to stand on wobbly legs will result in real suffering in Wyoming. When measured against the hypothetically possible, but highly improbable increase in consumer prices, Wyoming suggests the scales are not anywhere near equipoise.

## CONCLUSION

Matters such as that pending before the Court are outside the norm for Wyoming and the State admittedly comes to this case with a beginner's mind. But with a view untainted by convention, an outsider can often see plainly what is obscured to the insider. In Wyoming's view,

the benefits of the proposed joint venture to the public plainly outweigh the unlikely anti-competitive effects. It just does not make sense to Wyoming that the merged entity can or will raise prices; effectively cutting off its nose to spite its face. Nor does it makes sense to Wyoming to conclude that a reduction in production is anti-competitive rather than a reasonable and necessary response to reduced demand. A healthy, albeit consolidated, coal production industry benefits the mines, the miners, the State, its citizens, and the public at large. And consolidation is going to happen one way or another. The Court should permit it to happen thoughtfully rather than through one catastrophic closure after another.

WHEREFORE, the State of Wyoming respectfully requests that this Court deny the FTC's motion for preliminary injunction.

SUBMITTED this 2nd day of July 2020.

/s/ James Kaste
James C. Kaste, 6-3244 (WY)
Deputy Attorney General
Wyoming Attorney General's Office
2320 Capitol Ave.
Cheyenne, WY 82002
(307) 777-7895
(307) 777-3542 (Fax)
james.kaste@wyo.gov

*Attorney for the State of Wyoming*