**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | |
| Plaintiff, | |
| v. | Civil Action No. 4:20-cv-00317-SEP |
| **PEABODY ENERGY CORPORATION** | **PUBLIC VERSION** |
| and | |
| **ARCH COAL, INC.,** | |
| Defendants. | |

**PLAINTIFF'S REPLY MEMORANDUM OF LAW
IN SUPPORT OF PRELIMINARY INJUNCTION**

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 2

    I.    THE FTC HAS PROPERLY DEFINED A RELEVANT ANTITRUST MARKET FOR SPRB COAL ............... 3

      A.  Defendants Misconstrue the *Brown Shoe* Factors and Ignore the Narrowest Market Principle .. 3

      B.  Dr. Hill's Implementation of the Hypothetical Monopolist Test Stands Unrebutted ................. 9

      C.  Customer Testimony Supports SPRB Coal Relevant Market, Contrary to Defendants' Unsupported Assertion that "Customers Would Resist" a SSNIP ................................... 11

    II.  DEFENDANTS DO NOT CONTEST EVIDENCE OF COMPETITION AMONG SPRB COAL SUPPLIERS .... 13

    III.  DEFENDANTS CONCEDE RELEVANT GEOGRAPHIC MARKET AND HIGH SHARES AND CONCENTRATION WITHIN THE SPRB COAL MARKET ........................................................... 13

    IV.  DEFENDANTS FAIL TO REBUT THE FTC'S PROOF OF A RELEVANT SPRB COAL MARKET AND LIKELY ANTICOMPETITIVE EFFECTS ................................................................................ 14

      A.  Defendants' Speculative Customer Testimony Cannot Rebut the FTC's Proof ........................ 14

      B.  Dr. Bailey's Flawed "Natural Experiments" Do Not Rebut the FTC's Proof ......................... 16

      C.  Defendants' Asserted "Retirement Threat" Does Not Rebut the FTC's Proof......................... 17

      D.  It is Not "Irrational" for the JV to Increase Prices Compared to the But-For World................ 19

      E.  Defendants' Inaccurate Claim That They Have Not Documented an Intention to Increase Prices is Irrelevant ................................................................................................................ 19

    V.  DEFENDANTS FAIL TO MEET THEIR BURDEN TO DEMONSTRATE THAT SMALLER SPRB COAL PRODUCERS, COGNIZABLE EFFICIENCIES, OR "POWER BUYERS" WILL REVERSE THE JV'S ANTICOMPETITIVE EFFECT ............................................................................................. 20

      A.  Defendants Have Not Met Their Burden to Show That Expansion by SPRB Competitors Will Replace Competition from JV ........................................................................................ 20

      B.  Defendants Have Not Met Their Burden to Show Significant Verifiable, Merger-Specific Efficiencies That Will Be Passed On to SPRB Coal Customers ............................................ 21

      C.  Defendants' Fail to Support a "Power Buyer" Defense ...................................................... 24

    VI.  EQUITIES.................................................................................................................. 25

CONCLUSION ................................................................................................................. 25

## TABLE OF AUTHORITIES

**Cases**

*Brown Shoe Co. v. United States,* 370 U.S. 294 (1962) ................................................. passim

*Cf. Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410 (5th Cir. 2008) ......................................... 20

*FTC v Cardinal Health*, 12 F. Supp. 2d 34 (D.D.C. 1998)................................................................... 1

*FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109 (D.D.C. 2004). .................................................. 3, 8, 14, 23

*FTC v. Bass Bros. Enterprises*, No. 84-CV-1304, 1984 WL 355 (N.D. Ohio June 6, 1984).................... 1

*FTC v. Butterworth Health Corp* 946 F. Supp. 1285 (W.D. Mich. 1996)............................................ 25

*FTC v. Great Lakes Chem. Corp.*, 528 F. Supp. 84 (N.D. Ill. 1981) ...................................................... 21

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) ...................................................... 9, 21, 25

*FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327 (3d Cir. 2016) .............................. 22, 25

*FTC v. Procter & Gamble Co.*, 386 U.S. 568 (1967) ............................................................. 21

*FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278 (D.D.C. 2020) ................................................. 21

*FTC v. Sanford Health*, No. 1:17-CV-133, 2017 WL 10810016 (D.N.D. Dec. 15, 2017)...................... 3

*FTC v. Sanford Health,* 926 F.3d 959 (8th Cir. 2019)................................................................. passim

*FTC v. Staples, Inc.* ("*Staples I*"), 970 F. Supp. 1066 (D.D.C. 1997) ........................................ 4

*FTC v. Staples, Inc. ("Staples II")*, 190 F. Supp. 3d 100 (D.D.C. 2016) .................................. 6

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015)........................................................... 6, 10, 24

*FTC v. Tenet Health Care Corp.*, 186 F.3d 1045 (8th Cir. 1999) .................................................. 3

*FTC v. Tronox Limited*, 332 F. Supp. 3d 187 (2018)................................................................. 2, 3, 22

*FTC v. Wilh. Wilhelmsen Holding ASA,* 341 F. Supp. 3d 27 *(D.D.C. 2018)*......................... 10, 22, 23, 25

*H.J., Inc. v. IT&T*, 867 F. 2d 153 (8th Cir. 1989) ................................................................. 8

*Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381 (7th Cir. 1986) ................................................. 20

*In re Wholesale Grocery Prods. Antitrust Litig.*, 752 F.3d 728(8th Cir. 2014)........................................ 20

*New York v. Deutsche Telekom AG*, No. 19 CV. 5434, 2020 WL 635499 (S.D.N.Y. Feb. 11, 2020) .................................................................................................................... 24, 25

*Se. Missouri Hosp. v. C.R. Bard, Inc.,* 642 F.3d 608 (8th Cir. 2011) ....................................... 8

*Standard Oil v. FTC*, 340 U.S. 231 (1951)................................................................................... 2

*U.S. v. SunGard Data Sys Inc.*, 172 F. Supp. 2d 172 (D.D.C. 2001) .................................... 18

*SuperTurf, Inc. v. Monsanto Co.*, 660 F.2d 1275 (8th Cir. 1981)............................................ 9

*United States v. Bazaarvoice*, 2014 WL 203966 (N.D. Cal Jan 8. 2014)................................. 14

*United States v. Continental Can Co.,* 378 U.S. 441 (1964) ................................................. 4, 5

*United States v. Country Lake Foods, Inc.*, 754 F. Supp. 669 (D. Minn. 1990)...................................... 25

*United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586 (1957) ................................... 19

*United States v. General Dynamics Corp* 341 F. Supp. 534 (N.D. Ill. 1972)............................... 4

*United States v. H&R Block, Inc.,* 833 F. Supp. 2d 36 (D.D.C. 2011) ...................................... 4, 5, 22, 23

*United States v. Ivaco, Inc.*, 704 F. Supp. 1409 (W.D. Mich. 1989) ......................................... 1

*United States v. Oracle*, 331 F Supp. 2d 1098 (N.D. Cal. 2004)............................................. 12

**Other Authorities**

U.S. Dep't of Justice and Federal Trade Commission Horizontal Merger Guidelines (2010). ............ 5, 25

## INTRODUCTION

Defendants' Opposition repetitiously observes that SPRB coal demand has decreased due to customer preferences, government regulations, and recent low prices of other fuels such as natural gas. But these facts, which are not contested, do not help Defendants. The Clayton Act provides no exception for anticompetitive transactions in declining markets.[1] Moreover, when placed in proper context, these facts cut against Defendants. As Peabody itself recognizes, ███████████████████████████ ██████████████████████████████████████████ (March 2020). In the SPRB coal market, this intensified competition has benefited consumers through a ██████████ and a ██████████████████████████; ██████████. In plain English: Peabody and Arch keep each other's prices low through head-to-head competition, and it is probable that eliminating this close competition will lead to higher prices for SPRB coal than if the competition continued.

Defendants insist that it is not probable that the JV will lead to higher prices compared to the but-for world in which Peabody and Arch continue to compete, but they fail to support their claims. Defendants' retained economists advance no reliable or accepted methods of merger analysis. Defendants' principal economist, Dr. Israel, conceded that his novel, ad-hoc "dynamic model" fails to make any reliable prediction of the competitive effect of the JV, admitting it is ███████████████ ████████████████████████████.

Defendants' second hired economist, Dr. Bailey, offers no economic model at all. Moreover, the documentary evidence she cites actually proves Plaintiff's case: while she claims that SPRB prices are determined by natural gas prices, the evidence she cites shows instead that the prices customers pay for

---

[1] *FTC v Cardinal Health*, 12 F. Supp. 2d 34, 64-65 (D.D.C. 1998) (preliminary injunction granted where, absent continued competition among the defendants, "the prices set today could in effect become the floor tomorrow"); *FTC v. Bass Bros. Enterprises*, No. C84-1304, 1984 WL 355, at *3 (N.D. Ohio June 6, 1984) (preliminary injunction granted in market with "increasing costs and declining demand"); *United States v. Ivaco, Inc.*, 704 F. Supp. 1409, 1424-25 (W.D. Mich. 1989) ("shrinking" market with "stable prices, high overhead and persistent losses," to the point that one of defendants may exit, "does not necessarily justify the clear anticompetitive effects of the joint venture").

SPRB coal actually depend on head-to-head competition between Peabody and Arch, *not* natural gas prices. *See infra* at IV.B. This is the crux of Plaintiff's case: while natural gas may impact overall SPRB coal demand, the prices that customers actually pay are determined by the close head-to-head competition between SPRB coal suppliers—usually Peabody and Arch.

With no reliable economic model, Defendants' Opposition relies on speculation from Defendants' executives and a handful of other fact witnesses that natural gas prices and the threat of plant retirements would prevent the JV from increasing prices. Courts routinely reject such speculative testimony as unhelpful, and this Court should do the same. *See infra* at IV.A.

Finally, Defendants imply, and amicus explicitly proposes, that the best outcome would be for the Court to supervise the "thoughtful planned consolidation of coal mines in Wyoming, despite the resulting production decline."[2] This Court must reject the invitation to act as a centralized industrial planner. A supposedly benevolent JV controlling an overwhelming share of SPRB coal is flatly inconsistent with this country's "national economic policy" favoring competition.[3] And any benefit to the citizens of Wyoming would result in higher electric bills for millions of citizens in many other states.

The preliminary injunction should be granted to prevent Defendants from consummating the JV before the FTC's administrative proceeding completes its determination of the merits.

## ARGUMENT

Congress and the Eighth Circuit have prescribed this Court's task: to decide whether to issue preliminary relief maintaining the status quo during the FTC's adjudication of the JV's legality under

---

[2] ECF No. 273-1 at 14. Amicus admits forthrightly that, "[t]he merged entity can, and probably will reduce production." *Id.* at 12. While this is a credit to the State of Wyoming's candor, it also concedes the merits of Plaintiff's claim. *See, e.g.*, *FTC v. Tronox Limited*, 332 F. Supp. 3d 187, 212, 229 (2018) (granting preliminary injunction where "[t]he merger will increase already prevalent incentives to engage in strategic output withholding").

[3] *See Standard Oil v. FTC*, 340 U.S. 231, 248-49 (1951) ("The heart of our national economic policy long has been faith in the value of competition. In the Sherman and Clayton Acts… Congress was dealing with competition, which it sought to protect, and monopoly, which it sought to prevent.") (internal quotation omitted).

the antitrust laws. *See FTC v. Sanford Health*, 2017 WL 10810016, at \*23 (D.N.D. Dec. 15, 2017), *aff'd* 926 F.3d 959 (8th Cir. 2019). The Court should grant such relief here because the FTC's evidence raises "questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance." *FTC v. Tenet Health Care Corp*., 186 F.3d 1045, 1051 (8th Cir. 1999). Defendants' stated intent to forgo the administrative trial does not alter either the governing statutes or the legal standard applicable here.

## I.      The FTC Has Properly Defined a Relevant Antitrust Market for SPRB Coal

Defendants incorrectly assert that the FTC's product market analysis is "based largely on" Judge Bates' 2004 *Arch Coal* decision,[4] which they claim this Court should ignore on the grounds that the defendants in that case "did not argue, and the court did not assess, whether, and to what extent SPRB coal" competed with other fuels. Opp. at 38.[5] Defendants forget their past arguments: In *Arch Coal* defendants argued "for consideration of all PRB coal as a broader relevant market" (*i.e.*, a market that includes NPRB coal) and the Court rejected their claim. 329 F. Supp. 2d at 121. Judge Bates applied the *Brown Shoe* factors and the hypothetical monopolist test ("HMT") to identify the narrowest market in which the merging parties competed—the "narrowest market principle." *Id.* at 120.[6] *See FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 201-02 (D.D.C. 2018) (quoting *Arch Coal*, 329 F. Supp. 2d at 120) (defining a relevant market is "based on the narrowest market principle").

### A. Defendants Misconstrue the *Brown Shoe* Factors and Ignore the Narrowest Market Principle

Defendants' discussion of the *Brown Shoe* factors misses the point entirely. The *Brown Shoe* factors identify whether a set of products has enough common characteristics to constitute a *narrower*

---

[4] *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109 (D.D.C. 2004).
[5] The FTC refers to its Motion, Dkt. 152, as "Mot.," and Defendants' Opposition, Dkt. 176, as "Opp."
[6] In *Arch Coal*, Defendants argued for a broader market than SPRB coal and Plaintiff argued for a narrower one. In advancing their arguments, **both sides** experts' performed an HMT and each separately concluded that SPRB coal passed that test. This was the "agreement" to which Judge Bates referred— there was no broader agreement on market definition in that case. 329 F. Supp. 2d at 121.

relevant product market (a "well-defined submarket") "within [a] broader" range of products that exhibit "reasonable interchangeability of use." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *see also United States v. H&R Block, Inc.,* 833 F. Supp. 2d 36, 51 (D.D.C. 2011); *FTC v. Staples, Inc.* ("*Staples I*"), 970 F. Supp. 1066, 1075 (D.D.C. 1997). "Examination of [the *Brown Shoe*] factors is helpful ***to augment*** the assessment of interchangeability and cross-elasticity of demand when determining the relevant product market." *Arch Coal*, 329 F. Supp. 2d at 120 (emphasis added). Rather than analyzing the factors appropriately in order "to augment" the analysis, Defendants simply insist that none of the factors are satisfied based on the incorrect argument that SPRB coal is just as interchangeable with other fuels as it is with SPRB coal. In other words, Defendants argue that a broader all-fuels marketplace proves that a narrower SPRB market cannot exist. But *Brown Shoe* forecloses such an argument, as the Supreme Court explained in *United States v. Continental Can Co.*:

> That there may be a broader product market made up of metal, glass and other competing containers does not necessarily negative the existence of submarkets of cans, glass, plastic or cans and glass together, for 'within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes.'

378 U.S. 441, 457-458 (1964) (quoting *Brown Shoe*, 370 U.S. at 325). Likewise, the existence of a broader fuels marketplace would not negate the fact that the narrower relevant market for SPRB coal is appropriate to assess the competitive effects of combining the two largest rival SPRB coal producers.

The narrowest market principle is in no way undermined by the 1972 district court opinion in *General Dynamics*, which Defendants cite repeatedly for its product market analysis even though the Supreme Court did not affirm the ruling on that basis. In *United States v. General Dynamics Corp.*, the Supreme Court explicitly chose *not to rely* on the district court's assessment of the product and geographic markets. 415 U.S. 486, 510-11 (1974).[7] Moreover, the Supreme Court in *General Dynamics*

---

[7] *General Dynamics* has little to do with SPRB coal, as it related to coal mined in Illinois and Kentucky, sold within the "Illinois and Eastern Interior Coal Province sales area." 415 U.S. 486, 512. The majority and the dissenters disagreed largely on a question irrelevant here—the appropriate timing for assessing the likely competitive effects in a case that involved a merger accomplished in 1959 that did not reach

repeatedly cited and endorsed *Brown Shoe* and *Continental Can. See, e.g.*, 415 U.S. at 497-98, 504, 510 (citing *Continental Can*); *id.* at 496, 498, 505 (citing *Brown Shoe*). These authorities remain controlling and establish beyond doubt that the existence of a broader "energy" market does not defeat Plaintiff's proof of the narrower market for SPRB coal. They require this Court to reject Defendants' inaccurate suggestion that "[a] properly-defined product market must include all functionally similar products to which customers could turn if the Joint Venture attempted to, post-closing, impose a price increase." Opp. at 16. Defendants' claim contradicts controlling authority, as well as the Horizontal Merger Guidelines which state "properly defined antitrust markets *often exclude* some substitutes to which some customers might turn in the face of a price increase even if such substitutes provide alternatives for those customers." Merger Guidelines § 4 (emphasis added).[8]

Compounding their fundamental conceptual error, Defendants misconstrue or make incorrect claims about specific *Brown Shoe* factors, which are addressed below.

*(1) Industry or Public Recognition* (**Opp. 18-24**). Defendants suggest public recognition of competition between fuels in a broader market means that no narrower SPRB coal market exists. This repeats their fundamental conceptual error. The right question is whether there is evidence of industry and public recognition of an SPRB coal market. And there is plenty of that. *See* Mot. at 18-19.

*(2) Distinct Characteristics and Uses* (**Opp. 28-29**). Defendants concede that SPRB coal has characteristics that "physically distinguish it from natural gas, other fuels, and other types of coal." Opp. at 28. Defendants fail to discuss or acknowledge how these characteristics impact each different fuel's reliability, emissions, transportation, and regulation. *See* Mot. at 19-21. Instead, Defendants incorrectly assert that totally different fuels (*e.g.*, uranium, wind power) must be functionally interchangeable because all can be used to generate electricity. Opp. at 28. But even if this were true, assessing

_____

the trial court until 1970. *See generally General Dynamics*, 415 U.S. 486.
[8] *Cf. H&R Block*, 833 F. Supp. 2d at 54 ("It is beyond debate – and conceded by the plaintiff – that all methods of tax preparation are, to some degree, in competition.").

functional interchangeability is not the purpose of the *Brown Shoe* factors.

(3) *Unique Production Facilities.* Defendants ignore and thus concede this factor, as they cannot pretend that SPRB coal can be produced anywhere other than SPRB mines.

(4) *Distinct Customers* **(Opp. 29)**. As explained in the FTC's opening brief, customers operate SPRB coal-powered units configured for SPRB coal's distinct characteristics. Mot. at 22. Their purchase of other fuels is neither relevant nor inconsistent with the existence of the SPRB coal market.[9]

(5) *Distinct Prices* **(Opp. 30-31)**. Defendants do not dispute that Defendants themselves, industry analysts, market indexes, and government agencies track and forecast distinct SPRB-specific prices. *See* Mot. at 18-19, 22-23. Instead, they argue that the prices of other fuels impact SPRB coal's price. Opp. at 30-31. But this will be true in every *Brown Shoe* analysis of a narrower market: competition in the broader market will have some effect on the products in the narrower market; otherwise, there would be no broader market. The right question is whether the prices of the products in the narrower market are *distinct* from those in the broader one, not whether they are completely unrelated.

The actual price of SPRB coal is nearly always determined by an RFP bidding process that includes only SPRB coal suppliers. Seeking to avoid the obvious import of this fact, Defendants assert that "[SPRB] coal producers consider natural gas prices when determining what price to bid in response to an RFP," Opp. at 30, but they provide ***not one*** documented example of any RFP bid response in which this occurred. *See* Opp. at 30 n. 143. Defendants rely on Bailey Report ¶ 27, but this does not discuss an RFP bid at all. Instead, ███████████████████████████████████████ ████████████████████████████████████ and in the process actually makes Plaintiff's case. ██████ ███████████████████████████████████████████████████

---

[9] This factor is important to market definition principally when a market is defined around a set of targeted customers. *See, e.g., FTC Staples, Inc.*, 190 F. Supp. 3d 100, 120 (D.D.C. 2016). *See also FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 39 n. 19 (D.D.C. 2015).

███████████████████████████████████████████████████████

████████████████████████████████████ ██ ████████████████ The evidence Defendants rely on thus proves the

FTC's point: the actual price that the customer paid for SPRB coal relied on head-to-head competition

between Peabody and Arch, irrespective of Mr. Smith's views on warm weather and natural gas.[11]

Defendants' failure to support their central contention that natural gas prices determine SPRB

suppliers' RFP responses is fatal to their defense. The FTC has shown that the close competition

between SPRB suppliers regularly affects the SPRB prices that result from RFPs. *See* Mot. 7-8, 31-35;

*see Staples I*, 970 F. Supp. at 1075-78 (finding relevant antitrust market of office superstores based on

evidence of direct price competition particular to such superstores, even though other stores also sold

identical products). Defendants cannot provide any contrary demonstration that natural gas prices are

significant to SPRB suppliers' RFP pricing, let alone equal to or *more* significant than the close

competition between SPRB coal suppliers.[12]

(6) *Price Sensitivity* **(Opp. 25-28)**. It is undisputed and unsurprising that other fuels have *some*

effect on the market for SPRB coal: all substitutes, even distant ones, exhibit some level of sensitivity to

changes in each other's prices (also known as cross-price elasticity). The competitive significance is

---

[10] Defendants failed to attach the document at issue to their Opposition. *See* DX1042 (in fact, Mr. Smith authorized any price of "$11.95 or higher, you decide.").

[11] The other citations provided in Opp. at n. 143 likewise fail. ██████████████████████████

████████████████████████████████████████████████ ████████████████████████

████████████████████ *See* ███████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████ ████████████████████████████████

████████████████████████████████████████████████████████████

[12] ███████ affirms that ██████████████ that customers have in negotiating SPRB coal prices ██████

███████████████████████████████ There is no evidence that ██████████████████

ever includes suppliers of natural gas or other fuels. *See* Mot. at 23 & n. 62.

determined by the *degree of sensitivity*, which is an issue Defendants ignore.[13] For example, Defendants claim that ████████████████████████████████████ between coal and natural gas. Opp. at 25. However, Defendants ignore ████████'s testimony that SPRB coal prices are ████████████████████████ than versus natural gas, that natural gas prices *do not* factor into ████████'s SPRB pricing offers made in response to RFPs, and that the "████████" SPRB customers have to get a better deal is bidding among SPRB suppliers. ████████████████.

None of Defendants' experts estimated the cross-price elasticity between natural gas and SPRB coal,[14] likely because it is *low*, which demonstrates that natural gas and SPRB coal are not properly included within the same relevant product market. *See H.J., Inc. v. IT&T*, 867 F. 2d 1531, 1538 (8th Cir. 1989) ("degree" of cross-elasticity must be high for products to be in the same relevant antitrust market).

Defendants claim that Dr. Bailey showed that Dr. Hill's analysis implies "demand for SPRB coal is just as responsive to changes in the price of natural gas as it is to changes in the price of SPRB coal." Opp. at 25. Dr. Bailey's analysis is unpersuasive,[15] but even taking this claim at face value would only prove Plaintiff's case. Dr. Hill showed that the own-price elasticity of demand for SPRB coal is relatively *low*. *See* PX8001 (Hill Report) ¶¶ 122-146; Mot. at 24-25. Thus, even assuming Dr. Bailey is correct, her point would merely confirm that there is a *low* cross-price elasticity between SPRB coal and natural gas. As Defendants' own cited authority points out, when two products exhibit *low* cross-price elasticity, that provides a reason to *exclude* a substitute (in this case, natural gas) from the relevant product market. *See H.J., Inc.*, 867 F.2d at 1538; *SuperTurf, Inc. v. Monsanto Co.*, 660 F.2d 1275, 1278

---

[13] Defendants also fail to show that a "slight decrease" in price would cause "a considerable number of customers" to substitute between SPRB coal and other fuels, which is the relevant inquiry. *Arch Coal*, 329 F. Supp. 2d at 120; *Se. Missouri Hosp. v. C.R. Bard, Inc.,* 642 F.3d 608, 613 (8th Cir. 2011).

[14] ████████████████████████████████████████████████████████████ ████████████████████.

[15] Among other failures, Dr. Bailey made no effort to determine whether a relationship between SPRB coal prices and natural gas prices is merely correlation rather than causation, as she failed to examine whether common factors, such as the weather, impacted both prices at the same time.

(8th Cir. 1981) (narrower relevant antitrust market may exist despite a showing of some cross-elasticity in a broader market); *Staples I*, 970 F. Supp. at 1078-80 (excluding substitutes with low cross-elasticity from the relevant product market). Moreover, natural gas prices are projected to increase dramatically from their current lows.[16] Thus, if Dr. Bailey is correct, then demand for SPRB coal will go up in response, and the JV will be even better positioned to raise SPRB prices.

(7) *Specialized Vendors* (**Opp. 31**). Defendants bizarrely claim that there are no "specialized vendors" of SPRB coal because Peabody and Arch sell other products in different markets. Opp. at 31. It is irrelevant that Peabody also sells metallurgical coal in Australia, just as the fact that Heinz also sells ketchup does not mean that in *FTC v. H.J. Heinz Co.* the court wrongly considered a market for jarred baby food. 246 F.3d 708, 716 (D.C. Cir. 2001). *See also, e.g., SuperTurf*, 660 F.2d at 1279 (*Brown Shoe* analysis concluding that Monsanto and SuperTurf were specialized vendors of artificial turf, even though Monsanto sells other products). The question is whether customers of SPRB coal face a set of specialized vendors to turn to *for that product*. The evidence overwhelmingly shows that customers turn specifically to specialized vendors of SPRB coal to buy SPRB coal.[17]

### B. Dr. Hill's Implementation of the Hypothetical Monopolist Test Stands Unrebutted

Defendants do not seriously address Dr. Hill's implementation of the HMT, which demonstrates that a hypothetical monopolist of SPRB coal could profitably impose a small but significant and non-transitory increase in price ("SSNIP"). *See* Mot. at 24-26; PX8001 (Hill Rpt.) ¶¶ 12, 107-146. Defendants weakly claim that the existence of an SPRB coal market is "out of step with the reality of low producer margins, which would not exist if, as Dr. Hill finds, SPRB coal were a relevant market." Opp. at 36. This unoriginal argument has been raised and rejected in past merger litigations because it

---

[16] PX8006 (Hill Rebuttal Rpt.) ¶¶ 43-47; PX9196-003 (EIA June 2020 forecast for Henry Hub natural gas prices averaging $3.08/mmBTU in 2021).

[17] *See, e.g.*, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

starts from the flawed premise that all concentrated markets must result in high profit margins. (In other words, it assumes that low margins and low prices within a concentrated market such as SPRB coal cannot be explained by close competition between the firms that seek to merge.) For example, in *FTC v. Sysco Corp.*, the defendants argued that their relatively low margins on sales within the FTC's proposed (concentrated) relevant market disproved the FTC's claims. 113 F. Supp. 3d 1, 47-48 (2015).[18] The court rejected that argument, reasoning that "Defendants' present inability to earn duopoly profits [from customers within the proposed relevant market] is probably because large customers can keep prices down by leveraging the defendant companies against one another." *Id.* at 48. Defendants here make the same argument, and this Court should reach the same conclusion: Arch's and Peabody's margins within the SPRB coal market are explained by the close competitive constraint they impose on one another.[19]

Defendants further suggest that Dr. Hill's hypothetical monopolist analysis does not account for the risk that "a price increase" may cause SPRB coal plant retirements. Opp. at 34-35. This argument misses the mark. First, Defendants conflate Dr. Hill's HMT analysis with the Cournot model he used to simulate the merger's anticompetitive effects. *See* Opp. at 35. Dr. Hill's unrebutted HMT *identifies* a relevant market,[20] while Dr. Hill's Cournot model analyzed the probable effect of the merger on

---

[18] Notably, Defendants' current economist Dr. Israel acted as the FTC's expert in *Sysco*, and opined in that case that the merging parties' margins were consistent with the FTC's proposed market, even though the margins he calculated (between 15 and 20%) were on par with the ████████████████████████████████████████████. Dr. Israel used an even lower margin figure—10%—in his *Sysco* hypothetical monopolist calculations and still found that the FTC's proposed market met the test. 113 F. Supp. 3d at 35 & fn.14. While the FTC disputes Dr. Israel's calculations for Peabody and Arch and believes the appropriate margins are higher, Dr. Israel's inconsistency is nonetheless illuminating.

[19] Likewise, in *FTC v. Wilh. Wilhelmsen Holding ASA*, "Defendants argue[d] that current [low] market pricing is inconsistent with the notion that they exercise market power" and "indicates that the products must exist in a competitive environment—not a highly concentrated (and therefore noncompetitive) one." 341 F. Supp. 3d 27, 63 fn. 12 (2018). The court rejected this argument, instead endorsing the FTC's view that "the continued competitiveness of the market depends on aggressive competition between the two existing global suppliers with high market shares." *Id.*

[20] Dr. Hill's hypothetical monopolist test analyzes SPRB coal purchase prices and shipment volumes from 2009 to 2018, thus incorporating all factors that have influenced SPRB prices during that period—including any risk of SPRB plant retirements. PX8001 (Hill Rpt.) ¶¶ 126-128. Moreover, the PROMOD

customers *within* that market by taking into account declining demand. Moreover, as explained *infra* at Section IV.C., there is no basis to believe that SPRB coal plant retirements would materially accelerate due to the kinds of small price increases relevant to antitrust analysis.[21] Members of Peabody's own Board of Directors do not believe that the JV's price increase would ███████████████████████ ████████████, and Dr. Israel provides no basis to conclude that a small price increase would trigger the dramatic increase in SPRB plant retirements assumed by his flawed "dynamic" model.

### C. Customer Testimony Supports the SPRB Coal Relevant Market, Contrary to Defendants' Unsupported Assertion that "Customers Would Resist" a SSNIP

Defendants attempt, ineffectively, to dismiss testimony from customers explaining why they require SPRB coal and "would not be able to resist a SSNIP by switching to other forms of generation." Opp. at 33-34 nn. 152-154. The FTC will call at the hearing each of the customers Defendants identify (Ameren, Evergy, Xcel, Minnesota Power, and Western Fuels Association) to explain why they cannot easily substitute away from SPRB coal if faced with a SSNIP. Defendants provide no basis to believe that these customers are a "small and unrepresentative set." Opp. at 33. To the contrary, the witnesses the FTC will call are employed by utilities both large and small, accounting for <u>nearly 33% of all SPRB coal burned</u>,[22] across a broad geographic region, and as Defendants acknowledge, these customers rely to varying degrees on SPRB coal in their generation mix.[23] The witnesses will not provide statements of idiosyncratic "preferences" that are unlikely to impact their actual behavior; they instead provide

---

model forecasts explicitly build in expected plant closures. *Id.* ¶ 130.
[21] While a SSNIP focuses on a 5% increase in the mine-mouth price of SPRB coal, this would translate into only a 2.5% increase in the delivered price of SPRB coal paid by power generators. Dr. Hill showed that such an increase had only a minimal impact on coal unit retirement risk. *See infra* at Section IV.C.
[22] *See* PDX0003 (PX8006 (Hill Rebuttal Rpt.) Appendix B.8).
[23] *See* Opp. at 29 ("each and every FTC customer witness has a portfolio of generating assets that is not limited to coal, much less SPRB coal"); *id.* at n.137 ███████████████████ ████████████████████; *id* at 33 n.154 ████████████████████████████ The Court should disregard Defendants' unsupported assertion that "most customers who procure some amount of SPRB coal rely far less on coal generation and have not registered concerns about their ability to switch among fuels in the short run." *Id.* at 33.

reliable assessments, grounded in current business realities, of each current SPRB purchaser's *ability* to switch to a different fuel if faced with a modest increase in the mine mouth price of SPRB coal.[24] Such customer testimony is valuable in assessing the relevant market, particularly when it merely confirms rather than substitutes for expert economic analysis.

In contrast to the factual testimony the FTC's witnesses will provide, Defendants have only three unpersuasive cites in support of their assertion that "customers would resist" a SSNIP. Opp. at 32-34.



- First, Defendants vastly overstate a vague statement from ███████████████████ ███████████████ (emphasis added). This vague statement fails to support Defendants' suggestion that ███████ could avoid a SSNIP imposed by a hypothetical monopolist of SPRB coal. The best reading of ███████ testimony is that if ***the JV*** increases prices ███████████████ will either purchase SPRB coal elsewhere (███████████) or build non-SPRB generation resources. ███ addressed neither a *5% price increase*, nor what ███████████ could do absent competing suppliers for SPRB coal (*i.e.,* if a hypothetical monopolist controlled SPRB coal). To the contrary, ████████████████████ ██████████████████████ This testimony supports the FTC, not Defendants.

- Second, Defendants cite an email from ██████████████████████ ████████████████████████ fails to support Defendants' suggestion that customers could successfully resist a SSNIP imposed by a *hypothetical monopolist* of SPRB coal.

- Third and last, Defendants cite to ████████████'s deposition. Opp. at 32. ████████ is contradicted by each Defendant's recent pass-through of the Black Lung Excise Tax to customers. *See* Mot. at 27-28, nn. 72-74. Morever, ████████ is not an SPRB coal purchaser. He may be able to speak to ████'s business circumstances, but his speculation regarding the JV's customers' reactions does not rebut testimony from actual customers indicating that they cannot substitute away from SPRB coal if faced with a 5% increase in SPRB mine-mouth prices.

---

[24] This is not testimony regarding "preferences." *See United States v. Oracle*, 331 F. Supp. 2d 1098, 1131 (N.D. Cal. 2004) (customers unhelpful where "none gave testimony about the cost of alternatives to the hypothetical price increase a post-merger Oracle would charge").

[25] While ███████'s testimony is not entirely clear, ████████████████████████ ██████████████████████████████████ Unlike Plaintiff's witnesses, ████████ will not testify at the hearing to provide clarity to the Court.

[26] ███████ is cited Opp. at 2 n. 4, at 13 n. 72, at 20 n. 90, and at 32 n. 149.

Finally, his speculation regarding the behavior of *the JV* does not address the question relevant to market definition, which deals with constraints faced by a *hypothetical monopolist*.

## II.     Defendants Do Not Contest Evidence of Competition Among SPRB Coal Suppliers

Defendants do not contest the evidence in Plaintiff's Motion demonstrating that SPRB coal suppliers compete directly with each other to make sales to customers, and that this competition yields concrete price and other benefits for SPRB coal customers. *See* Mot. at 7, 31-35. Defendants instead attempt to minimize this evidence by suggesting, contrary to all evidence, that Arch is not a strong competitive force. Opp. at 5. This contradicts Arch's own public statements,[27] Arch's internal planning documents,[28] and clear evidence that Peabody routinely loses bids to Arch.[29] *See* PX8001 (Hill Rpt.) ¶¶ 169-178, Fig. 26; Mot. at 33-34. Moreover, even when Peabody prevails over Arch in an RFP, competition from Arch drives down Peabody's prices. *See, e.g.*, ███████████████████████

██████████████████████████████; █████████████████████████████████████

███████████████████████████████████████████

## III.     Defendants Concede Relevant Geographic Market and High Shares and Concentration Within the SPRB Coal Market

Defendants have not contested the FTC's proposed geographic market of the SPRB, nor have they contested the FTC's calculation of market shares and concentration in the relevant market. They also do not dispute the conclusions that the market for SPRB coal is currently highly concentrated and

---

[27] As one example, Arch's ████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████ *See also id.* at ████████████████████

████████████████████████████████████████████████████.

[28] Contrary to Defendants' suggestion that Arch plans to scale back production at its primary SPRB mine, Black Thunder, ██████████████████████████████████████

████████████████████████████████████████.

[29] *See* Mot. at 31-35 (For example, Peabody stated in February 2019 that ██████████████

███████████████████████████████████████████████

██████████████████████, and noted in 2018 that █████████████████████

███████████████████████████████████████████████.).

that the JV would result in a significant increase in concentration in that market. Accordingly, if the Court concludes that SPRB coal is a relevant product market, it follows that the FTC has met its prima facie case and established a presumption of illegality. *Sanford*, 926 F.3d at 962.

## IV. Defendants Fail to Rebut the FTC's Proof of a Relevant SPRB Coal Market and Likely Anticompetitive Effects

### A. Defendants' Speculative Customer Testimony Cannot Rebut the FTC's Proof

Defendants rely heavily on customer speculation about whether the JV will increase prices, the impact of a price increase on the JV's market share, and whether the JV can achieve significant efficiencies. Opp. at 32-33 & n.155. This testimony is outside the competence of these witnesses and should not be credited by the Court. Witnesses may competently testify to what they individually would do if an SPRB coal supplier attempted to raise its price to them, but they have no basis to say whether the JV would be able to raise other customers' prices, or impose an overall market price increase. *Arch Coal*, 329 F. Supp. 2d at 146 ("Customers do not, of course, have the expertise to state what *will* happen in the SPRB market. . . ."). Judge Bates has explained that, in deciding *Arch Coal*, he credited customer testimony that "pertained to facts about which the customers had actual knowledge—that is, about which they were competent to testify. The testimony was not forward-looking, and did not require any predictions or projections about the future."[30] Predictions about the transaction's impact on the SPRB market as a whole must be left to the economic experts, because "[t]he predictive power of economics far outreaches the similar power of any individual in the industry, no matter how intelligent or experienced that individual may be." *Id.* at 287. Likewise, in *United States v. Bazaarvoice, Inc.*, the court found that customers were "the most credible sources of information on their need for, use of and substitutability of [the relevant] products, as well as regarding their companies' past responses to price increases." 2014 WL 203966, at *61 (N.D. Cal. Jan. 8, 2014). However, "it would be a mistake to rely

---

[30] John D. Bates, *Customer Testimony of Anticompetitive Effects in Merger Litigation*, 2005 Colum. Bus. L. Rev. 279, 286 (2005).

on customer testimony *about effects of the merger*." *Id.* at \*4 (emphasis added).[31]

Defendants resort to unpersuasive documents to support their claim that "many customers" believe the JV might "benefit competition." Opp. at 33 n. 155. Defendants cite ███████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████ █.[32] This provides no support for Defendants, nor does Defendants' citation to DX1008, a draft letter that indicates only that NIPSCO considered and ***rejected*** the option to provide support for the JV. *See* Opp. at 33 n. 155. These unpersuasive citations aside, Defendants' sole document cited in support of their claims regarding the views of "many customers" is a single letter stating that ██████████████████████████████████████ ████████.[33] This lukewarm support provides no meaningful prediction of competitive effects, particularly as no witness employed by ████ has provided any sworn testimony, and none will appear at the hearing.

Defendants also misconstrue snippets from depositions of two witnesses who will appear at the hearing in an effort to support their claim that customers believe the JV might "benefit competition." *See* Opp. at 34 n. 155. These witnesses, Ms. Sandlin of Western Fuels Association ("WFA") and Mr. Fuller of Southern Company, did not make any such predictions. Both WFA and Southern Company are ambivalent regarding the JV. While each may hope that the JV will produce a more stable SPRB coal

---

[31] Indeed, while the *Bazaarvoice* defendants pointed to the fact that "none of the 104 customers whose depositions are part of the record complained that the merger has hurt them," *id.* (and included a 64-page index of customer testimony, *see* PDX0002), the court deemed this testimony "entitled to limited weight given the customers' narrow perspective on the economic and legal questions before the Court and their lack of visibility into [defendant's] practices." *Id.* at \*74.

[32] *See also* ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ .

[33] Defendants' Oppposition does not cite the only other letter of "support" sent by a customer to the FTC, written by ███████████████ . *See* ████████ . ████████████████████████████████████████████████████████████████ . As discussed below, customers lack information sufficient to testify regarding the possibilities for cost reductions, as ████ ████ confirmed at his deposition. ████████████████████

supplier, that speculative hope does not outweigh their fears that "competition would be reduced, ultimately resulting in less favorable coal pricing than would otherwise be available,"[34] and "concerns about whether or not [the JV] could lead to increased pricing due to the concentration of power of this particular joint venture." PX6027 at 126-28.

Just as individual customers are poorly situated to testify about the likely competitive effects of the JV, they are not capable of testifying about whether Defendants can achieve their claimed efficiencies. The customers cited by Defendants acknowledge that they know little about whether and how such efficiencies could be achieved, whether those same efficiencies could be achieved through less anticompetitive means, or whether any cost savings might be passed through.[35] (However, third-party evidence *does* indicate that customers saw no price benefit from Defendants' prior SPRB coal acquisitions. ██████████ ; ██████████ .)

### B. Dr. Bailey's Flawed "Natural Experiments" Do Not Rebut the FTC's Proof

Defendants claim that Dr. Bailey presents "natural experiments" in an effort to rebut the FTC's proof that the relevant market consists of SPRB coal. Opp. at 36-37. Dr. Hill detailed in his rebuttal report the defects in all four of Dr. Bailey's claimed "event studies." PX8006 (Hill Rebuttal Rpt.) ¶¶ 115-133. None of the four rebuts the FTC's proof of relevant market and anticompetitive effects, and two of them actually support the FTC's case, as they focus on instances in which one or more SPRB coal mines suffered supply interruptions. In both of these instances, customers turned to other SPRB coal mines to acquire replacement SPRB coal, confirming that customers view SPRB coal suppliers as

---

[34] PX7003 ¶ 12 ("WFA is concerned that consolidating such a large portion of the coal production capacity of the SPRB, and a larger portion of its ultra-low sulfur coal production capacity, under the control of the Joint Venture could lead to further production and supply constraints. WFA believes competition would be reduced, ultimately resulting in less favorable coal pricing than would otherwise be available.").

[35] *See, e.g.*, ██████████ ; ██████████ ; ██████████ ; ██████████ . Likewise, Defendants' competitor ██████████ testified that while he did not ██████████ to evaluate Defendants' claimed efficiencies, Defendants' ██████████

particularly close substitutes. ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████ This fact is confirmed by Defendants' ordinary course

documents and their witnesses' testimony.[36] Likewise, ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████; ██████████; ████████

and Peabody benefitted at another customer, ████████████████████████████

████████████████████████████████████████████████████.

## C. Defendants' Asserted "Retirement Threat" Does Not Rebut the FTC's Proof

Defendants have failed to establish that small changes in SPRB coal prices significantly impact plant retirement decisions, which are based on many factors including plant age, size, non-fuels costs, regulatory requirements, and the costs of upgrading the unit to achieve environmental compliance. PX8006 (Hill Rebuttal Rpt.) ¶ 92. Indeed, ████████████████████████████

████████████████████████████████ *Id.* ¶¶ 95-99. ████████████████████

████████████████████████████████████████

████████████████████████████ *Id.* ¶¶ 95-99. Dr. Hill's own models of coal plant

retirements yield the same outcome. *Id.* ¶¶ 92-94. Dr. Hill concludes, accordingly, that "Dr. Israel's assertion that the risk of retirement is so severe that it constrains current pricing is baseless." *Id.* ¶ 94.

In contrast to Dr. Hill, Dr. Israel conducted no empirical analysis to support his assumption that Defendants' SPRB coal pricing is significantly influenced by the risk of coal retirements, and his assumption is flatly contradicted by Defendants' own statements. Defendants have asserted that ████████

---

[36] ████████████████████████████████████████████████████████

████████████████████████████████████████████████

████; ████████████.

████████████████████████████████████████████ (emphasis in original).

Likewise, Peabody's President Mr. Williamson ██████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████.[37]

Dr. Israel exaggerates the impact of plant retirements by lumping together SPRB coal units and units that burn coal from other basins. Compared to units that burn coal from other basins, SPRB coal units are *less* affected by retirements.[38] Yet Dr. Israel ignored this, and lumped together retirements of all coal units, when fewer than half of the units Dr. Israel identified burned *any* SPRB coal. PX8006 (Hill Rebuttal Rpt.) at ¶¶ 86-88, 90-91 & Figures 15, 17-18. Moreover, Defendants inaccurately claim that SPRB unit retirements result in a "permanent loss of coal demand." Opp. at 27. In reality, Peabody itself recognizes that when one SPRB plant retires, other SPRB plants may burn more coal to make up for the retired plant.[39] Finally, Dr. Israel exaggerates the extent to which █████████████████████

██████████████████████████████████████████████████████. While he claims to provide nine ████████████████ the majority of these so-called examples simply describe discussions or meetings regarding pricing, without any indication that Peabody or Arch prices actually changed as a result.[40]

---

[37] Arguments based on coal plant retirements also do not undermine the FTC's evidence on the relevant market. Notably, to the extent that regulatory mandates or "green power" commitments cause power producers to retire SPRB units in favor of renewables, this only proves that renewables and SPRB coal units are not within the same market. *See Sungard*, 172 F. Supp. 2d at 184 (where substitution between "shared hotsites" and alternative solutions was done for reasons other than price, products not included within the same relevant antitrust market).

[38] PX8006 (Hill Rebuttal Rpt.) at ¶¶ 88-89; PX8001 (Hill Rpt.) ¶ 64 and Figure 9. █████████████ confirmed this, testifying that, among coal basins, ████████████████████████████████████ ██████████████████████.

[39] *See, e.g.*, ██████████████████████████████████████████████ ███████████████████████████████; █████████████████████████████ ████████████████████████████████; ██████████████████████ ███████████████████████████████████████████.

[40] *See, e.g.*, *id.* ██████████████████████████

**D.  It is Not "Irrational" for the JV to Increase Prices Compared to the But-For World**

Defendants simply ignore business realities when they claim competition from other fuels makes it "irrational" for the JV to "impose a price increase or restrict output." Opp. at 44. If other fuels constrained SPRB prices as closely as Defendants suggest, there is no rational reason that SPRB suppliers would offer lower prices in response to SPRB-specific competition. But, of course, Defendants' story is not reality. Indeed, if Defendants' story were true, power producers would not waste time issuing and comparing RFPs at all, because SPRB coal prices would be predetermined by the competitive pressure from other fuels. Nor would Defendants spend their resources tracking production and sales of SPRB coal, and analyzing competition and prices in the SPRB market. *See* Mot. at 18-19; PX1685; ▮▮▮.

**E.  Defendants' Inaccurate Claim That They Have Not Documented an Intention to Increase Prices is Irrelevant**

Defendants' claim they have not documented an intention to raise prices is legally irrelevant, as no showing of anticompetitive *intent* is required under the Clayton Act; the statute addresses the probable effect of the transaction on competition. *See, e.g.*, *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 589 (1957). Defendants' claim is also untrue. Opp. at 45; *see* Mot. at 38 (citing


); *see also* ▮▮▮ (

▮▮▮ ).

Moreover, the lack of further "smoking gun" documents cannot save the JV where Defendants have been preparing for this very litigation since at least 2017, with a keen understanding that the JV would face "regulatory obstacles."[41] Under such circumstances, it is entirely unsurprising that they have

---



).

[41] ▮▮▮ (during fall 2017 discussions, an Arch board member observed that ▮▮▮ while Peabody's CEO and CFO ▮▮▮ ). By December of 2017, Defendants were

created relatively few documents detailing a specific plan to raise prices. As the Eighth Circuit Court of Appeals observed, "Perhaps there are aspiring monopolists foolish enough to reduce their entire anticompetitive agreement to writing, which would make the answer easy. But most would-be monopolists probably can be expected to display a bit more guile . . . ." *In re Wholesale Grocery Prods. Antitrust Litig.*, 752 F.3d 728, 734 (8th Cir. 2014).[42]

## V. Defendants Fail to Meet Their Burden to Demonstrate that Smaller SPRB Coal Producers, Cognizable Efficiencies, or "Power Buyers" Will Reverse the JV's Anticompetitive Effect

### A. Defendants Have Not Met Their Burden to Show That Expansion by SPRB Competitors Will Replace Competition from JV

Defendants cannot meet their burden to show that expansion from the other, much smaller SPRB competitors will "fill the competitive void" left by the JV. *Sysco*, 113 F. Supp. 3d at 80. *See* Mot. at 39-41; *Sanford*, 926 F.3d at 965. Defendants provide no support for ███████████████████████ ████████████████████████████████████████████████████ ████████████████████████████. The cited source does not even purport to support this assertion, as Dr. Bailey did not present any data regarding excess capacity in ████████████████████████ Dr. Bailey presented a single number for █████████████ for each mine, which she claims is ████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████████████████████.

---

actively discussing ████████████████████████████████████████████
███████████. Defendants have invoked work-product protection (which applies only to litigation preparation) to shield communications regarding this specific transaction for thousands of documents dating as far back as January 2017. *See, e.g.*, PX0068-813 (withholding PEC_PL00013130, dated 1/16/2017, as an "[e]mail containing or referencing legal advice prepared in anticipation of seeking regulatory approval of the present transaction").

[42] *Cf. Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 435 (5th Cir. 2008) (evidence "deemed of limited value whenever such evidence *could arguably* be subject to manipulation"); *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1384 (7th Cir. 1986).

Dr. Bailey's estimate is wildly exaggerated,[43] and in any event insufficient to carry Defendants' burden, because Dr. Bailey fails to establish that these mines could increase output at reasonable cost.[44] Indeed, Defendants provide virtually no evidence regarding the costs that most of its smaller SPRB competitors would face in attempting to increase output, and have not addressed the supposed ability of Eagle Specialty Materials (the FM Coal affiliate that owns the Eagle Butte and Belle Ayr mines) to do so; as of May 2020, Eagle risked losing its mining equipment to creditors.[45]

The authorities Defendants cite regarding excess capacity are easily distinguished. None of Defendants' cited cases involved the creation of a single dominant firm that would unilaterally control the vast majority of capacity in the relevant market. Instead, they involved mergers that did not create a dominant firm where the presence of excess capacity could potentially disrupt coordination among the remaining firms. *See FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 317-18 (D.D.C. 2020); *FTC v. Great Lakes Chem. Corp.*, 528 F. Supp. 84, 94 (N.D. Ill. 1981).[46]

### B. Defendants Have Not Met Their Burden to Show Significant Verifiable, Merger-Specific Efficiencies That Will Be Passed On to SPRB Coal Customers

"Congress was aware that some mergers which lessen competition may also result in economies but it struck the balance in favor of protecting competition." *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 580 (1967). Because of this, courts subject efficiencies defenses to a "rigorous analysis." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 720-21 (D.C. Cir. 2001). Claimed efficiencies must be "independently verifiable and derived specifically from the merger," *Sanford*, 926 F.3d at 965, and likely to be "passed

---

[43] Dr. Hill showed that, even employing assumptions extremely favorable to Defendants, all other SPRB coal producers *combined* would only have enough capacity to serve 53 percent of Arch's production at Black Thunder in 2019. PX8006 (Hill Rebuttal Rpt.) ¶ 136 & Fig. 29.

[44] Dr. Israel admits he provides ████████████████████.

[45] *See* PX9227

[46] These cases were also primarily decided on other grounds that are irrelevant here, such as the failing firm defense and lack of barriers to entry in *Great Lakes*, 528 F. Supp. at 94, 96-98, and a failure of market definition relating to supply-side substitution in *RAG-Stiftung*. 436 F. Supp. 3d at 301-303.

on to consumers," *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 351 (3d Cir. 2016). Defendants fail to make any of these three separately required showings. *Tronox*, 332 F. Supp. 3d at 215; *H&R Block*, 833 F. Supp. 2d at 89.

Pass-through. Defendants' own business plans belie their claim that they will increase output and provide "better, more competitive pricing." Opp. at 5, 47. The JV's business plan does not █████████ █████████████████████████████████████████████████,[47] and it ███████████ ██████████████████████████████████████████. Thus, any cost savings the JV would be able to achieve would simply be pocketed by the JV, which is consistent with both Arch's behavior in past acquisitions[48] and Defendants' early statements to market participants that ███████████████████ ████████████████████████[49]

Verifiability. Defendants' argument that their claims are verified because their hired expert "independently substantiated" them, Opp. at 48, misses the mark. Proving verifiability requires Defendants to provide sufficient evidence to the Court to show that their claims can be "verified by a third party," not a statement from a paid expert that he privately verified the claims. *See, e.g.*, *H&R Block*, 833 F. Supp. 2d at 91; *Wilhelmsen*, 341 F. Supp. 3d at 73.

Dr. Israel cannot meet the verifiability standard because he fails to identify the facts and assumptions used to calculate each efficiency so that the Court can assess them. PX8007 (Zmijewski Rebuttal Rpt.) ¶¶ 19-24. Instead, he recites Defendants' bases for each claim and asserts it is verifiable



[47] ███████████████████████████████████████████████████████████████████████ ██████████████████████████████████; PX8007 (Zmijewski Rebuttal Rpt.) Fig. R-2.

[48] PX8006 (Hill Rebuttal Rpt.) ¶¶ 145-151 & Fig. 30-34. Dr. Hill analyzed Defendants' pricing and output after the past transactions to which they point. He concluded that neither transaction led to reduced prices or higher output; rather, there is evidence that prices rose and output fell. Defendants have identified no contrary evidence.

[49] ██████████████; *see also* ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████); PX6012 at 99-101; PX6029 at 183 ("Q. Did they describe any benefits they thought would come out of the JV for MidAmerican? A. No. No. They described the benefits that would come out of -- between Arch and Peabody.").

based primarily on private phone calls with Defendants' employees. *See also* ████████████

███. But Dr. Israel's seal of approval on unidentified business judgments and assumptions is not a

substitute for independent verification. As the *Wilhelmsen* court explained when rejecting similar work

from Dr. Israel, "reference to the merging parties' past practices, managerial expertise and incentives, or

internal verification processes" cannot be used to verify efficiencies because "[t]he court cannot

substitute Defendants' assessments and projections for independent verification." 341 F. Supp. 3d at 73;

*see also H&R Block*, 833 F. Supp. 2d at 91.[50]

Defendants claim that they have achieved some level of cost savings in past transactions, but

they do not show how these efficiencies are relevant to their current claims. For example, the claim that

Arch saved costs in a prior transaction by ████████████████████████████, does

not support the unrelated claim that Defendants will successfully change their method of mining coal.

Moreover, in *Arch Coal*, the defendants claimed $130-$140 million in efficiencies, but Judge Bates

rejected the vast majority as "not merger specific," or "called into question as either nonexistent or

overstated," ultimately crediting only about one-third of Arch's claims. 329 F. Supp. 2d at 151, 153.

<u>Merger Specificity.</u>  Even where claims can be verified they must still be shown to be "merger

specific"; that is, that they "cannot be achieved by either company alone." *Sanford*, 926 F.3d at 965.

Defendants must show merger specificity for *each* claimed efficiency: for example, they must show why

it is "merger specific" for Arch to sell idle equipment to Peabody, when such a sale could obviously be

accomplished without combining operations. The FTC identified several examples of non-merger

specific efficiencies in its opening brief, Mot. at 43, and Plaintiffs' expert, Dr. Mark Zmijewski,

discussed others in his report.[51] Defendants fail to respond to any of the FTC's examples and barely

---

[50] There is no truth to Defendants' claim that their claimed efficiencies reflect only ████████████
████████████ Opp. at 46 n. 200 (quoting ████████████). Were that true, Defendants' claims
would not have shifted so dramatically throughout this case. PX8007 (Zmijewski Rebuttal Rpt.) ¶¶ 28-
34 (identifying shifting claims).
[51] PX8002 (Zmijewski Rpt.) ¶¶ 131-172. For example, Arch ████████████████

even mention merger specificity. Opp. at 49-50. They instead suggest that every cost saving they have identified—regardless of what it entails—must be merger specific because each Defendant has already "undergone significant restructurings designed to reduce their independent cost structures as much as possible." Opp. at 49-50. No court has ever accepted such an overbroad argument.

In an effort to avoid this settled law on pass-through, verifiability, and merger specificity, Defendants turn to *New York v. Deutsche Telekom AG*, No. 19 CIV. 5434, 2020 WL 635499 (S.D.N.Y. Feb. 11, 2020), but that decision does not help them. *Deustche Telekom* involved the State of New York's unsuccessful challenge—undertaken without the support of federal antitrust authorities—to the Sprint/T-Mobile merger. In that case, the court addressed a traditional efficiencies defense involving two smaller competitors joining forces to compete against the "two largest players" in the relevant market. *Id.* at *51. Peabody and Arch, by contrast, are the two largest players in the relevant market. Moreover, in *Deutsche Telekom*, one of the parties showed that, after a previous transaction, it lowered pricing from $60 to $50 and doubled the acquired brand's customers. *Id.* at *26. Here, past transactions did not result in lower prices or increased customers for Arch, demonstrating that any efficiencies that were achieved went straight to Arch's bottom line.

### C.  Defendants Fail to Support a "Power Buyer" Defense

Defendants cite no evidence that SPRB coal customers have "great economic power" or "formidable bargaining strength." Even if Defendants had presented a serious power buyer defense, that defense would fail, because "[t]he ability of large buyers to keep prices down . . . depends on the alternatives these large buyers have available to them." *Sysco*, 113 F. Supp. 3d at 48. "If a merger reduces alternatives, the power buyers' ability to constrain price . . . can be correspondingly

---

██████████████████████████  *Id.* ¶ 135. As Dr. Zmijewski explained, Arch does not need to form a JV with Peabody in order to get a lower price; it need only change its contracting strategy. *Id.*

diminished." *Id.*[52] The Eighth Circuit has recognized this logic, upholding the district court's rejection of a power buyer defense despite the presence of a dominant buyer with over 60% of the market. *Sanford*, 926 F.3d at 962, 965 (noting the district court's findings that "there was a relationship between market concentration after the merger and bargaining leverage" and that defendants could force the powerful buyer to choose between paying higher prices or exiting the market); *see also Penn State Hershey*, 838 F.3d at 346. As in *Wilhelmsen*, where the court rejected a "power buyer" defense, Defendants in the present case "have not identified any *new* strategy or alternative likely to emerge post-merger. . . . On the other hand, the FTC has shown that the merger will result in the loss of a proven strategy"—the ability to leverage competition between the two largest SPRB suppliers. 341 F. Supp. 3d at 71.[53]

## VI.    EQUITIES

The paramount public interest is "effective enforcement of the antitrust laws," and "Congress specifically had this public equity consideration in mind when it enacted" Section 13(b). *Heinz*, 246 F.3d at 726. Defendants identify no private equities that can outweigh that public interest. *See* Mot. at 44-45.

<u>**CONCLUSION**</u>

For the reasons set forth above, the FTC respectfully requests that the Court grant the requested preliminary injunction.

---

[52] *See also* Merger Guidelines § 8 ("Even buyers that can negotiate favorable terms may be harmed by an increase in market power. The Agencies examine the choices available to powerful buyers and how those choices likely would change due to the merger.").

[53] Defendants' cited cases are inapposite. *FTC v. Butterworth Health Corp.* rested largely on the court's conclusion that "nonprofit hospitals operate differently" and the defendants' boards were "comprised of prominent community and business leaders" who "have demonstrated their genuine commitment to serve the greater Grand Rapids community." 946 F. Supp. 1285, 1302 (W.D. Mich. 1996). This is inapplicable to Defendants, and finds scant support in precedent. In *Deutsche Telekom,* 2020 WL 635499, at *15, *33-39, a DOJ-sanctioned settlement agreement allowed firms outside the relevant market to enter the relevant market. Here there is no prospect of new entry. *United States v. Country Lake Foods*, *Inc.*, 754 F. Supp. 669, 679-80 (D. Minn. 1990), likewise depended on an entry theory.

Dated: July 8, 2020                     Respectfully Submitted,


                                        /s/ Daniel Matheson
                                        DANIEL MATHESON 502490 (DC)
                                        ELIZABETH ARENS
                                        TAYLOR ALEXANDER
                                        JEANINE BALBACH
                                        CHRISTOPHER CAPUTO
                                        AMY E. DOBRZYNSKI 5902855 (MD)
                                        E. ERIC ELMORE
                                        MICHAEL FRANCHAK
                                        JOSHUA GOODMAN
                                        SEAN HUGHTO
                                        PHILIP KEHL
                                        JONATHAN LASKEN
                                        STEPHEN SANTULLI
                                        CECELIA WALDECK

                                        Federal Trade Commission
                                        Bureau of Competition
                                        400 Seventh Street, S.W.
                                        Washington, DC 20024
                                        Telephone: (202) 326-2075
                                        Facsimile:  (202) 326-2286
                                        Email: dmatheson@ftc.gov

                                        *Attorneys for Plaintiff Federal Trade
                                        Commission*